UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal Number: |
| | : | |
| v. | : | VIOLATION: |
| | : | 18 U.S.C. § 371 |
| WILLIAM J. HEATON, | : | (Conspiracy) |
| | : | |
| Defendant. | : | |

INFORMATION

The United States charges that:

COUNT ONE

18 U.S.C. § 371 - Conspiracy

INTRODUCTION

The Defendant

1. From in or about September 2001 through in or about July 2006, Defendant WILLIAM J. HEATON was employed by then United States Congressman Robert W. Ney ("Ney"). From in or about September 2001 through in or about February 2002, HEATON served as the Executive Assistant for Ney. From in or about February 2002 through in or about July 2006, HEATON served as Chief of Staff for Ney. HEATON's duties as Chief of Staff included, at times, managing the personnel in Ney's office and approving on behalf of Ney the staff's receipt and use of tickets to sporting and entertainment events. On repeated occasions from in or about August 2002 through in or about April 2004, HEATON communicated with his coconspirators in furtherance of their conspiracy using interstate electronic email, interstate telephone calls, and government and commercial mail carriers.

<u>Congressman Robert W. Ney and His Staff</u>

2.  From January 1995 until November 2006, Ney served as an elected member of the U.S. House of Representatives for the 18th Congressional District in Ohio. From January 2001 until he resigned as Chairman in mid-January 2006, Ney served as the appointed Chairman of the House Committee on Administration ("House Administration Committee").

3.  When HEATON began working in Ney's office, Neil Volz was employed as Chief of Staff for Ney. In February 2002, Volz quit his position on Ney's staff and was replaced by HEATON. Volz went to work with Jack Abramoff as a lobbyist after he left Ney's office.

<u>The Lobbyists and Their Clients</u>

4.  Beginning in or about 1994 and continuing until March 2004, Jack Abramoff was a lobbyist in Washington, D.C. Abramoff worked with other lobbyists, including Tony C. Rudy and Michael P.S. Scanlon, to represent Native American Indian Tribes, Commonwealths, foreign governments, businesses, and individuals, primarily in matters involving the United States Congress and federal departments and agencies. A significant portion of his work involved lobbying Members of Congress on behalf of Native American Indian Tribes operating or interested in operating gambling casinos throughout the United States. At various times from 2000 to approximately 2005, Abramoff owned or controlled a number of business interests, including a boat-based casino business in Florida and a Washington, D.C., restaurant, Signatures. During the same time, Abramoff controlled luxury box suites in the MCI Center Arena in

Washington, D.C. (now known as the Verizon Center), FedEx Field in Maryland, and Camden Yards Stadium in Maryland.

The Foreign Businessman

5. Beginning at least as early as January 2003, a foreign businessman (the "Foreign Businessman") owned and operated a business with offices in London, England, and through which the Foreign Businessman sought to sell U.S.-made airplanes and airplane parts to a certain foreign country. U.S. laws prohibited, at all times relevant to this Information, the exportation or sale of U.S.-made airplanes and airplane parts to this foreign country. The Foreign Businessman sought an exemption to or modification of these laws as well as a visa for travel to the United States.

Rules of the House of Representatives

6. At all relevant times, the Rules of the House of Representatives (the "Rules"):

   a. prohibited gifts to Members of Congress and staff members of more than $50 at one time, and a total of $100 per year from one source, except under limited circumstances;

   b. required that an exemption be sought from the Ethics Committee to receive more than $250 worth of gifts annually from anyone considered a personal friend. HEATON neither sought nor received such an exemption for gifts from Abramoff, his lobbyists, or the Foreign Businessman;

   c. required that Members of the House and staff members at or above a certain salary threshold publicly file and certify as true and accurate Annual Financial Disclosure Statements with the Clerk of the House reporting detailed financial

information. HEATON was required to file Annual Financial Disclosure Statements;

d. prohibited trips paid for by private sources, unless the trip had an official purpose, and prohibited all trips paid for by lobbyists regardless of the purpose; and

e. required that Travel Disclosure Forms containing detailed information about the purpose, cost, and sponsor of any trip paid for by private sources be publicly filed with the Clerk of the House within 30 days after any trips taken by Members of Congress or their staff and paid for by private entities or persons. The Rules also required that each Travel Disclosure Form be signed by the Member for Member travel or by the staffer and Member for staff travel, with a certification that the trip was in connection with official duties and that it "would not create the appearance ... of using public office for private gain."

## THE CONSPIRACY AND ITS OBJECTS

7. From in or about August 2002 through in or about April 2004, in the District of Columbia, and elsewhere, the defendant,

**WILLIAM J. HEATON,**

did knowingly conspire, confederate and agree with Abramoff, Ney, Volz, the Foreign Businessman, and other persons known and unknown to the United States to commit offenses against the United States, that is, to devise a scheme and artifice to defraud and deprive the House of Representatives and the people of the United States of their right to the honest services of HEATON, Ney, and Ney's staff performed free from deceit, fraud, concealment, bias, conflict of interest, self enrichment and self dealing and to use the

mails and interstate wires in furtherance of the conspiracy, in that HEATON, Ney, and Ney's staff accepted from Abramoff, lobbyists working with Abramoff (collectively referred to as "his lobbyists"), and the Foreign Businessman a stream of things of value intending to be influenced to take and to be rewarded for taking a stream of favorable official action in violation of 18 U.S.C. §§ 1341, 1343, 1346 and 2.

## PURPOSES OF THE CONSPIRACY

8. It was a purpose of the conspiracy for HEATON and Ney to enrich themselves and Ney's staff by using and agreeing to use their official positions and by performing and agreeing to perform official acts in return for a stream of things of value flowing to HEATON, Ney, and Ney's staff from Abramoff, his lobbyists, and the Foreign Businessman.

9. It was a further purpose of the conspiracy for HEATON, Ney, and Ney's staff to enrich Abramoff, his lobbyists, and the Foreign Businessman by providing favorable action to them and their clients.

10. It was a further purpose of the conspiracy to conceal from the House of Representatives, the citizens of the 18th Congressional District of Ohio, and the people of the United States the things of value HEATON, Ney, and Ney's staff received from Abramoff, his lobbyists, and the Foreign Businessman, to conceal the manner and the degree to which HEATON, Ney, and Ney's staff were enriched by Abramoff, his lobbyists, and the Foreign Businessman, and to conceal the ways in which HEATON, Ney, and Ney's staff had used and offered to use their official positions to benefit Abramoff, his lobbyists, and the Foreign Businessman.

## MANNER AND MEANS

11. The conspiracy was carried out through the following manner and means:

   a. HEATON and Ney solicited and accepted a stream of things of value from Abramoff and his lobbyists, including overseas and domestic trips, meals and drinks, golf, tickets to professional sporting events and concerts, and monetary and in-kind campaign contributions from Abramoff, his lobbyists, and their clients. Ney controlled the receipt of things of value by his personal office staff and the House Administration Committee staff as a way to reward and punish staff by approving their receipt of things of value or by taking things of value and redistributing them to others. HEATON, on behalf of Ney, occasionally approved the staff's receipt and use of tickets to sporting and entertainment events.

   b. In exchange for this stream of things of value, HEATON, Ney, and Ney's staff provided and agreed to provide a stream of favorable official action to, and to use their influence on behalf of, Abramoff, his lobbyists, and their clients, none of whom were Ohio-based.

   c. HEATON and Ney solicited and accepted things of value from the Foreign Businessman, who was seeking official action from Ney, including meals and gambling chips.

   d. HEATON and Ney concealed the things of value they received from Abramoff, his lobbyists, and the Foreign Businessman by failing to report them or by misrepresenting their nature and value, in contravention of the disclosure requirements contained in federal statutes and the Rules of the House of

Representatives, and by Ney's failure to report fully and accurately the in-kind campaign contributions received from Abramoff and his lobbyists.

## OVERT ACTS

In furtherance of the conspiracy and to achieve its purposes, HEATON and his co-conspirators committed the following overt acts, among others, in the District of Columbia and elsewhere:

### Stream of Things of Value Provided to HEATON, Ney, and Ney's Staff from Abramoff, His Lobbyist Associates, and the Foreign Businessman

12. From on or about August 3, 2002, through on or about August 10, 2002, HEATON, Ney, and another of Ney's staff joined Abramoff, Volz, and four others on an all-expense-paid trip to Scotland to play golf on world famous courses. All expenses for the trip were paid through Abramoff, including approximately $50,000 in funds raised by a Native American Indian Tribal client of Abramoff's ("Texas Tribe #1"). The trip included a private jet from Maryland to Scotland and from Scotland to London, commercial airline tickets to return to Washington, D.C., from London, luxury accommodations in Scotland and London, daily golf at St. Andrews and other famous courses in Scotland, meals, drinks, and local transportation. The trip costs for the entire group exceeded $160,000.

13. From on or about May 9, 2003, through on or about May 12, 2003, HEATON and Ney traveled with Volz and another lobbyist to New Orleans for an all-expense-paid, three-night stay, which included a visit on the final day to the reservation of one of Abramoff's Native American Indian Tribal clients in Louisiana. The trip costs for the group exceeded $7,200, which costs were reimbursed through Abramoff's lobbying firm.

7

14. From on or about August 24, 2003, through on or about August 27, 2003, HEATON, Ney, and another Ney staff member spent a two-night vacation at the Sagamore Resort in Lake George, New York, with Volz and another lobbyist paying for more than $3,500 in expenses incurred for lodging, a boat rental, a chartered town car, meals, drinks, and golf. Volz's share of the costs was reimbursed through Abramoff's lobbying firm.

15. From at least in or about August 2002 until March 2004, HEATON, Ney, and members of Ney's staff, with Ney's knowledge and consent, solicited and received numerous expensive tickets to Washington, D.C.-area sporting and entertainment events. For example, on or about November 12, 2003, Volz offered to HEATON, Ney, and others tickets to Abramoff's luxury box suite at the MCI Center arena for an upcoming Washington Wizard's basketball game. On or about November 19, 2003, HEATON emailed Volz, directing him to purchase certain beverages for the event.

16. From in or about August 2002 until March 2004, HEATON, Ney, and Ney's staff regularly solicited and accepted meals and drinks paid for by Abramoff and his lobbyists. For example, on or about November 21, 2003, HEATON emailed Volz about an upcoming party he was hosting, telling Volz that another Abramoff lobbyist had offered to cover the costs of the party and asking how much money HEATON could expect the other lobbyist to contribute.

17. On or about August 29, 2003, HEATON, Ney, and another staff member traveled to London and met with the Foreign Businessman. Throughout the evening of August 29 and the early morning of August 30, 2003, the Foreign Businessman provided to HEATON, Ney, and the other staff member on multiple occasions thousands of dollars

worth of gambling chips for use at various private casinos of which the Foreign Businessman was a member and to which the Foreign Businessman accompanied HEATON, Ney, and the other staff member. Neither HEATON nor anyone else ever returned any of the free chips to the Foreign Businessman or shared with the Foreign Businessman any of the money they had won as a result of the thousands of dollars worth of chips that the Foreign Businessman had given to them. HEATON imported into the United States approximately $5,000 he had obtained from gambling with the Foreign Businessman's money on August 29, 2003.

**Stream of Official Acts and Influence by HEATON, Ney, and Ney's Staff**

18. From March 2002 through at least on or about October 4, 2002, Ney agreed that, as the Co-Chairman of a Conference Committee of House and Senate Members of Congress involving election reform legislation known as the Help America Vote Act ("HAVA"), he would insert a variety of amendments into the HAVA at Abramoff's request as follows:

   a. Ney agreed to insert an amendment to lift an existing federal ban against commercial gaming by a Texas Native American Indian Tribal client of Abramoff ("Texas Tribe #1");

   b. Ney agreed to insert an amendment to lift an existing federal ban against commercial gaming by another Texas Native American Indian Tribe ("Texas Tribe #2");

   c. Ney agreed to insert an amendment to allow a foreign-beverage-distiller client of Abramoff's lobbying firm to label its product as "Made in Russia" when that client's product was to be distilled in a former Soviet Republic; and

  d. Ney agreed to insert an amendment causing the General Services Administration to transfer property in its inventory to a religious school founded by Abramoff.

19. To assist Ney in carrying out his corrupt agreements, HEATON agreed to take and took a variety of official action to aid Texas Tribe #1. For example, on or about August 2, 2002, which was the day before HEATON and Ney left on the Scotland golf trip paid for in part using money raised by Texas Tribe #1, HEATON emailed Abramoff, offering to have Ney "say or do" what Abramoff wanted in an upcoming meeting with representatives of Texas Tribe #1. After returning from the Scotland golf trip, HEATON provided regular updates to Volz and Abramoff regarding the status of the HAVA Conference Committee negotiations, enabling Abramoff to coordinate other measures he had taken to maximize the chance that Ney would successfully insert the amendment sought by Texas Tribe #1.

20. HEATON agreed to take and took a variety of official action to aid Abramoff's Russian clients. For example, on or about July 30, 2003, HEATON told Volz that he had contacted the State Department regarding a visa for travel to the United States for the daughter of one of Abramoff's Russian clients. Subsequently, HEATON traveled to Russia with Ney as part of a Congressional Delegation and, while there, he followed up with the American Consulate regarding the visa. After returning to the United States from Moscow, on or about August 12, 2003, HEATON placed an interstate telephone call to Russia "to walk [Abramoff's Russian client] through the process" for obtaining the travel visa.

21. From in or about August 2002 through 2003, Ney, with HEATON's knowing assistance, met with and praised Abramoff and his lobbyists to clients, both actual and potential, in an effort to maintain and enhance Abramoff's lobbying practice.

**Concealment of Relationship with Abramoff, his Lobbyists, and the Foreign Businessman from the U.S. House of Representatives and the Public**

22. On or about September 9, 2002, HEATON prepared Ney's Member Travel Disclosure Form for the August 2002 Scotland golf trip using figures and descriptions suggested to him by Volz. On Ney's form, HEATON substantially under-reported the value of what Ney received from Abramoff and his clients and mischaracterized the purpose of the trip. Ney signed the form, certifying that the "travel was in connection with my duties as a Member ... and would not create the appearance that I am using public office for private gain." On or about September 3, 2004, HEATON filed the form with the House of Representatives, knowing that representations on the form were false.

23. On or about May 15, 2003, HEATON caused to be filed his Annual Financial Disclosure Statement for calendar year 2002 in which he mischaracterized the Scotland golf trip as being for an official purpose. Heaton also failed to disclose as gifts the golf expenses from the Scotland trip as well as the tickets, meals, and entertainment provided by Abramoff and his lobbyists.

24. On or about May 17, 2004, HEATON filed an Annual Financial Disclosure Statement for calendar year 2003 that failed to disclose his receipt of thousands of dollars worth of gambling chips from the Foreign Business Man as well as trips, tickets, meals, and entertainment provided by Abramoff and his lobbyists.

**(All in violation of Title 18, United States Code, Section 371.)**

Dated: 2/26/07

EDWARD C. NUCCI
Acting Chief, Public Integrity Section

STEVEN A. TYRRELL
Acting Chief, Fraud Section

Mary K. Butler
James A. Crowell IV
M. Kendall Day
Trial Attorneys
Criminal Division
U.S. Department of Justice