United States of America

vs.

William J Heaton

ATTACHMENT A

FACTUAL BASIS FOR THE PLEA
OF WILLIAM J. HEATON

CR 07-042-(ESH)

FILED
FEB 2 6 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

This statement is submitted to provide a factual basis for my plea of guilty to the conspiracy charge filed against me.

Congressman Robert W. Ney

1. From January 1995 until November 2006, Robert W. Ney served as an elected member of the U.S. House of Representatives for the 18th Congressional District in Ohio. From January 2001 until he resigned as Chairman in mid-January 2006, Ney served as the appointed Chairman of the House Committee on Administration ("House Administration Committee").

Ney's Staff

2. From in or about September 2001 through in or about July 2006, Defendant WILLIAM J. HEATON was employed by Congressman Ney. From in or about September 2001 through in or about February 2002, HEATON served as the Executive Assistant for Ney. From in or about February 2002 through in or about July 2006, HEATON served as Chief of Staff for Ney. HEATON's duties as Chief of Staff included, at times, managing the personnel in Ney's office and approving on behalf of Ney the staff's receipt and use of tickets to sporting and entertainment events. On repeated occasions from in or about August 2002 through in or about April 2004, HEATON communicated with his coconspirators in furtherance of their conspiracy using interstate electronic email, interstate telephone calls, and government and commercial mail carriers.

3. When HEATON began working in Ney's office, Neil Volz was employed as Chief of Staff for Ney. In February 2002, Volz quit his position on Ney's staff and was replaced by HEATON. Volz went to work with Jack Abramoff as a lobbyist after he left Ney's office.

The Lobbyists and Their Clients

4. When HEATON began working in Ney's office, Jack Abramoff was a lobbyist in Washington, D.C. HEATON knew that Abramoff represented Native American Indian Tribes, businesses, and individuals in matters involving the United States Congress and federal departments and agencies. Abramoff owned or controlled a number of business interests, including a Washington, D.C., restaurant, Signatures. Abramoff also controlled luxury box suites at the MCI Center Arena in Washington, D.C. (now known as the Verizon Center), FedEx Field in Maryland, and Camden Yards Stadium in Maryland.

5. When HEATON began working in Ney's office, Michael P.S. Scanlon worked with Abramoff to represent Native American Indian Tribes operating or interested in operating gambling casinos.

6. In January 2001, Tony C. Rudy began working with Abramoff as a lobbyist, a position he held through July 2002.

The Foreign Businessman

7. Beginning at least as early as January 2003, a foreign businessman (the "Foreign Businessman") sought to sell U.S.-made airplanes and airplane parts abroad. The Foreign Businessman hired Washington, D.C., based lobbyists to pursue an exemption to, or modification of, United States laws prohibiting the sale of these airplanes and parts to businesses in a foreign country. He also sought a visa to enter the United States.

Scheme to Defraud the House of Representatives
and the Public of HEATON and Ney's Honest Services

8.  Beginning in or about August 2002 and continuing through in or about April 2004, HEATON joined in a conspiracy involving Ney and others, using mail and interstate wire communications, to deprive the public of the honest services of HEATON, Ney, and Ney's staff. That is, HEATON and Ney corruptly solicited and accepted a stream of things of value from Abramoff, Scanlon, Volz, Rudy, other lobbyists working for Abramoff (collectively referred to as "Abramoff and his lobbyists"), and from the Foreign Businessman, with the intent to be influenced and induced to have Ney and his staff take a series of official actions and to agree to perform a series of official actions. Abramoff and his lobbyists, the Foreign Businessman, and others provided the stream of things of value knowing that it was received by Ney and his staff with the intent to be influenced and induced to take official action.

9.  As part of the conspiracy described in paragraph 8, the stream of things of value solicited and accepted by HEATON, Ney, and others, and paid for by Abramoff, his lobbyists, and their clients in exchange for the stream of official action, included, but was not limited to, the following:

    a.  an all-expense-paid trip to play golf with HEATON, Ney, and six others in Scotland in August 2002, with total trip costs exceeding $160,000; an all-expense-paid trip to gamble, vacation, and tour the reservation of one of Abramoff's Native American Tribal clients with HEATON, Ney, and two others in New Orleans in May 2003, with total trip costs of approximately $7,200; and a reduced-price trip to vacation with HEATON, Ney, and three others at Lake

3

George, New York, in August 2003, with more than $3,500 of the trip costs paid by the lobbyists;

b. numerous meals and drinks at Washington, D.C., area restaurants, including an open bar tab at Signatures restaurant for the use of Ney and HEATON;

c. numerous tickets for HEATON, Ney, and Ney's staff to use Abramoff's box suites to attend sporting events and concerts in the Washington, D.C., area;

d. substantial campaign contributions from Abramoff's clients for whom Ney had agreed to perform official acts; and

e. in-kind campaign contributions in the form of the free use of, catering for, and tickets to Abramoff's luxury box suites at the MCI Center Arena and Camden Yards Stadium or Signatures restaurant on at least eight occasions for political fundraisers, which HEATON had reason to believe were not properly reported.

10. Ney, with HEATON's knowing assistance, took and agreed to take a stream of official action benefitting Abramoff and his lobbyists and their clients, none of whom were Ohio-based. The stream of official action taken or agreed to be taken by HEATON and Ney included, but was not limited to, the following:

a. Ney agreed to garner support for, support, and oppose legislation at Abramoff's request, including agreeing to insert an amendment on behalf of a Texas Native American Tribal client of Abramoff ("Texas Tribe #1") into the election reform legislation known as the Help America Vote Act ("HAVA"). After HEATON knowingly joined the conspiracy in August 2002, he took a number of steps to assist Ney in this corrupt agreement, including by, on or about August 2, 2002,

4

        offering to have Ney "say or do" what Abramoff requested in a meeting with representatives of Texas Tribe #1;

  b.    At various times from August 2002 through 2003, Ney, with HEATON's assistance, contacted personnel in United States Executive Branch agencies and offices in an effort to influence decisions of those agencies and offices at the request of Abramoff and his lobbyists, including contacting the State Department on multiple occasions in order to help an Abramoff client obtain a visa to travel to the United States; and

  c.    From August 2002 through 2003, Ney, with HEATON's assistance, met with and praised Abramoff and his lobbyists to clients, both actual and potential, in an effort to maintain and enhance Abramoff's lobbying practice.

11.    As part of the conspiracy described in paragraph 8, in return for the official action agreed to and taken by Ney on behalf of the Foreign Businessman, the things of value solicited and accepted by HEATON and Ney from the Foreign Businessman included, but were not limited to, the following:

  a.    In July or August 2003, Ney arranged for himself, HEATON, and another staff member to meet with the Foreign Businessman during a stopover in London so that they could gamble with him and receive free gambling chips from him;

  b.    On August 29, 2003, HEATON, Ney, and the other staff member traveled to London for a one-night stopover and the Foreign Businessman furnished HEATON, Ney, and the other staff member with thousands of dollars worth of gambling chips for use at various private casinos. The three public officials never

   returned any of the free gambling chips to the Foreign Businessman and never shared with the Foreign Businessman any of the money they won using the thousands of dollars worth of gambling chips that the Foreign Businessman had given to them. At the end of the evening, Ney received approximately $47,000 worth of British pounds, and HEATON received approximately $5,000 worth of British pounds;

 c. Following the August trip, HEATON and Ney took several steps to conceal the source and true amount of money Ney received while gambling. For example, as HEATON was aware, Ney gave approximately $5,000 worth of British pounds to another staff member to carry through the U.S. Customs Service checkpoint in Dulles, Virginia, so that Ney could carry and report a lower dollar amount to Customs Service officials upon reentry into the United States. On behalf of Ney, HEATON stored this money in the safe in Ney's Congressional Office, opening the safe as requested so that Ney could make repeated withdrawals; and

 d. HEATON helped Ney conceal the true amount of money Ney had received, knowing that Ney had been asked to take official action on behalf of the Foreign Businessman.

Concealment of the Corrupt Scheme
from the House of Representatives and the Public

12. As part of the conspiracy described in paragraph 8, HEATON and Ney knowingly concealed and misrepresented material facts regarding their receipt of the stream of things of value from Abramoff, Abramoff's lobbyists, and the Foreign Businessman by, among other things, falsifying the following forms:

6

a. Ney's Travel Disclosure Form for Scotland: On September 9, 2002, HEATON prepared Ney's Member Travel Disclosure Form for the August 2002 Scotland golf trip using figures and descriptions suggested to him by Volz. On Ney's form, HEATON substantially under-reported the value of what he received from Abramoff and his clients and mischaracterized the purpose of the trip. Ney signed the form, certifying that the "travel was in connection with my duties as a Member ... and would not create the appearance that I am using public office for private gain." On September 3, 2004, HEATON filed the form with the House of Representatives, knowing that representations on the form were false;

b. HEATON's 2002 Financial Disclosure Form: On May 15, 2003, HEATON signed and caused to be filed his Annual Financial Disclosure Statement for calendar year 2002. On his form, HEATON made the same false statements that Ney had made on his 2002 Financial Disclosure Form, namely mischaracterizing the purpose of the Scotland golf trip, and failing to disclose as gifts the golf expenses from the Scotland trip, as well as the tickets, meals, and entertainment provided by Abramoff, Volz, and other lobbyists working with Abramoff; and

c. HEATON's 2003 Financial Disclosure Form: On May 17, 2004, HEATON filed an Annual Financial Disclosure Form for 2003. On his form, HEATON made the same false statements that Ney had made on his 2003 Financial Disclosure Form, namely failing to disclose his receipt of thousands of dollars worth of gambling chips from the Foreign Businessman as well as the New Orleans and Lake George trips, tickets, meals, and entertainment provided by Abramoff, Volz, and other lobbyists working with Abramoff.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the conspiracy charge against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crime charged.

DATE: 2/12/07

*William J. Heaton*
WILLIAM J. HEATON

John N. Nassikas, Esq.
Timothy Kane, Esq.
Counsel for Defendant

8