## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **1:07CR42 (ESH)** |
| | : | |
| | : | |
| **WILLIAM J. HEATON,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## DEFENDANT WILLIAM HEATON'S
## <u>MEMORANDUM IN AID OF SENTENCING</u>

In accordance with this Court's order of May 23, 2007, Defendant William Heaton, by counsel, respectfully submits this Memorandum in Aid of Sentencing.  Mr. Heaton and the government agree that a sentence of incarceration is not warranted in light of Mr. Heaton's substantial assistance in the government's investigation and prosecution of others implicated in the Jack Abramoff scandal.  In its Substantial Assistance Memorandum ("Government Memorandum"), the government requested a five-level reduction in Mr. Heaton's offense level and recommended that any sentence of incarceration be satisfied through home confinement.  Moreover, as discussed below, Mr. Heaton's youth, good character, sincere remorse, role as a subordinate to Congressman Ney, and the harsh consequences he already has incurred – among the key sentencing factors the Court considers under 18 U.S.C. § 3553(a) – weigh heavily against any sentence of incarceration.  We therefore respectfully request that the Court sentence Mr. Heaton to some combination of community service, home confinement, and/or supervision so that Mr. Heaton may serve his sentence while continuing to contribute to society.

## I.     INTRODUCTION

In August 2001, about a year after he graduated from college, Will Heaton was hired by Congressman Bob Ney.  (Gov't Mem. at 1.)  Widely described as earnest, moral, and at times naive, Mr. Heaton was quickly realizing his dream of serving his country by working on Capitol Hill.  (*See, e.g.*, Letter from Karen Haas, attached as Ex. 20; Letter from former Congressman Edward Pease, attached as Ex. 41.)  For six months, Mr. Heaton worked as Mr. Ney's executive assistant and then, in February 2002, the Congressman promoted Mr. Heaton to the position of Chief of Staff – despite Mr. Heaton's initial rejection of the offer because of his own sense that he lacked the necessary experience.  (*See* Peggy Sampson Ltr., Ex. 47;  Karen Haas Ltr., Ex. 20.)  Just 23 years old, Mr. Heaton became the youngest chief of staff on Capitol Hill.  (*See* Gov't Mem. at 1; Robert Knapp Ltr., Ex. 35.)

As the record in this investigation makes clear, Congressman Ney was a corrupt, deceitful, and manipulative public official who sought and established improper relationships with lobbyists and others for personal and political gain.  Mr. Ney intentionally hired and quickly promoted young, inexperienced staffers – who did not receive any formal ethics training from Congress – so that the staffers would have neither the knowledge nor the maturity to question Ney's conduct.  (*See* Gov't Mem. at 1-2; *see also* Theodore Van Der Meid Ltr., Ex. 52.)  Indeed, Mr. Ney stated as much to another conspirator in explaining his promotion of Mr. Heaton. (Gov't Mem. at 1-2.)  Former Congressman Ney is currently in prison at the Federal Correctional Institute in Morgantown, West Virginia.

As he now deeply regrets, Will Heaton continued working for Congressman Ney even after he witnessed and recognized the Congressman's corruption.  (*See* Will Heaton Ltr., Ex. 1.)

Instead of speaking up or simply walking away from his job, Mr. Heaton tolerated the Congressman's misconduct and even, at times, participated in it. (*Id.*)

Congressman Ney's corrupt relationship with Jack Abramoff and other lobbyists eventually attracted scrutiny from the national media and the United States Department of Justice ("DOJ"). By the spring of 2006, DOJ prosecutors had subpoenaed thousands of documents from Ney's office and numerous Ney staffers for grand jury testimony. The investigation was massive and far reaching, implicating not only Congressman Ney but also other Congressmen, staffers, executive branch officials, and lobbyists.

On the evening of June 19, 2006, the government covertly recorded a telephone call to Mr. Heaton from a more junior (though older) Ney staffer. With the guidance of FBI agents and DOJ prosecutors, the staffer talked about conduct under investigation, claimed that his lawyers were pressing him for information he did not want to reveal, and repeatedly asked Mr. Heaton for guidance on what to do and what to say.

In response to the staffer's entreaties, Mr. Heaton displayed the integrity and moral character that so strikingly differentiate him from the other public officials and lobbyists prosecuted in this scandal. Repeatedly and emotionally refusing the staffer's invitations for guidance, Mr. Heaton pointedly warned the staffer against trying "to cover something up." Instead, Mr. Heaton told the staffer, "you need to talk to [your lawyers] and you need to trust them and you need to go forward with that … I can't tell you what to do." When the staffer kept asking, "[w]hat am I supposed to say," Mr. Heaton told him, "the truth is what the truth is."

The recorded conversation offers an unchoreographed snapshot of Mr. Heaton's good character – a picture unanimously confirmed by the myriad letters addressed to this Court from Mr. Heaton's former colleagues on Capitol Hill, from his former teachers, from clergymen, from

childhood friends, from his high school principal, from family relations near and far, and even from the government prosecutors in their sentencing memorandum to the Court. Indeed, instead of providing evidence of obstruction of justice against Mr. Heaton, the recorded conversation presented to the government prosecution team a staffer who – except for his conduct in this case – was conscientious and honest and thus could substantially assist their efforts to prosecute Congressman Ney and others. Before the end of June 2006, Mr. Heaton began cooperating proactively with government prosecutors and investigators.

As the government attests, Mr. Heaton's cooperation was "exceptionally important" in bringing about former Congressman Ney's guilty plea. (Gov't Mem. at 6.) At the government's request, Mr. Heaton actively cooperated against the Congressman including through recordings of telephone conversations and a face-to-face meeting, participated in many hours of debriefings, and provided documents that the government had been unable to obtain from any other source. (*Id*. at 3-5.) Mr. Heaton's cooperation with the government was demanding, extensive, and extremely valuable. (*See id.*)

In light of Mr. Heaton's extraordinary and valuable cooperation, his subservient role to Congressman Ney, his sincere remorse, his youth, and his character, a sentence of incarceration in this case would serve no purpose and, instead, would discourage similarly situated staffers from cooperating with prosecutors in the future. For these reasons, and as discussed in more detail below, Mr. Heaton requests that his sentence be a combination of community service, home confinement, and/or supervision that will permit Mr. Heaton to atone for his misconduct by working to help others.

## II.    DISCUSSION

In the Plea Agreement, Mr. Heaton and the government agreed to recommend an advisory sentencing calculation, before the § 5K1.1 reduction, within the sentencing guidelines range. In addition, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining the appropriate sentence. *See United States v. Dorcely*, 454 F.3d 366, 374 (D.C. Cir. 2006). The sentence must be adequate "but not greater than necessary" to comply with the relevant purposes and factors set forth in the statute. 18 U.S.C. § 3553(a). The principal section 3553 factors relevant to this case are Mr. Heaton's personal history and characteristics, the nature and circumstances of the offense, the need for a just punishment, and the deterrence of criminal conduct. These factors demonstrate that incarcerating Mr. Heaton would serve no worthwhile purpose. The government's dual interests in appropriate punishment and effective deterrence are more than amply met without incarceration, as the government itself agrees. Instead, the Court should sentence Mr. Heaton to a combination of community service, home confinement, and/or supervision that will enable Mr. Heaton to remain a contributing member of our society.

Mr. Heaton has reviewed the Presentence Report ("PSR") prepared in this matter and agrees with the information and recommendations contained in that report. In addition, for the Court's information and assistance, Mr. Heaton submits the attached letters from himself, his family members, friends, former teachers, clergymen, and former colleagues.

### A.    Will Heaton's Background and Character

Will Heaton was born in Aiken, South Carolina, on July 17, 1978, the oldest child of Deborah and Daniel Heaton. (*See* PSR, at 10.) Will's brother, Brian, was born 15 months later, and their sister, Mary, 15 months after that. (*Id.*) By all accounts, the Heatons were a loving, traditional, and devout Catholic family. (*See, e.g.*, Friar Conall McHugh Ltr., Ex. 39.) As a

factory manager in the textile industry, Dan worked long hours and often traveled out of town, but his salary permitted Debbie to stay at home with the children during their early years, before she returned to teaching kindergarten when the children grew older.  (*See* Deborah Heaton Ltr., Ex. 23.)

Will was a painfully shy and endearingly fastidious and caring child.  (*See id.*)  Rarely competitive and never bullying, Will had close relationships with Brian and Mary, and they looked up to him with admiration and affection.  (*See id.*; *see also* Brian Heaton Ltr., Ex. 21; Mary Heaton Ltr., Ex. 25.)  Though extremely loving and nurturing, Dan and Debbie were also quite strict with their children.  Will, Brian, and Mary were expected to live their faith each day, to treat others with kindness, to speak honestly and respectfully, and to accept punishment humbly when they misbehaved.  In adolescence, that meant one hour of chores for each minute after curfew that they arrived home.  (*See* Daniel Heaton Ltr., Ex. 22.)  But throughout childhood and adolescence, the punishments were rare.  (*See id.*)  Before this prosecution, the worst trouble Will had ever been in was during the eighth grade when he joined in a prank that ended with the bumper of a teacher's car being dented.  (Deborah Heaton Ltr., Ex. 23.)

Dan's job caused the family to relocate several times.  (Daniel Heaton Ltr., Ex. 22.)  The last time, as Will was entering the eighth grade, they moved from Wisconsin to North Carolina.  (*Id.*)  Will had always been a good student and well-liked by his classmates, but he constantly had struggled with shyness around his peers.  (*Id.*)  Eminently earnest and with the endorsement of his parents, Will simply decided, when the family moved to North Carolina, that he would no longer be shy.  (Deborah Heaton Ltr., Ex. 23.)

His decision presented a significant challenge.  Will was not competitive, he was openly devout, and he felt at ease following the rules – not the usual ingredients of teenage popularity.

But Will nonetheless became widely admired both by his peers and by adults, because of his guileless manner, his simple kindness, and his rare maturity.  (*See, e.g*., Michael Streich Ltr., Ex. 50; Robert Gates Ltr., Ex. 18.)  He handled conflicts with a deftness unusual in any setting, least of all in high school.  (*See* Mary Heaton Ltr., Ex. 25.)  He enjoyed helping others but avoided calling attention to himself for it.  (*See* Jeffrey Pojanowski Ltr., Ex. 42.)  He related to teachers and administrators with the same straightforwardness that he related to his peers.  (*See* Michael Streich Ltr., Ex. 50.)  As the Heaton family settled into North Carolina, Will's shyness matured into humility, and his kindness grew into purpose.

As his peers grew to admire Will and to recognize his natural leadership qualities, Will was developing a passion for American politics and political history.  He voraciously read books on American history, and he idolized American historical figures.  (*See* Peter Sinclair Ltr., Ex. 49.)  As a tenth grader, he participated in Harvard University's "Model Congress," where he won an award for excellence.  (*See* Michael Streich Ltr., Ex. 50.)  The experience in the Model Congress led Will to learn about the United States Congressional Page program, and Will immediately set his sights on spending his junior year in Washington as a page.  With the blessing of his parents and his school, Will applied and was accepted to the page program.  (*See* Deborah Heaton Ltr., Ex. 23.)

Will spent his entire junior year of high school in the page program where he made a strong impression on other pages and program administrators alike.  (*See* Robert Gates Ltr., Ex. 18; Peggy Sampson Ltr., Ex. 47.)  The pages voted Will as having the "Best Overall Personality," and they elected him as a representative of their dormitory.  (Tatum Evans and Todd Mayberry Ltr., Ex. 16.)  He impressed them by giving up prized positions in the program to allow others to have them.  (*Id*.)  Program administrators considered him to be one of the

finest pages they had ever known, a hard worker with high morals.  (*See* Peggy Sampson Ltr., Ex. 47.)

For Will's part, the experience confirmed his passionate feelings about the United States government.  The honor and allure of working on Capitol Hill, surrounded by men and women he idolized, working for the common good, left a deep impression on Will.  He came to see the men and women working on Capitol Hill as genuine heroes.  (*See* Peter Sinclair Ltr., Ex. 49.)

Will returned to North Carolina for his senior year of high school where he had been elected, in absentia, as President of the student body.  (Michael Streich Ltr., Ex. 50.)  He was elected a member of the National Honor Society.  (*Id*.)  After graduating high school ranked fourth in his class, Will attended the College of William and Mary, where, fittingly, he majored in government.  (*See* PSR, at 12.)  While in college, Will continued to impress people with his kindness and integrity.  For three years, he volunteered as a literacy tutor for illiterate adults, not only tutoring his students but befriending them and seeking to be a positive force in their lives.  (*See* Peter Sinclair Ltr., Ex. 49.)  Will's college friends used him as a touchstone for wise guidance.  When facing difficult situations, friends turned to Will for advice, and Will went out of his way to provide them support.  (*Id*.)  During college, Will met Katie Knapp, and they began a long relationship that culminated in marriage last year.  (Kathryn Knapp Ltr., Ex. 33.)

As college ended, Will was drawn again to public service.  He dreamed of entering the Peace Corps, but after going through the long application process, a health condition prevented him from joining.  (Michael Streich Ltr., Ex. 50.)  He also considered teaching in an inner city school or becoming a fire jumper out west, but ultimately, the allure of working on Capitol Hill proved irresistible.  (*Id*.; Deborah Heaton Ltr., Ex. 23.)  As one of the outstanding Congressional pages five years earlier, Will now had the opportunity to return to Congress and work in the

cloakroom of the House of Representatives. (Karen Haas Ltr., Ex. 20.) In the summer of 2000, Will graduated from William and Mary and again moved north to the city that embodied his highest ideals, the city of his heroes. He seemed on the verge of great things.

**B.      The Nature and Circumstances of the Offense**

In respectfully urging this Court not to order Mr. Heaton to be incarcerated, defense counsel call to the Court's attention three unique circumstances of this offense: Mr. Heaton's youth and inexperience; his sense of duty and loyalty as a subordinate of Congressman Ney; and his significant public service. These facts, of course, do not excuse Mr. Heaton's misconduct, but they shed light on important distinctions between Mr. Heaton and the other conspirators.

First, Mr. Heaton is, by several years, the youngest person charged in connection with this scandal. Indeed, at the time of much of the conduct at issue, the United States Constitution prohibited Mr. Heaton, because of his youth, from holding the congressional office of whose honest services he helped defraud the public. *See* U.S. Const. art I, § 2 (prohibiting Congressional Representatives younger than 25 years old). When Congressman Ney hired him, Mr. Heaton was 23 years old, and when Mr. Ney promoted him to chief of staff, Mr. Heaton was still 23 years old. (*See* Gov't Mem. at 1.) Mr. Heaton, in fact, resisted his promotion to chief of staff because he worried that he did not have the experience or knowledge to handle the job. (*See* Peggy Sampson Ltr., Ex. 47; Karen Haas Ltr., Ex. 20; Kathryn Knapp Ltr., Ex. 33.) Over the course of about a week, however, the Congressman repeatedly pressured him to accept the position, offering him a significant pay raise and assuring him that he would be guided and mentored along the way – a promise left tragically unfulfilled. (*See* Peggy Sampson Ltr., Ex. 47; Karen Haas Ltr., Ex. 20; Kathryn Knapp Ltr., Ex. 33.)

In August 2002, when Mr. Heaton accompanied the Congressman, Mr. Abramoff, Ralph Reed, and other Washington power brokers on the now infamous golf trip to Scotland, Mr. Heaton had recently turned 24 years old and the conspiracy was already in "full swing." (Gov't Mem. at 2.) His youth undoubtedly limited his ability to question the conduct of the Congressman and these lobbyists, and the situation was not helped by the fact that neither Congressman Ney's office nor Congress required formal training in ethical and legal restrictions for congressional staffers at that time. (*See* Theodore Van Der Meid Ltr., Ex. 52 (discussing the House of Representatives' "new" mandatory staff training program instituted in 2007).) In a Capitol Hill culture widely reported to be flush with lobbyists offering international trips and other perks to Congressmen and their staffers, it is not surprising that Mr. Heaton lacked the confidence and perspective to challenge the ethics of Congressmen and powerful lobbyists. (*See, e.g.*, Jeffrey H. Birnbaum, *Privately Funded Trips Add Up on Capitol Hill*, Wash. Post, June 6, 2006, at A4, attached as Ex. 54.)

Indeed, the trip to Scotland in particular, and working for Congressman Ney in general, brought into conflict for the first time in his life two basic parts of Mr. Heaton's character. On the one hand, he was an honest and righteous young man, but on the other hand, he was loyal and eager to please. In Scotland, surrounded by these Washington power brokers, fearful of the consequences of challenging them, Mr. Heaton, as he now regrets, lacked the "courage to choose a different direction." (*See* Will Heaton Ltr., Ex. 1.) Dreading the role of "tattletale on the playground," Mr. Heaton tacitly joined the ongoing conspiracy. (*Id.*) That initial choice led to further involvement in the scandal and, ultimately, to the charges in this case.

The typical Congressional chief of staff, of course, has years of experience working in politics and would know by virtue of that experience the ethical and legal rules attendant to

working in a Congressional office. The typical chief of staff would likewise have experience

regarding when to challenge his or her boss and when to defer. But Mr. Heaton relied solely on

the Congressman for guidance, and his trust in Congressman Ney was sorely misplaced. Instead

of seeing Mr. Heaton's youth as a reason for careful mentoring, Mr. Ney took advantage of Mr.

Heaton's youth and, as he confided to others, saw in Mr. Heaton's youth and inexperience an

opportunity to behave unethically without consequence. (*See* Gov't Mem. at 1-2.)

Second, Mr. Heaton's misconduct in this case derived largely from a well-intentioned,

though obviously misguided, sense of loyalty and duty to Congressman Ney. This loyalty grew

out of Mr. Heaton's idolization of American political figures – what one childhood friend

described as his "undeserved reverence" for political leaders. (*See* Peter Sinclair Ltr., Ex. 49.)

With that reverence, Mr. Heaton combined hard work and an open eagerness to please. Former

Congressman Edward Pease described Mr. Heaton as idealistic, eager to please, and "constantly

amazed at his good fortune to be working" on Capitol Hill. (Edward Pease Ltr., Ex. 41.)

Numerous other friends and former colleagues wrote of Mr. Heaton's abiding sense of loyalty,

but longtime friend Peter Sinclair may have said it best when he wrote the following:

> [W]hile his intellect and work ethic brought Will success quickly,
> they denied him the chance to mature in his role as a servant to our
> country. He served as a top aide to a very powerful politician, but
> he reached that post without ever losing his naïve faith in the
> authority of such leaders. So while on a purely intellectual level he
> knew his actions were wrong, I believe that on some deeper level he
> thought that failing to follow where Mr. Ney led would be an even
> graver sin.

(Peter Sinclair Ltr., Ex. 49.) Given Mr. Heaton's character and background, it seems patently

obvious that, if he had been hired by an upright, ethical Congressman, Mr. Heaton would have

thrived, advanced, and matured without taking the unethical or illegal missteps that he did here.

Indeed, the plea documents reflect that Mr. Heaton assisted and followed along with Congressman Ney and the lobbyists with whom Ney worked and socialized. (*See* Gov't Mem. at 2-3). Importantly, when sentencing Mr. Ney, this Court found that the Congressman exercised control over other conspirators and that this control, among other factors, militated for a harsher sentence. The opposite situation inheres in this case. Just as Mr. Heaton followed Congressman Ney's orders and guidance in his daily work, so too he followed Mr. Ney along the path of misconduct described in detail in the Factual Basis. His obedience and loyalty, especially in light of Mr. Heaton's youth and inexperience, militates in favor of a more lenient sentence.

Indeed, not only did Mr. Heaton play a subservient role to Congressman Ney in the conduct at issue, but, as the government attests, "Ney rarely allowed Heaton or any other member of his staff to act on his behalf in exercising his official power or influence absent Ney's direct involvement." (Gov't Mem. at 2.) Thus, Mr. Heaton was a Chief of Staff in title only, acting according to Congressman Ney's orders or after consulting Mr. Ney. (*See id*.) In controlling and manipulating his staffers, Mr. Ney preyed not only their youth and experience but also on their dependence on Mr. Ney as an employer. He frequently "fired" staffers for perceived disloyalties and then permitted them to keep their jobs after his bullying had its desired effect. (*See* Kathryn Knapp Ltr, Ex. 33.) For young staffers, Ney's repeated threats of termination not only brought fears of unemployment but also of losing their political careers altogether. (*See id*.) Thus, Mr. Heaton's loyalty often derived from his sense of powerlessness to choose a different course.

Finally, despite Mr. Heaton's missteps, his tenure on Capitol Hill was defined, not by the conduct at issue here, but by the kindness, hard work, and public service that have always and will always define Will Heaton. Unlike other conspirators in this case, Mr. Heaton never left his

position as a congressional staffer in order to join the rotating door of former staffer-lobbyists who used their connections on Capitol Hill to cultivate improper relationships with public officials.  Further, friends from Capitol Hill describe his kind manner and his nonjudgmental engagement with those of differing political viewpoints.  (*See* Lindsay Rosenfeld Ltr., Ex. 46.) A former Ney staffer describes Mr. Heaton's genuine concern for the well-being of his coworkers when difficult situations arose in their lives.  (Christopher Kreuger Ltr., Ex. 36.)

The recorded telephone call to Mr. Heaton from another Ney staffer starkly revealed Mr. Heaton's priorities: he considered others before himself.  During the conversation, Mr. Heaton repeatedly expressed concern, not for himself, but for the staffer's well-being.  He worried about the legal bills the staffer was accruing, advised the staffer not to sacrifice himself out of loyalty to others, and offered to meet with the staffer anytime to let him "bawl [his] eyes out."  The only legal implication of the conversation about which Mr. Heaton expressed concern was that the staffer could lose his own legal privileges by talking to Mr. Heaton.

Thus, despite Mr. Heaton's sixteen hour work days, his hand-holding of Congressman Ney on the Washington social scene, and the intense stress that took a toll on his body and spirit, Mr. Heaton remained the same compassionate, idealistic, and caring person he has always been. For example, during his first few years in Washington, Mr. Heaton lived with and provided care for his ailing grandmother.  His friends and family members remark on how grateful he was to be able to spend those times with her, despite the many hours spent mowing her lawn, running errands for her, or simply keeping her company.  (Dorothy Battista Ltr., Ex. 4; Aaron Rashba Ltr, Ex. 44; Karen Haas Ltr, Ex. 20.)  Later, after he moved into his own home, Hurricane Katrina left two New Orleans friends homeless.  Mr. Heaton promptly welcomed them into his

home, and they lived with him for the next two and half months.  (Tatum Evans and Todd
Mayberry Ltr., Ex. 16.)

     Given his many admirable qualities and the many lives that Mr. Heaton touched, his
friends and colleagues understandably were shocked by the news when Mr. Heaton pled guilty to
a crime.  A chaplain from Mr. Heaton's high school described it as "one of my greatest surprises
in seventy-nine years of living."  (Rev. Joseph Kelleher Ltr., Ex. 30.)  Rita Hofbauer, a coworker
who became acquainted with Mr. Heaton after he left Capitol Hill writes that his crime, "is so
out of character for him that it challenges one's ability to comprehend it."  (Rita Hofbauer Ltr.,
Ex. 27.)  Ms. Hofbauer, a non-lawyer, explained that when she learned of his crime she
researched the honest services fraud legislation to try to understand what Mr. Heaton had done.
(*Id*.)  Muftiah McCartin, a former colleague from Capitol Hill, confesses that she "openly wept"
when she heard about Mr. Heaton's legal troubles.  (Muftiah McCartin Ltr., Ex. 38.)

     Tellingly, those who expressed surprise at Mr. Heaton's crime did not change their
opinion of him as a result.  They continue to view him as one of the most admirable young men
they have ever known, a man with a "good, kind, and generous heart."  (*See id*.)  They see his
criminal conduct as an aberration, consistent with youth and naivety, but not a product of ill will.
Further, Mr. Heaton has demonstrated his remorse not only in his substantial assistance to the
government, his guilty plea, and his letter to this Court, but also in numerous conversations he
initiated with family members, friends, and former colleagues.  (*See, e.g*., Daniel Heaton Ltr.,
Ex. 22; David Horne Ltr., Ex. 28; Theodore Van Der Meid Ltr., Ex. 52.)  For several months
after he began his active cooperation with the government, Mr. Heaton was unable to discuss the
case with his friends and family members.  (*See, e.g*., Christopher Edmunds Ltr, Ex. 15; Emily
Seidel Ltr., Ex. 48.)  After his case became public, Mr. Heaton reached out to his friends and

former colleagues to apologize for his actions, express his remorse, and seek their forgiveness. (*See, e.g.*, Lindsay Rosenfeld Ltr., Ex. 46; Daniel Heaton Ltr., Ex. 22; David Horne Ltr., Ex. 28; Theodore Van Der Meid Ltr., Ex. 52; Christopher Edmunds Ltr., Ex. 15; Emily Seidel Ltr., Ex. 48.) Such affirmative acts of repentance speak to Mr. Heaton's depth of character and his sincere remorse.

### C.    Just Punishment in Light of Mr. Heaton's Substantial Assistance

As detailed in the government's Substantial Assistance Memorandum, Mr. Heaton actively cooperated with the government over the course of several crucial months in the investigation of Congressman Ney and others. His cooperation was "exceptionally important" in bringing about Former Congressman Ney's guilty plea. (Gov't Mem. at 6.) Indeed, without Mr. Heaton's cooperation, it is quite possible that Congressman Ney would have contested the prosecution at trial, bringing uncertainty as to whether he ever would have been held accountable for his grave abuse of Congressional office. In terms of value, Mr. Heaton's cooperation was indeed crucial.

His cooperation was likewise extensive. At the government's request and direction, Mr. Heaton recorded telephone calls and a two-and-a-half hour meeting with Congressman Ney. Mr. Heaton participated in many hours of debriefings, often on weekends and late at night so that he could continue working for Congressman Ney without arousing suspicion that he was cooperating with the government. Mr. Heaton also turned over documents from Congressman Ney's office that the government had been unable to obtain from any other source, even from its subpoena of Congressman Ney's office. (*See id*. at 3-5.) Mr. Heaton's cooperation with the government was difficult, extensive, and crucial in the prosecution of the Congressman. (*See id.*)

In light of his extraordinary cooperation, we respectfully submit that a combination of community service, home confinement, and/or supervision is an adequate and just punishment for Mr. Heaton's crime. In addition, if the Court orders Mr. Heaton to pay a fine, we ask the Court to consider several facts in deciding the amount of such a fine. First, Mr. Heaton, as a result of this prosecution, has lost his employment on Capitol Hill and now does landscaping work for which he earns about $800 per month. (*See* PSR at 14.) Second, Mr. Heaton has significant legal debts. (*See id.* at 14-15.) Third, Congressman Ney, who, as discussed above, was more culpable than Mr. Heaton and did not assist the government's prosecution, received a fine of $6,000. For these reasons, we respectfully submit that the Court set any fine amount at or near the low end of the range applicable for offense level ten.

### D.    Deterrence

In a case followed closely on Capitol Hill, Mr. Heaton pled guilty to a serious felony with a significant up-front guidelines range before application of the section 5K1.1 departure. His guilty plea alone therefore carried a significant – and adequate – deterrent message to the wider community. Indeed, the direct and collateral consequences of this plea send a powerful message to others: Mr. Heaton lost his job and his career and will carry this felony conviction for the rest of his life.

Thus, a sentence of incarceration would be "greater than necessary" to provide the general deterrent message under the statute. *See* 18 U.S.C. § 3553(a). Further, although Mr. Heaton avowed his willingness to plead guilty to a felony from the outset of his active participation with the government, a felony conviction alone is greater punishment and deterrent than his counsel strenuously, albeit unsuccessfully, urged the government to pursue.

Given the consequences – both personal and professional – that he has experienced to this point, Mr. Heaton likewise has been deterred from committing future crimes. He recently turned 29 years old and celebrated his first wedding anniversary earlier this summer. He has taken complete responsibility for his crimes and already has incurred the harsh punishments of losing his career on Capitol Hill, losing the right to vote, significant legal debts, and widespread public disgrace. In light of his remorse, his character, and his hard-earned maturity, Mr. Heaton is simply not a risk to recidivate.

## III.    CONCLUSION

When young Americans graduate college and first enter the professional world, they often need some time to get grounded, find their direction, and grow up. Most, of course, do not grow up on the national political stage in the midst of a major Washington scandal and ensuing massive federal criminal investigations. But, because of his talents, his naiveté, and the twists of fate, Will Heaton took his missteps of youth under the bright lights of Capitol Hill and under the jurisdiction of this Court.

In committing this crime, Mr. Heaton not only failed to live up to his morals, but at times he found himself working directly against them. For his misconduct, Mr. Heaton has apologized to the Court in his attached letter, has apologized directly to many individuals affected by this investigation, and looks forward to the opportunity to voice his remorse in person to this Court, to his family, friends, and former coworkers, and to the American public.

In light of his personal background and character, the severe punishments he already has incurred, his sincere remorse, and the substantial assistance he has provided to the government, Mr. Heaton respectfully requests that the Court sentence him to some combination of community service, home confinement, and/or supervision. Such a sentence would permit Mr. Heaton to

reach out to help others facing similar moral and legal dilemmas by contributing his immense

talents to society.

                                        Respectfully submitted,


                                        _____/s/_____
                                        John N. Nassikas III  (Bar No. 387167)
                                        Timothy P. Kane (Bar. No. 500660)
                                        ARENT FOX LLP
                                        1050 Connecticut Ave., N.W.
                                        Washington, DC 20036-5339
                                        (202) 857-6000 (Telephone)
                                        (202) 857-6395 (Fax)

Dated: August 6, 2007

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this sixth day of August 2007, a copy of the foregoing Memorandum in Aid of Sentencing was delivered to Kendall Day, Esq. and Mary Butler, Esq. at the Public Integrity Section of the United States Department of Justice via the CM/ECF system, and a copy was sent via Federal Express to Deborah Stevens-Panzer, Senior United States Probation Officer at the Probation Office for the United States District Court for the District of Columbia.


_____/s/_____
Timothy P. Kane

# List of Exhibits

### to Defendant's Memorandum in Aid of Sentencing

*United States v. William J. Heaton*
Case No. 07-cr-042 (ESH)

<u>Letters to the Court from:</u>

1.  Will Heaton
2.  Bill Battista
3.  Caroline Battista
4.  Dorothy Battista
5.  Joey Battista
6.  Suzanne Battista
7.  Michael Clark
8.  Chaplain Daniel Coughlin
9.  Aimee DiGilio
10. Daniel DiGilio
11. Joseph DiGilio
12. Kathleen DiGilio
13. Kimberly DiGilio
14. Sister Lisa Marie Drover
15. Christopher Edmunds
16. Tatum Evans & C. Todd Mayberry
17. Edward Eynon
18. Robert Gates
19. Kathleen Grady
20. Karen Haas
21. Brian Heaton
22. Daniel Heaton
23. Deborah Heaton
24. Elizabeth Heaton
25. Mary Heaton
26. Tim Hellinger
27. Rite Hofbauer
28. David Horne
29. Very Reverend Louis Iasiello
30. Reverend Joseph Kelleher
31. Daniel Keniry
32. James Knapp
33. Kathryn Knapp
34. Kristin Knapp
35. Robert Knapp
36. Christopher Kreuger
37. Steve Maradian
38. Muftiah McCartin

39.    Friar Conall McHugh
40.    Jamie McMillen
41.    Edward Pease
42.    Jeffrey Pojanowski
43.    Robert Porter
44.    Aaron Rashba
45.    George Repass
46.    Lindsay Rosenfeld
47.    Peggy Sampson
48.    Emily Seidel
49.    Peter Sinclair
50.    Michael Streich
51.    Jeff Trandahl
52.    Theodore Van Der Meid
53.    Dana Waesche

<u>Other:</u>

54.    Jeffrey H. Birnbaum, *Privately Funded Trips Add Up on Capitol Hill*, THE WASHINGTON POST, at A4 (June 6, 2006)

# EXHIBIT 1

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

August 1, 2007
United States District Court of the District of Columbia
333 Constitution Avenue, NW
Washington DC 20001


Dear Judge Huvelle,

During my last year of high school my English teacher asked me and my classmates to find a poem that inspired us and described how we wanted the world to remember us. Each of us read our poem in front of the class and then explained why we had chosen this poem. I chose Rudyard Kipling's poem "IF." I have tried to use this poem as a moral touchstone for a long time. I have strived always to act morally and yet during my tenure with Congressman Ney I failed miserably.

Some of the letters you receive on my behalf may ask for leniency because of my character or age or because of Congressman Ney's manipulative practices. However, I want to make it perfectly clear that I take full responsibility for my wrongful actions in this conspiracy. Not only am I a grownup, but I was raised in a devout Catholic family that taught me right from wrong and gave me all of the love that a son and brother could possibly want. Your Honor, I take full and sole responsibility for my actions; in my mind, there are no excuses for what I did. I sincerely hope this letter conveys how disappointed I am in myself; my actions have caused great agony for all who love me and also have violated the public's trust in our government servants.

Rudyard Kipling's poem IF starts with these words:

> If you can keep your head when all about you
> Are losing theirs and blaming it on you,
> If you can trust yourself when all men doubt you
> But make allowance for their doubting too...

I made several terrible decisions while working for Congressman Ney but in my mind the most awful was my silence. I remained silent about much that occurred during my tenure with Congressman Ney because I was too fearful of the consequences if I spoke up. I didn't trust my instincts to stop and rectify these deeds, instead remaining silent, hoping this terrible mess would go away on its own. In Kipling's words, I lost my head and failed to trust myself. The agony and duress my silence caused my former co-workers and loved ones weigh on me every day. At each moral juncture, I knew that what was happening was wrong, despite what Congressman Ney and others told me, and yet I didn't trust myself or have enough courage to choose a different direction. I bear full responsibility for these failures and I face the consequences willingly.

My actions reflect my injudicious acceptance of what others were doing. Due to a lack of resolve, I simply followed some of my peers and supervisors. I blurred the distinction between acceptable and unacceptable professional behavior. Even more sickening to me though is that I realized that what was happening was beyond "normal accepted behavior on Capitol Hill" but still allowed it to continue because I didn't want to be the "tattletale on the playground." I chose to let these grossly unprofessional and

immoral actions slide for the sake of acceptance amongst my professional peers. For that, I am ashamed and deeply sorry.

The moment I walked into my first meeting with the Justice Department, a huge weight was lifted off my chest. For the first time in years I felt at peace with myself and I knew I was finally making the right choice. I had made myself so sick by remaining silent that the moment I began to let it out I felt immeasurably better, even while knowing that the consequences I faced would be severe. I never realized how miserable I had been while working for Congressman Ney, but despite the current situation, my quality of life has increased immensely since leaving his service. Hard to believe, but totally true.

I am not an inherently bad person nor was I while working for Congressman Ney. However, I paid less attention to important priorities as I became more consumed with work. I placed my loyalty and trust in individuals who deserved neither. I wanted to believe Bob Ney, a man I knew well, was someone I should work for and grant my loyalty. Now, I realize otherwise and know never to doubt my conscience and my gut. I am a better person than my behavior with Congressman Ney exemplifies. Coming clean has enabled me to reclaim my moral grit and I know that I will avoid other unethical situations should they arise in the future. I shutter sometimes at what I may have become if not for this turn of events. I am relieved that I now possess the courage to ensure I will not remain silent when action is necessary.

I want to take accountability for my actions and serve whatever sentence this Court thinks is just. I want my mistakes to become a cautionary tale for others. Many people may find themselves in a situation similar to mine, but it doesn't need to end the way my story has. Hopefully my experience can help to give others the courage and guidance to speak up and make moral choices. Truly looking at myself in the mirror and casting aside my rationalizations (for which I had many!) was an extremely humbling experience but also a liberating one. All that I have learned and all that I have shared with my wife, family, friends and God over this last year has made me a stronger, more resolute person than at any point in life. I hope that I have become a better husband, son, brother, and friend because of this experience.

I am also learning how to forgive myself for what I have done. I realize that relatively few people face the circumstances I faced as a young adult. I am a firm believer that things happen for a reason and each day as I mature from my past mistakes I strive to set an example for others. It reminds me of a quote from Mother Theresa: "I know God will not give me anything I can't handle. I just wish that He didn't trust me so much." I want others to learn from my experience and I am hopeful and determined that some goodness will emerge from my story. On August 16th, I will make it perfectly plain and clear that I fully accept responsibility for my actions. By doing so, I hope I can set a good example. People need to find the courage to act morally and to know that's the best choice even when facing tough repercussions; the repercussions from immoral choices are far more grave. I intend to use my experience to educate others and have already begun to discuss with others how to make my intention a reality. If I sulk and wallow in misery, no one will benefit. I have an opportunity to make a difference, to reach out to people and deliver a distinct and important message about standing your ground and trusting your conscience. Atoning for my past actions and hopefully guiding others towards the right choices will not be easy but I have faith that God has given me this challenge for a reason and some inherent good may emerge from it.

I hope this letter has conveyed that I have learned from this experience. I am not trying to explain my actions – there is no excuse for what I did. In my mind, it is far more important that you, Your Honor, understand that regardless of the sentence you give me, I have already begun to live and deal with the moral consequences of my mistakes, and I will never falter again. Your sentence will assure society that I pay for my crime but the disappointment and sadness I see on the faces of those who love me is the worst sentence I can serve. My actions weigh on my mind heavily and will for a long time but also have motivated me to create good from this experience and help those around me. IF I can do that, then I will consider my life a success.

Sincerely,

Will Heaton

# EXHIBIT 2

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

July 1, 2007

The Honorable Ellen Segal Huvelle
United States District Court
  for the District of Columbia
333 Constitution Ave., N.W.
Washington, DC 20001

Re: <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle,

Allow me to introduce myself. My name is Bill Battista, an uncle of Will Heaton. I realize Will has pleaded guilty to one charge of conspiracy to commit honest services fraud in connection with his work in Congressman Ney's office.

I have known Will Heaton since he was born. Will is one of the most honest, decent young men I have ever known. He has been a wonderful person, mentor and example to his cousins (my children), and is honest as the day is long. What has happened to him is tragic and I feel Will was deceived, deluded, and intimidated by Congressman Ney. Will would never purposely break the law and it doesn't surprise me one bit that he went to the authorities and cooperated fully once he realized he had been led down a dishonest path by Congressman Ney.

Your Honor, I ask that you please be lenient on Will. I believe the true perpetrators are already serving their punishment. I apologize for my directness but with all due respect I know Will is a fine and decent young man, who in my humble opinion, was completely broadsided by Congressman Ney, the truly guilty one in this matter. Thank you for your time and consideration.

Sincerely,

Bill Battista

Bill Battista
Silver Spring, Maryland

# EXHIBIT 3

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 27, 2007

The Honorable Ellen Segal Huvelle
United States District Court
   for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re:   <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle:

I have known Will Heaton all 24 years of my life.  He is my first cousin on my mother's
side of the family.  I am well aware of my cousin's situation of pleading guilty to a
criminal charge of conspiracy to commit honest services fraud in connection with his
work in Congressman Ney's office.  It does not surprise me in the least bit that Will has
been cooperating fully with the government since long before he pled guilty to this
charge.  This sort of honest and compliant behavior is more of character for Will then the
charge he has pled guilty to.

It greatly saddens me to think that Will has gotten himself into this situation and as a
young women in the working world striving to be successful in my own career field, I
can totally see how Congressman Ney took advantage of Will's own desire and drive to
be successful in the political realm.

I have spent a lot of time with Will since this whole mess has commenced and there is no
doubt in my mind that he deeply regrets putting his trust into a man that he supposedly
thought was a great mentor.  He was naive and took orders, some of which were the
wrong ones to take, and definitely wishes that he had questioned Ney more on the ethics
of his behavior and decisions he was making, rather than putting his trust into his boss.
As my mother always says you can't trust anyone in this world, I guess Will just learned
that the hard way and is definitely paying the price.

When I think of my cousin Will and the type of person he is only positive personality
traits and memories we have shared together come to mind.  Will is a great friend that has
always been there to support me in everything that I do.  We both have a passion for
running so when I was training for my first marathon last fall, Will was the first one to
tell me how proud he was and offer to map out running routes for me.  We have a lot of
family around the DC area and Will is so good about getting us all together for dinner or
just to hang out to catch up on each others lives.  Will truly is a warm, generous, down to
earth, and very genuine person That is why it is so hard for me to think that anyone could
dislike him or call him a sneaky dishonest person.

A lot of the times people in our world are so quick to judge others.  For just a moment I
ask you to put yourself in Will's shoes to maybe make light of why he chose to handle the
situation with Congressman Ney the way he did.  You are the youngest chief of staff,
making a decent salary, on your way to becoming successful in a field that you have
wanted to have a career in your whole life.  Your boss, as far as you know, seems like a
great guy who definitely has established himself in the political realm and is someone
you can look up to.  There are a few instances in which you question his actions but he is

your boss right? He has much more experience than you do so you let things slide and just trust that he is acting in everyone's best interest. When you look at Will's situation form this point of view it is easy to see how things played out the way they did.  I am not saying that Will is totally innocent in this situation but he is definitely not the one to point the finger at.


Respectfully,

Caroline Battista
Silver Spring, MD

# EXHIBIT 4

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

July 10, 2007


The Honorable Ellen Segal Huvelle
United States District Court
    For the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001


Re: United States V. William Heaton, Case No. 07-042


Dear Judge Huvelle:

Please allow me to first introduce myself to you. I am Dorothy Battista, an aunt of William (Will) Heaton. I am married and the mother of four children, I live in Silver Spring Md. and am currently employed as a substitute teacher. I am aware and well informed of the charges my nephew has pleaded guilty to and am sure, given his nature, he is cooperating fully in this matter.

I would like to take this opportunity with you to express and share a few of my feelings about my nephew. Will was born almost 29 years ago in Aiken S.C.. My brother-in-law (Will's father) is from Aiken and at the time of Will's birth was employed there. Over the years their family moved to several different states because  my brother-in-law was transferred to different corporate locations. We however always managed to spend quality time together on their visits back home to the Maryland area. There are eleven first cousins on my side of the family and I can't tell you how every one of them looked forward to each visit. Will, being the oldest of the eleven, was always the "leader of the pack"- the one the rest looked up to. When Will was a junior in high school, he was fortunate to land a page position at the U.S. Capitol. My kids were ecstatic- more time with cousin Will!  The job did allow him to spend his free time with the family. As a young man, we all could see what a responsible and mature man he was for his age. He seemed to have a real devotion to the political life and always said he wanted to do his part to make our already great nation even better. His humanitarian attitude was very apparent. He often contemplated joining the Peace Corps (he was accepted) or training to be a forest firefighter in the West. He always has such a desire to help others and make a positive difference. Eventually Will went onto William & Mary for college and landed a job at the U.S. Capitol. Since relocating to Washington, D.C. meant needing a place to live, without hesitation he asked my mother (his maternal grandmother) if he could live with her and my father (his granddad). Please let me explain at this time that my father was in the latter stages of Alzheimers and my mother was his primary caregiver. This was NOT a situation one would think very appealing to a young, single, man with a promising career ahead of him. Needless to say, we were all grateful Will would be there with my parents, but we also warned him of the added responsibilities and pressures this would most likely bring to his daily life. Living with two elderly people with compromised

health issues, both physically and mentally was not an appealing situation to put yourself in. But without hesitation, Will insisted this is where he not only wanted to be but where he was grateful to be. I can't even begin to tell you the joy and comfort he brought to my parents and their home. I often marveled how Will had such a kind way of caring and looking-out for his grandparents. I saw the role of caretaker became a new occupation for him and he always insisted how grateful he was to have this opportunity with his grandparents. I know from having my own 20, 23 and 24 year-olds that there are a whole lot of other things to be doing in the Washington, D.C. area than watching out for your grandparents. Will's contentment was often having dinner, watching a movie, taking my parents for a car ride, taking my Dad for a walk around the neighborhood or sitting and listening to their childhood stories, and all the while being so happy to share this time with them.

This Your Honor, is a person who truly cares about others more than himself. This is why, I believe, he is in the situation he faces today. Simply because he cared more about the people he felt obligated to rather than himself. These charges that Will faces are totally out of character for Will and I truly believe he's remorseful for any and all harm he has caused others and our government. I know because I have heard his remorse, seen his remorse and most of all felt his remorse first hand. I realize it is impossible for you to know Will and his true self the way his family does, but I do ask that you might put your faith in those that have loved, watched, witnessed and genuinely understand this fine individual. We should all be so lucky in our lifetime to know someone as kind, compassionate and decent as Will Heaton.

Thank you for your time and consideration in reading this letter.

Gratefully,

Dorothy Battista
Silver Spring, Maryland

# EXHIBIT 5

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

July 1, 2007

The Honorable Ellen Segal Huvelle
United States District Court
    for the District of Columbia
333 Constitution Ave., N.W.
Washington, DC 20001


Re: <u>United States v. William Heaton</u>, Case No. 07-042


Dear Judge Huvelle,

    My name is Joey Battista, I am fourteen years old, and I live in Silver Spring, MD. I have known William Heaton, or Will as my family calls him, for all fourteen years I have lived. Will is my first cousin and one of the nicest, most caring, kind men I know. Ever since I was a kid, he has always come to my sporting events, hung out with me, and looked out for me. I'll always remember the time he took me to the zoo and then we went to lunch together. After lunch, Will and I hung out all afternoon talking and enjoying each other's presence. It was a memory I will never forget because it meant so much to me that despite our huge age difference, Will did not mind hanging out all day with me. I am aware that Will pled guilty to a criminal charge and is awaiting sentence. I have been informed that he pled guilty to one charge of conspiracy to commit honest services fraud in connection with his work in Congressman Ney's office. When I heard that this had happened to Will, I couldn't believe it was true. I believe that had Will known what exactly what was going on at the time, he would never have chosen to take part in it. Judge Huvelle, I ask for you to please not put a harsh penalty on Will because I know he intentionally would never do something that would harm others. He is a great person that so many of us look up to. I hope you can understand that he is a terrific person that might have just put his trust in the wrong people. Again, I ask for you to please be kind to him because I really want to be able to spend time with Will whenever I can. I really hope that you can now see that Will Heaton is the best! Thank you for your time and consideration.


                                    Sincerely,

                                    Joey Battista

                                    Joey Battista
                                    Silver Spring, MD

# EXHIBIT 6

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

The Honorable Ellen Segal Huvelle
United States District Court
  for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re:   <u>United States v. William Heaton,</u> Case No. 07-042

Dear Judge Huvelle,

As one of William Heaton's maternal first cousins, I would like to introduce myself and share with you my own personal reflections on the behavior and overall character of William Heaton. I am aware that William pled guilty to a criminal charge of conspiracy to commit honest services fraud in connection with his work in Congressman Ney's office and is awaiting sentencing on his court date of August 15, 2007. I am writing this letter in William's defense and to vouch for the true character that he beholds as a dedicated Government employee.

My name is Suzanne Kittson Battista and I am currently enrolled as a Junior at The University of Georgia-Athens, majoring in Speech Communications. I have known William Heaton all 20 years of my life and am very proud to say that we belong to the same extended family. Recently, since we have both grown older and I have ventured down to the South to attend college, I am not able to see William, or Will as my family calls him, as much as I would like to but the times that we do share together at family dinners and other random occasions are always filled with laughter and enjoyment. I have always looked up to my cousin Will since Day 1, not only because he is one of the nicest gentlemen I know, but also because his true character and overall outlook on life are two aspects of his personal life that I really admire. That is why when the time came during

my 8th grade year, I chose Will as my Confirmation sponsor because I knew that he was

someone who really cared about his faith and would always be there to support me for the

rest of my life. I do not know how familiar you are with the Catholic faith or perhaps you

are a member of the Catholic Church yourself, but the process of selecting a

Confirmation sponsor is one that requires deep thought on who you personally believe

will be there to help you keep your faith and improve your spiritual welfare. My cousin

Will has done just that. He is a dedicated Christian and one of the most humble persons I

have ever met. My mother, father, brothers, sister, and I may not be members of his own

immediate family, but he treats us as if we are his own family and has *always* made an

effort to be there for every major event from sports games to graduations to birthday

parties that are important to every member of my family.

   This past year when I learned about the convictions and charges Will was facing,

I was shocked to think that my very own cousin had taken part in such a thing mainly

because after all these years and hard work Will has put in to becoming a successful

Government employee, I figured there was no way that such an honest, humble young

man would risk losing everything in a situation like the one at hand. That is why I am

writing this letter to you, Judge Huvelle. I do believe that not one person I have ever met

that knows Will has ever had a negative thing to say about his overall character. Take a

look at this young man and the life he has led over the past 30 years. Caring: He was

always the cousin that would tell my older brother, Willie, and my older cousin, Danny,

to bug off when they were picking on me no matter how much they would make fun of

him for sticking up for my little self. Kind: He was always the cousin that would

volunteer to hold my hand in the water and lift me above the waves no matter how many

of our other cousins would be swimming out deep and playing games in the water. Considerate: He was the one cousin out of all 12 of my grandmother's grandchildren that lived with her and took care of her for over 2 years after she lost her one and only true love, my grandfather at age 80. Passionate: He trained for over 3 months for the AIDS marathon while in college until his dream was taken away after blowing out his knee while studying abroad during college. Loving: He dedicated his life to Mrs. Katie Heaton last June during one of the most beautiful ceremonies I have ever witnessed in my lifetime. Not only does Will behold all of these aspects that attribute to his overall well-being, but also he dedicates his life to God, his wife, his family, and his career.

Prior to his conviction, Will had always been one of the most upbeat, cheerful guys I had ever known. He led a life of no regret and cherished the wonders he was given throughout his life. After proposing to his wife, Katie, over 2 years ago and continuously succeeding as the Chief Assistant for Congressman Ney, it seemed as though nothing could stop Will from obtaining the ultimate success he was driven to achieve. Following his conviction, I could see a significant change in the emotional aspects of Will's life. His enthusiasm and upbeat personality seemed to slightly diminish and aside from his wedding last June, it seemed as though Will felt discouraged that his dream of success was slowly slipping through his fingers. But never did he lose faith in God or his family. He held on to that faith and continues to do so. Slowly, through the support of his family, his closest friends, and his wonderful wife, Katie, Will began to regain his strength and continue on to prepare to face the challenges that lay ahead. Never did he show any negativity or depression, but then again, Will is so strong and cares so much about the

people close to him that I feel as though his one wish would be to not have those who are close to him suffer with him.

In conclusion, I would just like to say that William Heaton may have committed a crime that was against the law, but so do millions of other people in the world who are horrible people. Will is **not** a criminal. He is a man of wisdom, compassion, and bravery. He never gave less than the best when it came to his career as well as his life in general. I still till this day look up to Will because I know in my heart that the crime he committed is one that in no way reflects the true character he possesses. It is tough to say exactly why he would commit any sort of crime in general, but I can assure you that this crime is one that Will I'm sure was unaware of and in no way wished to hurt anyone or himself by doing so. Thank you for your time and consideration and I wish you as well as William the best of luck during the trial. Best wishes.

Sincerely,

Suzanne Kittson Battista
Silver Spring, Maryland

# EXHIBIT 7

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

6/29/07


The Honorable Ellen Segal Huvelle
United States District Court
 For the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001


Re: United States v. William Heaton, Case No. 07-042

Dear Judge Huvelle:

For me, Will Heaton is one of the sole bright spots about living in Washington DC. He is the most positive, uplifting, generous and sincere person I know in a city that has otherwise disappointed me because of its competitive, overly confident and condescending airs. While I've only lived in DC for a year, I've known Will for 11, since our freshman year at The College of William and Mary. We met as teammates on the ultimate Frisbee team, and spent four years together traveling, practicing, and trying to balance our love for frisbee with our class studies.

After Will's guilty plea I expected Will to be sullen or irritable because I assumed that would be the natural human instinct when someone is in such a situation. Instead, he was joyous and relieved that he was finally able to have the opportunity to be forthcoming and honest. Will's reflection on his time with Bob Ney has been relatively simple, he's glad it is over and behind him. The media has portrayed Will as someone who enjoyed extravagant trips and personal excesses, while in reality Will is a modest person who was over-worked by his boss, and acted out of character in his professional capacity.

Since his plea, Will has shown remorse but never a hint of self-pity, never blaming anyone else for the situation he is in, and shockingly he feels no bitterness about the permanent end of his future in politics which is the only professional world he has known.

Now Will is constantly finding new work and hobbies that excite him. As one can imagine, due to his legal situation, it is impossible to find employment that uses his talents, and instead he's been seeking odd jobs on Craigslist to pay the bills. When he told me he had found a gardening gig for a professional gardener, I felt sorry that with all his capabilities Will was picking weeds out of rich peoples' gardens. Will is cut from a different cloth however, and when he came over to my apartment after a day of gardening, he was earnestly excited to tell my wife and I about the incredible gardens he works in, and all the new things he is learning about plant arrangements and growing cycles. His current boss is encouraging Will to take horticultural classes and to learn the trade, and Will seems to be seriously considering this as a career path.

There are a dozen stories I'd like to tell you to demonstrate Will's character, but in respect of your time I understand that I can't. I'd like to tell you about the time he got hit by a car while riding his bike and then asked the bikeshop (where I work on weekends) not to tack on any extra repairs that would get charged to the driver's insurance because it would be dishonest. Or the time I arrived at the airport, and Will insisted that he pick me up from there rather than from the Metro because he assumed I'd be tired.

At this point, Will is ready to move forward, find new goals, and have another opportunity to contribute to society. The fact that Will can never pursue a career in the public eye is punishment he'll face for the rest of his life. In my opinion, a sentence in which Will doesn't have an opportunity to serve our community would be a disservice not to him but to all of us. Will is the person you want in your community because he's the guy who gives up his seat on the Metro, who doesn't honk his horn if you cut him off in traffic, who smiles when he walks by, who is kind, caring, and who makes his community a better place to live.

Sincerely

Michael Clark
Washington, D.C.

# EXHIBIT 8

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

# Office of the Chaplain
## U.S. House of Representatives
### Washington, DC 20515–6655

June 5, 2007

The Honorable Ellen Segal Huvelle
United States District Court
   for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re:   <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle:

In 2000, as the Chaplain of the U.S. House of Representatives, I came to know Will Heaton soon after I arrived. I remember at the time he worked for Speaker Hastert. As years passed, we came to know each other better. I saw Will advance to other positions and, I presumed, take on more responsibilities.

When clouds formed around Congressman Cunningham's investigation and then began to envelop others, Will came to see me and we talked extensively. As Will wrestled with his guilt and yet his best intentions, I saw in him someone young, talented, responsible and reliable, yet caught in a web of evil around him. I have come to know Will as a faithful practicing Catholic who has turned to the Lord both confessing some guilt and much naiveté and I have seen him turn to the Lord for guidance.

Once he decided to turn in "State evidence" I talked to him many times on how to go about this with courage and integrity. I encouraged him to go ahead with plans to marry, thinking he would need this kind of support as he stepped forward. Now I know how difficult this has been on him and his bride, but at the time, I believed that with everything else changing around him, the commitment to marriage might serve as a gravitational force for him.

Because Will is competent and truly contrite for his mistakes, I have always been hopeful those involved in the legal process would see him as I see him. Once he left working for Congress, I helped Will find employment elsewhere. I knew he could be trusted. Even with much "hanging over his head" I knew Will would be forthright and honest.

I have seen Will grieve over the loss of a great career here on Capitol Hill. I have heard of the pain this has caused his fiancé/bride/wife and both their families. In our conversations I have rehearsed with him on how to say the "tough things" that needed to be said so that everyone could "steel themselves" for the worst.

Thank God, Will is young:  Maybe too young, at the time, to make some of the responsible decisions a "chief of staff in his position" needed to make.  Perhaps he was too young and inexperienced to confront a boss when the wrong decisions were being made.  But I am glad he is still young, and  also quite convincing, a natural leader, good in conversation and loyal.  Because when this is all over, I believe the true Will Heaton will shine even more brightly.

Will is the kind of person who has all the makings for a good career here on Capitol Hill no matter what his party affiliation.  But now he has lost all that.  In recent conversations, Will has asked me if I could set up some format where he might, in a workshop with staffers of Congress, talk to them, warn them, point out ambiguous signs and help them avoid the very mistakes he made that has now caused him to lose everything.

Truly, his is a repentant soul who now wants to guide and protect other innocents from acts of self-destruction and compliance with the evil of others.  (I have advised him to make notes on this period of history and during these days of legal process while on the path to reconciliation.  I believe some written pieces might serve his healing and help others in the future).

Through my years of priesthood, I have heard many stories from drunkards, felons, people in organized crime, dozens of pan-handlers and big, important phonies, but I have also listened to broken, contrite and good people who admittedly have made mistakes.  I believe Will Heaton is one of those young people full of potential who stepped off the right course.  I not only believe Will regrets his actions, but he has learned from his mistakes and wants to help others avoid similar action.  Because of Will's undeniable goodness, faithful prayerfulness and solid resolve, given half a chance at another career, I believe he will prove to be not only successful, but a laudatory man whose careful and steady story of rebuilding will inspire others.

I ask you, Your Honor, to be most lenient because Will Heaton has tried to cooperate fully with the government investigation and because he is believable, contrite and needs a completely new day of freedom from the past to start over.  As I said before, I thank God that Will is still a young man and he has a whole life ahead of him. With the right opportunities and his wife beside him I believe he can serve as an example to help others along the way.

Thank you, Your Honor, for your own public service to this nation and in the cause of justice.

Sincerely,

Chaplain Daniel P. Coughlin
Washington, DC

# EXHIBIT 9

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

July 1, 2007


The Honorable Ellen Segal Huvelle
United States District Court
    for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001


Re:    <u>United States v. William Heaton,</u> Case No. 07-042


Dear Judge Huvelle:


     I am writing in regards to the charges brought against Will Heaton to which he
has pled guilty. Will is my first cousin and I have known him for my entire life of 24
years. Throughout our childhood, Will was always the leader of the 11 kids in our
family. He used to organize our games and make sure we all felt included. Even at a
young age, it was clear how much my aunt and uncle relied on him. He was (and still is)
the reliable one. He attended the Page Program and the only thing I remember from his
graduation is that he had perfect attendance for the entire year. That demonstration of
responsibility greatly impressed me that day and has become one of Will's defining
characteristics.
     As he grew older and moved to DC, I got to see how caring he had become. The
night my grandfather died, I had been caught in the rain for hours at a concert and was a
mess when I reached the house. Will quickly handed me a T-shirt and led me to the room
without me having to say a word. He didn't pass judgment and he didn't ask for an
explanation.
     Now that we have entered adulthood, Will constantly tries to get everyone
together. At times it seems impossible for our families to find a good time amidst
everyone's busy schedules. This does not deter Will and he persists until he finds a time
that works. Then he begins to plan another one. He recognizes the true importance of
family and urges everyone to do the same.
     Will has led me through both word and example. Anyone who has known him
can attest to that. Like all of us, he has made mistakes. But the conduct in question is
extremely out of character for Will. He has always been a rock in our family, someone
we can go to should we need anything at all. I am incredibly lucky to have him as a role
model and a cousin.


Sincerely,

Aimee DiGilio

Aimee DiGilio

# EXHIBIT 10

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 25, 2007

The Honorable Ellen Segal Huvelle
United States District Court
    For the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re:    <u>United States v. William Heaton,</u> Case No. 07-042

Dear Judge Huvelle:

It is my understanding that Will Heaton has pled guilty to the criminal charge of
conspiracy to commit honest services fraud in connection with his work in Congressman
Ney's office.  It is also my understanding that Will has been cooperating fully with the
government since long before he pled guilty to the charge.  Will is doing everything in
his power to correct all wrongdoing.

Will is my cousin and I have known him for nearly 23 years.  He is the oldest of
our cousins and has thus taken on a lot of responsibility in our family.  I have always
looked up to Will and admired his work ethic.  In high school, Will longed to take on
further challenges that existed outside of his hometown in North Carolina.  He
participated in the page program on Capitol Hill.  I was thrilled that he was coming to DC
because this meant I would get to see him more.  I remember going to his graduation
ceremony and having Will introduce me to his fellow classmates and teachers.  Will has
always been an active participant in the community and has always treated me like one of
his best friends even though I am 6 grades behind him.  Being in 5th grade at the time, I
remember this to be my first genuine interest in politics.  I asked Will questions about the

program for the rest of the night and he was more than overjoyed to talk with me about them. Will has been a loving cousin and one I have looked up to for my whole life.

When Will got the position of Chief of Staff for Congressman Ney, I was overjoyed at his success. I was so proud of all his hard work. I even selected to do a project on Will for one of my classes at Georgetown University. When I asked Will to take me on a tour of his office and show me his daily activities, he was delighted at the chance to see me. Will welcomes everyone with open arms. He is one of the most pleasant people I have had the chance to be around. Will introduced me to everyone in the office and let me shadow him while he did some of his job duties. This is a moment I will never forget. Will's generosity to me is something that I will always treasure and I will forever be in debt to him.

As expected, this criminal case has affected Will in his life. I think it would be impossible for Will not to feel the affects of this process. This is mostly due to his honest and ethical nature. Will has pleaded guilty because he knows there has been an injustice and he will not rest until it is corrected. Will has a heart as big as a mountain and uses it to perform good in the world. Most people would find this criminal charge to be overbearing and could not perform their daily functions. A criminal charge is a lot to have hovering over one's shoulders. However, it is Will's strong character and work ethic that makes him want to come out of this trial as a stronger and better man. Even during this hard time, Will has managed to stay active and build better and stronger relationships with his family and peers. I regularly receive emails from Will asking how I am doing and seeing when I can meet up for lunch. Will is the foundation for the

relationships I have built with my cousins. He regularly sets up times where all the cousins can meet and catch up on our recent activities.

Not only does Will stay close with the family now, but he also manages to find time for his physical health. He goes on many runs and bike rides to keep his body active and in shape. During one of his bike rides, Will was unfortunately struck by a car, however not even an automobile could keep Will down for very long. This is another example of Will's strong minded work ethic. Nothing can keep him down, he is a fighter and has already overcame so much in his life. He is constantly giving to others. When I tried to go visit him in the hospital, he told me not to worry about him and to go play a round of golf. Will is always looking out for other people and would not allow anyone to put him first. His selfless attitude has made him a joy to be around. With his strong will, it is no wonder why Will is a model citizen in the community. He keeps a very strong spiritual life and keeps his family close to him.

The conduct for which Will has pled guilty is completely out of character for him. His active lifestyle has made him a strong member of the community and he has touched the lives of many. Will is doing everything in his power to correct any wrongdoing. I have never once questioned Will's ethics and integrity and still today do not question it. Will has served as a role model for me for nearly 23 years and has touched the lives of so many. I ask the court to be lenient with Will's sentencing, not only for his and my sake, but the community as a whole. There are few men out there who have accomplished as much as Will and given one more chance I know he can go on to do many more great things.

Sincerely,

Daniel DiGilio
Rockville, MD

# EXHIBIT 11

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

July 1, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:  United States v. William Heaton,  Case No. 07-042

Dear Judge Huvelle:

I know that Will Heaton, my nephew, is awaiting sentencing for a charge in connection
with his work in Congressman Ney's office.  His conduct in this situation is totally out of
character for him.  Will is and always has been a fine, upstanding citizen.

I am Will's uncle by marriage and have known him all his life.  He is my godson and I
know he was raised a good Catholic.  He attended a Catholic elementary and high school
and  has remained a church-going Catholic throughout his life. I even recall attending a
Passion Play at his school around Easter time when he played the role of Jesus Christ.
In high school he went to school for a year in the Page Program in Washington,  DC.  At
his graduation from the program,  his teachers spoke with us about all the wonderful work
he had done and highly praised his values and character.

He  also demonstrates very strong family ties.  One impressive action he took was his
many visits to our house for months to visit his grandmother who lived out her dying
months bedridden at our house.  He even made many trips to North Carolina to see her
when she lived at his parent's house.  Will has always been present at  family gatherings
and on holidays.  He, himself, has organized many events and loves to get the family
together. He is looked up to as a leader by his cousins.  I recall wonderful summer
vacations at the beach, and all the family fun we would have.  One wonderful time was
when the entire family went down to his graduation at William & Mary.  We were all so
proud and he was beaming with enthusiasm.

Will has great integrity, and is a loyal and trustworthy person.  He is greatly admired by
his family and peers.  He is an extremely kind and considerate person and always there to
help out in any situation.  He has often helped my children with homework or assignments
in school.   I ask that you would please be lenient in your sentencing of Will. He is a true
asset to our family and much loved by all.   Thank you.

Sincerely,

Joseph DiGilio
Rockville, Maryland

# EXHIBIT 12

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 20, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:   United States v. William Heaton, Case No.07-042

Dear Judge Huvelle:

My name is Kathleen DiGilio and I am Will Heaton's aunt, his mother's sister. I live here
in the metropolitan area in Rockville, Maryland with my family. I have known Will since
he was born on July 17, 1978, becoming the first grandson. Our family is and always has
been a close-knit group. Though Will did not grow up in the Washington, DC area, he
and his family spent many holidays here, as well as summer vacations. Our parent's house
was always a favorite meeting place. Will and his cousins were always entertaining the
adults with plays and shows they would put on in the basement. Or they would spend
hours in a game of what they called "flashlight tag." Will and his brother, being the oldest
cousins, were expected to "save" the younger ones. My children, who still refer to the
game as the scariest but most fun they ever had, were always glad when Will was in town
to play as they knew he would "protect" them. Most summer vacations were spent at
Ocean City, Maryland with everyone building castles, riding the waves, talking and just
having a genuinely good time. Each visit, I saw the compassion, the leadership, and the
gentleness that Will displayed, grow deeper and deeper. He was just a great kid.

During his latter high school years, Will applied for a page program in Washington, DC,
and was selected. He spent a year going to school here and working at some of the
district buildings. I saw an independence and determination in him not always present in
boys his age. At graduation from the program, which my family all attended, I saw how
much Will was respected by his teachers, elders, and peers. He had made life-long friends
and possessed a dedication to serve others. He introduced us to his teachers and they all
said how efficient Will was in his jobs. He was highly praised by all who worked with him
for his integrity and dedication. Will always gave one hundred percent in whatever he did
and was extremely loyal to everyone he came in contact with.

During this time as a page, back at his high school in North Carolina, elections for
student council were underway. Will decided to run for President. I remember thinking
to myself how this boy who had not attended his high school during his junior year
because of doing the page program, and had not had much visible contact with his
classmates, thought he could win the election. It is hard enough to win such an election
when one is present everyday at the school and campaigning. I actually was stunned when
I heard Will had won. I thought it was remarkable that a teenager could have such a

profound influence on a school his first 2 years there, be away for a year, and still be held in such regard as to be voted student council president. He must have left a spirit and enthusiasm at his school that one did not forget.

Will attended the College of William and Mary and then moved to the Washington, DC area to work on Capitol Hill. When he came to live here, he moved in with my mother, his grandmother, who lived by herself. Mom was so happy to have him there as she had a special place in her heart for her first grandchild. My sisters and I were also glad to have some one in the house to keep her company and be on hand if she needed anything. Will took her to church, for walks in her wheelchair, went to the grocery store for her, planted flowers and did a host of other jobs that needed to be done. He would watch TV with her on some evenings and take her out to eat for lunch or dinner. It was a great comfort to me to know he was there to check on her. I didn't worry because I knew Will would protect her. Since Will had spent many holidays at her house with his family when he was growing up, he even made a point to make sure the house was decorated as Mom had done herself for so many years. One time I went down to the house around Christmas time, and found the tree and all the trimmings already out of the attic and put in all the right places. Will was raised with a lot of family traditions and has never forgotten them. He also would come to visit my family on occasion, attend my son's baseball games, or help them with government projects. He was just always there to lend a helping hand.

I know Will liked his job on Capitol Hill but am not sure exactly what his duties were. I am sure, though, that whatever those duties were, Will was an ardent and hard worker in doing what was expected of him. As exemplified in his younger days, Will gave 100 percent of himself to you as this was innate to his character. One could always count on Will to be a faithful employee. About a year before his marriage to Katie, his wife, my Mom who had previously been living with Will's mother, came to stay with me for awhile. She was a hospice patient and not in the best of health. Will came to visit often. There was still a special bond between the two of them. He would stay for hours, the two of them just talking or looking at old pictures, telling stories. One day, I remember my Mom was in a bad mood, but when Will arrived he had her laughing and smiling within minutes. He brought so much love and happiness to the final days of my Mom's life and I will always be thankful for his care and concern.

I am aware that Will pled guilty to a criminal charge and is awaiting sentencing. I know he is cooperating fully with the government as this is what Will does. His conduct in committing the charges against him is totally out of character. Having known Will all his life, this would never change the way I feel about him. He is a loyal and trustworthy person, someone I can count on to be there if I need him, someone I can trust to the fullest and someone who is full of love and compassion. He is a vital member of our family and I have the utmost respect for him. I would never question his integrity. I know he is very upset over what he did and sorry if anyone else has suffered because of the charges against him. I ask that you would please be lenient in your sentencing of Will. He is truly a wonderful person, one I am so proud to call my nephew. Thank you for taking the time to read this.

Sincerely,

Kathleen DiGilio

# EXHIBIT 13

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

27 June 2007

The Honorable Ellen Segal Huvelle
United States District Court
     for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re: <u>United States v. William Heaton</u>, Case No. 07-042


Dear Judge Huvelle:

I am writing in regards to the government's prosecution of William Heaton in connection
with his work in former Congressman Bob Ney's office. I am aware that Will has pled
guilty to a criminal charge of conspiracy to commit honest services fraud in connection
with his work in Congressman Ney's office, and has fully cooperated with the government
since long before he pled guilty to the charge.

I have known Will for my entire life. He is my cousin - our mothers are sisters - and is the
oldest grandchild in the Donovan family. Because he is the oldest grandson, and I am the
oldest granddaughter, Will has always been a special role model for me, setting the
standard for all twelve grandchildren in the family. Growing up, I always looked forward
to holidays and birthday celebrations when the family would get together. Some of my
fondest childhood memories center around the Heatons coming to visit and spending time
with them. Will was, and continues to be, the responsible one, the mature one, the one
who keeps all of us in line. When one of our rebellious cousins would act up, a simple
look from Will would make him shape up. Will has a strong sense of family and tradition.
Even today, he organizes regular happy hours for "the cousins" who still reside in the
Washington Metropolitan Area.

Will is a leader. His strong morals and genuine compassion for others has earned him the
utmost respect from not only myself, but all those around him. Will has a gentle strength
and a positive demeanor which enables him to relate and connect with people from all
different walks of life. When you are in his presence, you instantly feel welcome and at
ease. It is these qualities which truly embody and define my cousin, Will Heaton.

My maternal grandmother passed away last year, and Will remained a pillar of strength for
his mother and for the entire family. He has a keen sense of responsibility and stands
strong as a source of comfort for others when they are in pain or in need. My own mother
was recently ill and hospitalized. It was no surprise that Will was the first to get in touch
with me to see how my family was doing and to inquire as to how he could help. His
selfless offerings of service are part of who he is.

Ever since we were young, I knew that Will would grow to become an upstanding,

successful man.  His participation in the United States Government Page Program when he was in high school hinted at his interest in politics.  This interest was then affirmed by his decision to study Government and History at the College of William and Mary.  Will approaches all tasks in his life with the utmost dedication and determination.  When he began working for former Congressman Ney, I remember being so proud that my cousin had become the youngest Congressional Chief of Staff.  He was later recognized by the Capitol Newspaper as one of the Top Ten Most Promising Young Professionals in Government.

I wholeheartedly believe that the conduct for which Will has pled guilty is completely out of character for him.  Judge Huvelle, I ask you to be lenient on my cousin, my role model, my friend.  These charges very much contradict the loyal and trustworthy person that I have known my entire life.  Thank you for your consideration.


Respectfully,

Kimberly DiGilio
Washington, DC

# EXHIBIT 14

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**



## WASHINGTON THEOLOGICAL UNION

June 27, 2007

The Honorable Ellen Segal Huvelle
United States District Court
    for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:    <u>United States v. William Heaton,</u> Case No. 07-042

Dear Judge Huvelle:

I am writing to you on behalf of Will Heaton. I am aware that Will has pleaded guilty to one charge of conspiracy to commit honest services fraud in connection with his work in Congressman Ney's office. Further, I know that Will has co-operated to the fullest with the government for a long time prior to his plea of guilty to the charge.

Will and I met at Washington Theological Union in September 2006. In his role as Consultant to the President of the Union, one of Will's challenges was to help re-establish a working Development Department. Within a few weeks of his arrival I was hired to work with Will as the Office Manager for Development.

Upon meeting Will, my first impression was this is a professional, intelligent, fine young man. Over the course of the next six months we worked as colleagues. Consistently I found my first impressions to be true. In all of his interactions, Will always showed respect for the individual and what they had to contribute to the discussion. This was evident in his one-on-one interactions as well as when he was facilitating a group discussion or a meeting. He consistently comes across as a warm welcoming individual, a real people person. A clear example of this is in how over the course of several weeks Will met with all of the key staff and faculty of the school and soon had them not only offering suggestions, but showing a willingness to help and be included in the Development Plan for the institution. In the past, these same people felt like they had not been consulted nor did they have a role in development for the school.

Because of the task before us, Will and I spent a lot of time working together. His strong commitment to family – his wife, Katie; his parents; brother and sister is evident as he shared stories and took time to be present for family gatherings, most times requiring travel of some distance. Will's faith in God and valuing of his Catholic tradition shone through in how he conducted himself, consistently upholding a high ethical and moral standard.

Will has always struck me as an individual willing to help with whatever needed to be done. It did not matter if it was envelopes that needed to be stuffed or laying out the details of a strategic plan, Will did his part. He showed interest in learning new things, but was always willing to share his learning. I recently learned that he has again become involved in a literacy program, tutoring those who need assistance.

Knowing and experiencing Will as I have noted here, I was shocked to hear of the situation which Will finds himself in at this time. I strongly believe that the conduct for which Will has pled guilty was out of character for him. This is a young man who has much to offer his community, the world and the Church. I hope that Your Honor will consider all of this when sentencing Will.

Thank you for allowing me to express my feelings and impressions of Will Heaton.

Sincerely,

Sister Lisa Marie Drover, CSSF
Washington, DC

# EXHIBIT 15

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 24, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re:  <u>United States v. William Heaton,</u> Case No. 07-042

Dear Judge Huvelle:

On Monday, February 26, 2007, I sat alongside William Heaton's parents as he pleaded guilty to one count of conspiracy in connection to his work in former Congressman Bob Ney's office. For Will, that day ended a long journey wrought with heartache over the pain he had caused so many people. For months, during his cooperation with the US government, Will had been unable to speak of his actions to family members or friends, all the while maintaining a sense of normalcy. Now, he could begin to apologize for and heal the wounds that his actions had helped to cause. When Will asked me to appear in court to support him and his family, I immediately agreed. Later, while sitting there, I struggled to understand how the most genuine, trustworthy, and hard-working friend I've ever known had fallen so far. His actions under Congressman Ney's tutelage seemed so wildly out of character for my friend of ten years.

I first met Will in the Fall of 1996, while I was a junior at the College of William and Mary. Will was a freshman and had recently joined the ultimate frisbee club. Early on a Saturday morning, our team embarked from Williamsburg towards suburban DC for a weekend tournament. I was annoyed by having to drive three freshmen in my car, preferring to be in the company of my friends. Despite my poor attitude, Will engaged me in conversation over the course of our drive. I was immediately struck by his positive, continually upbeat personality. Even after a full weekend of rigorous play, punctuated by a number of losses, Will remained energetic and kept me alert during our drive back to Williamsburg. We quickly became best friends. Even today, in the face of his upcoming sentencing, Will remains positive. He understands the impact of his demeanor on his friends and family.

I moved to California before Will's graduation, but remained in constant contact with him. Our careers took different avenues, but our friendship remained steadfast. It was no surprise when Will went to work on Capitol Hill. He seemed well suited and was excited for a career in public office. His transition to Bob Ney's office though, marked a shift in our relationship. Bob Ney was extremely demanding. He would call Will at all hours of the day, even while on vacation. I believe that he preyed upon Will's young age and eagerness. Will trusted the seasoned Congressman. His loyalty to Ney and work scuttled his decision making professionally and privately. I moved to DC in the Fall of 2004, excited that I would see my best friend on a regular basis. I vividly recall Will telling me, upon my arrival, that he would never be able to visit with me, Monday through Thursday. His life had been consumed by Bob Ney and a myriad of political functions. I was not eager to be "penciled in" to his calendar.

Today, I speak with Will on an almost daily basis. We often discuss his past and how his case affects his family and friends. Outwardly, he is optimistic, so that those close to him may gain strength through his countenance. Life post-felony however, is not so bright. His new marriage has been deeply strained and his inability to find consistent work challenges his financial well-being. I know that Will is deeply saddened and ashamed by his actions and especially his change of character. Over the past few months, he has reached out to numerous friends and former work acquaintances to apologize for his conduct during his tenure under Ney. He has only encountered support from these efforts, a testament to the true quality of his character. Will has learned many lessons from his mistakes and pledges to become a better individual in light of them. I ask for leniency in sentencing Will Heaton, so that this young man may quickly restart his career, revitalize his marriage, and continue to support those important in his life.

Sincerely,

Christopher Edmunds

Washington, DC

# EXHIBIT 16

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 27, 2007

The Honorable Ellen Segal Huvelle
United States District Court
   for the District of Columbia
333 Constitution Ave., NW
Washington, DC  20001


Re:  <u>United States v. William Heaton</u>, Case No. 07-042


Dear Judge Huvelle,

My husband and I acknowledge that our friend of 13 years, Will Heaton, pleaded guilty to one charge of conspiracy to commit honest services fraud in connection with his work in Congressman Ney's office. We understand that Will has cooperated fully with the government long before his guilty plea and is currently awaiting sentencing.  We are compelled to share some thoughts about Will's true character as a warmhearted, hard working, religious, and thoughtful person.

My friendship with Will began as Congressional Pages in the fall of 1994.  As there were only twelve Republican pages selected to stay the entire year, there was an instant friendship between the two of us.  As I look through our page yearbook I can sight the following accomplishments: Will was voted by his peers "Best Overall Personality," had perfect attendance throughout the school year, was voted to be a representative on the Dorm Activity Council, was a member of the National Honor Society, and contributed to the literary magazine. Everyone wanted to be in Will's presence because of his amiable personality and his goodwill.

What I specifically remember from our page years was working together in the cloakroom.  After several months as cloakroom pages our supervisor decided to introduce new pages one at a time to the cloakroom positions.  By drawing straws, the person left with the shortest straw would relinquish their position in the cloakroom to become a runner page.  Unfortunately for me, I drew the shortest straw indicating my time in the cloakroom was complete.  Knowing I enjoyed working in the cloakroom and aware of my devastation of having to leave, Will selflessly surrendered his cloakroom position to become a runner page.  Will was sensitive to my feelings as he is with all his friends and family.  Although our paging years ended, our friendship continued. Will is the kind of person worth keeping in touch with, the kind that gives someone the shirt off his back, or opens up his house to friends in need of a roof over their heads.

As residents of New Orleans, August 29, 2005 will always be a vivid date in our minds. My husband and I were affected by Hurricane Katrina, and like so many others we were searching for a place to live. We needed something temporary while we got back on our feet. Will volunteered without question and opened his home to us. He welcomed us for two and half months during our evacuation time. Although Will had a busy schedule, he never hesitated to listen to our anguish and cheer us up when needed. We were states away from our immediate families, but Will treated us like family when we needed it most.

Will Heaton is a good person and one not deserving of ill fate. He is held in high regards by his peers and loved by his wife and family. We support Will because we believe in his true character; one that has been proven time and time again as a responsible, trustworthy and good natured person.

Sincerely,

Tatum Evans
Austin, TX

C. Todd Mayberry
Austin, TX

# EXHIBIT 17

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

# Polsinelli

### Shalton | Flanigan | Suelthaus pc

555 12th Street, N.W., Suite 710 | Washington, D.C. 20004-1206
(202) 783-3300 | Facsimile: (202) 783-3535 | www.polsinelli.com

July 2, 2007

The Honorable Ellen Segal Huvelle
United States District Court
for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:    <u>United States vs. William Heaton,</u> Case No. 07-042

Dear Judge Huvelle:

The purpose of this letter is to express my knowledge and familiarity with William Heaton's good character and solid reputation as a friend.

It is my understanding that Will pled guilty to a criminal charge and awaits sentencing. Will pled guilty to one charge of conspiracy to commit honest services fraud in connection with his work in former Congressman Bob Ney's Washington office. It is also my understanding that Will cooperated fully with the government long before and subsequent to the time he pled guilty to the charge.

I first met Will in 2002 at a charity event in Washington, DC and have enjoyed a friendship on a personal and professional level since that meeting. Further, I believe the friendship we have enjoyed for 5 plus years provides me a unique perspective on his character.

On a personal level, Will has always been a person I can trust for sound advice, empathy and confidence. On one particular occasion, when we discussed a personal childhood tragedy that left terrible and deep psychological scars – and even caused some family members to distance themselves – I found his demeanor and immediate offer of help and support calming and comforting. In fact, Will's initial reaction was calmer and more constructive than that of some family members and friends of many more years. He has my implicit trust.

Regarding professional experience, on numerous occasions I never found Will to be anything less than considerate and helpful. For example, a prior employer had a client with a service it wished to sell to the federal government and, for that reason, wanted to meet with Will. Often a Congressional Office will meet with an individual or institution

and politely decline or offer to help. Will met with us longer than the allotted time, listened intently to the client's presentation, discussed the company's product application and suggested where it might work best. Further, over the course of several months following that meeting, he proved to be a consistent and reliable source of communication and information.

In my opinion, Will was in the classic wrong place, with the wrong person, at the wrong time environment. He was a young man who worked for a very powerful and impressionable congressman who exploited his youth and inexperience. Congressman Ney was very popular with his constituents, fellow politicians and the greater Washington, DC professional community. When one recognizes that professional politicians and adults succumbed to Mr. Ney's charm and believed his lies, it becomes clear that a young man in his first job had no chance against such a charlatan.

This has been a humiliating experience for William Heaton. He has withdrawn from and in some cases avoided his friends. Will has lost weight and aged dramatically over the past two years. He has, clearly, suffered.

Given my personal and professional experience with him, I am confident had Will worked for anyone other than Mr. Ney he would not be before you today. In fact, I firmly believe the charge to which Will has pleaded guilty is out of character for him/

As you consider his sentence, I ask that you take into account Will's reputation amongst his friends and professional colleagues.

Thank you for your time and consideration.

Sincerely,

Edward Eynon

# EXHIBIT 18

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

ROBERT C. GATES
1436 WEST WINONA
CHICAGO, IL 60640

June 28, 2007

The Honorable Ellen Segal Huvelle
United States District Court
    For the District of Columbia
333 Constitution Avenue, NW
Washington D.C. 20001

Re:    *U.S. v. William Heaton*, Case No. 07-042

Dear Judge Huvelle:

It's difficult to comprehend that my good friend, William Heaton, will soon be before you for sentencing. In the 12 years we've known one another, I have only known Will to be a man of high character. The charges for which he has plead guilty are an aberration when considered against the life he has led.

Will and I first met as Congressional Pages in January 1995. Will was the seasoned first semester veteran, I was the new rookie coming on board the second semester. Will and I were assigned as roommates. For most people, when a third person assigns you a live-in roommate, news of that assignment is likely greeted with trepidation. After all, we've all heard the stories about roommate assignments leading to disaster.

Will, though, is not like most people. Instead, I was greeted with a hearty handshake and an immediate itinerary detailing the schedule of events. Will had taken it upon himself to not only be my roommate, but to be a guide as to the ways of the Page Corps, Capitol Hill, and – most important – the closest greasy spoon (Pete's). From the outset. he went out of his way to be generous with his knowledge, time, and advice.

And it was no small feat turning a kid from the sticks of northwest Illinois into a contributing team member.

Will's generosity did not extend only to me. Walk into our suite and you were likely to find a number of people waiting to run something by Will. Quick to share his knowledge, never asking for anything in return, Will was eager to help ease the transition.

Keep in mind, your honor, this was when most of us were 15 to 16 years old. We came from all parts of the country and from different

backgrounds. This is about the age when the idea of going to Wal-Mart by yourself in your hometown was a rite of passage – never mind landing in Washington, D.C. unaccompanied.

Absent Will Heaton, many of us would have lost our bearings.

For example, I got myself into a delicate situation after speaking to a national talk radio show without prior approval from the Speaker of the House's office. This typically is an offense that results in packing bags and going home.

Once news spread of my predicament, the first person to reach out to me was Will. He became my de-facto counsel. He spoke when I could not and, at every turn, sought to take the pressure off my shoulders. Will even aided in drafting the letters I sent to various Members of Congress and, ultimately, my parents.

I recognize that reading old stories about teenage Will might give you pause in terms of its relevance. Well, those same qualities demonstrated years ago persist today. Will is always quick to respond to a plea for help, generous with his time, and compassionate to a friend's needs.

Your honor, the charge that Will is pleading guilty to is serious and disappointing. Will's once-promising career is now over. The life he once knew, gone. And it appears all because he made the mistake of working for an abysmal man, Rep. Bob Ney. Will's judgment lapsed and he has paid the price.

Somebody once told me that mercy bears richer fruits than strict justice. In this case, your honor, you can achieve both. Justice has been served as evidence by Will's cooperation with the U.S. government. His career is over and his reputation tarnished. By demonstrating mercy, Will's community and Church will benefit having the riches of his talents.

Thank you for reading.

Sincerely,

# EXHIBIT 19

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 25, 2007

The Honorable Ellen Segal Huvelle
United States District Court
  for the District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

Re:  <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle:

I am writing on behalf of William Heaton who is to be sentenced on August 15th of this year.  Will's mother Debbie, and I are first cousins and the same age.  She and I grew up less than a mile apart from each other here in Washington, DC attending both grade school and high school together.  We have remained close since childhood, although Debbie and her family have lived outside the area.

After Will graduated from college and came to live and work in the DC area, we were able to become engaged in family and career activities.  We have enjoyed lunches, receptions, dinners and cookouts together, as well as our various members of the family getting married and Will's own marriage.  We continue our family relationship to this day.

Will had a wonderful career ahead of him when he first went to work on Capitol Hill.  He was on a first name basis and had excellent working relationships with Members of Congress and their senior staff.  Our family was honored when Will became the youngest Chief of Staff on Capitol Hill.  Will has always had a very strong commitment to duty and I know he took his new responsibility seriously.  It is clear to me that he naively took instruction from others believing he was doing his job, and he made a terrible mistake.  He has admitted his guilt; and I can personally testify to the pain he feels regarding his part in a much larger plan to deceive the American people.  Will comes from a religious and patriotic family where his reputation and commitment to honesty are the foundation of his character.  I cannot understand how Will could consciously make a decision to commit a crime, nor do I believe he fully understood the criminal nature of his actions.  His actions have caused a family crisis, created severe emotional and financial damage, and his reputation is suspect to everyone for the rest of his life.

I do not intend that this letter should diminish Will's culpability. However, I do believe his basic character, his young age and impressionable approach to learning how to function in his new position would be a clear indication of his innate inability to share in the motives of those who acted to violate the law to further their own agenda. I hope, therefore you could see some ground to justify leniency in his sentencing. Additionally, I can testify that the significant damage to his faith, finances, family, relationships, and future employment has been and will continue to be devastating for many years in the future.

Thank you for taking the time to hear my plea, for understanding my personal relationship with Will and for considering a sentence which recognizes Will's genuine remorse for what he has done.

Sincerely,

Kathleen N. Grady
Reston, Virginia

# EXHIBIT 20

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 23, 2007

The Honorable Ellen Segal Huvelle
United States District Court
      for the District of Columbia
333 Constitution Ave., NW
Washington, DC  20001

Re:    <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle:

I am writing today in reference to Will Heaton who I understand has pled guilty to a criminal charge and is awaiting sentencing.

I first came to know Will in the summer of 2000 when he worked as an intern in the Republican Cloakroom of the U.S. House of Representatives.  It was the practice to offer one or two of the best House Pages the opportunity to work in the cloakroom over the summer.  Will had previously graduated from the House Page Program and was invited to work in the cloakroom the summer following his college graduation.  He was a hard worker, knowledgeable of the legislative process and always willing to go the extra mile to assist staff and Members of Congress.  I was so impressed with Will that in August of 2000 I offered him a position as my assistant in the Floor Office of the Speaker of the U.S. House of Representatives.  At that time, I served as one of the Speaker's two floor assistants responsible for the day-to-day legislative functions of the House of Representatives.

Will was an immediate asset to our office.  He was always willing to work the very long hours required of our positions and never complained.  He was exceedingly courteous to Members and staff and never sought recognition or credit, traits that are extremely rare on Capitol Hill.  I got to know Will very well while we worked side-by-side.  I was so impressed at the relationship he had with his family.  He spoke to his mother in North Carolina regularly and visited his elderly grandmother almost every weekend.  His grandmother's health was failing but she insisted on remaining in her home.  Will would stop by her home and help with any chores that needed to be done, mow the grass, pick-up groceries as needed or sometimes just sit and talk with her.  He would frequently talk about the time when she would need to move out of her home and how difficult that would be.  You do not often see a young man in their early twenties so willing to help others.  That is truly a testament to his strong family values and his deep religious faith.

Will and I did speak from time to time about his faith.  During the year that he and I worked together, he often joked about what he wanted to do when he "grew-up".  He contemplated further religious study including the possibility of joining the priesthood.  He spoke with the House Chaplain as well as other active Christians to seek their guidance in this area.  In the summer of 2001 Will was approached by Congressman Ney to come and work in his office.  He had been very surprised at the offer and spent a great

deal of time discussing the opportunity. Will was concerned that his age and lack of experience would make it difficult to serve as Chief of Staff to a Member of Congress. I tried to persuade him from taking the position. He was smart and very mature but not ready for the responsibility this position required. Mr. Ney offered him a significant pay increase and continued to pursue him to accept the position. Will did accept the offer and worked very hard to learn all facets of the job.

Will and I continued to communicate over the next few years as I moved from the Speaker's office to serve as the Clerk of the U.S. House of Representatives. I noticed during this time that Will began to change. He drank heavily, something he had not done previously. As part of his job he was required by the Congressman to accompany him in the evenings outside of the office. I often worried about Will and would question him about how he was doing. I encouraged him to consider leaving Mr. Ney's office because I could see the toll the job was taking on him physically. He always tried to maintain a positive attitude and did not want anyone to worry about him. As I said previously, it is his nature to put others ahead of himself.

I hope I have been able to shed some light for you on the person I know, respect and care deeply for. The legal troubles he has faced have been an incredible drain on him personally and his family. This has damaged his professional reputation but the strain it has placed on his family weighs heavy on his mind. After everything that Will has been through, his first concern is to his family and the second is to learn from his mistakes. He talks about a future working with young people to help them avoid the mistakes he has made. As I said at the beginning of my letter, Will Heaton cares deeply about his family and others. He is a rare individual and someone I believe has truly learned from the mistakes he has made.

I appreciate your consideration of my letter and hope that you will contact me if I can provide any additional information.

Sincerely,

Karen L. Haas
Laurel, MD

# EXHIBIT 21

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 26, 2007

The Honorable Ellen Segal Huvelle
United States District Court
     For the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re:  United States v. William Heaton, Case No. 07-042

Dear Judge Huvelle,

Will Heaton is many things to me.  He is my best friend, and has been my whole life.  He is the person I go to when I need help or advice.  I do this because I respect his intelligence, his heart, and his ability to abide by strict principles of integrity he sets for himself.  He is a compass which I have always followed, and which has always led me without fail in a direction of honor, respect for others, and a love for life and everyone around me.  However, the most important thing that Will is to me is my brother.  We have been together our whole lives, and this allows me the solitary ability to know Will better than almost everyone.  I have seen him in happiness, sadness, anger, and peace.  I have been with him amid struggles, losses, and victories.  We have fought with each other, and celebrated with each other.   We have grown apart only to reunite stronger in our relationship as brothers.

I stress this point of brotherhood, because I want you to believe that what I say about Will in this letter is the truth.  I write to you with the honesty, integrity, and respect that I hold so dear, and which I have tried to emulate my whole life because of Will.  This letter is not meant as an excuse for my brother, but rather as an explanation of how Will's crime is so completely out of character for him.   What I would like Your Honor to see through this letter is that Will's crime is an anomaly, and that though guilty, he remains the honorable man that everyone recognizes immediately when they meet him.

Regardless of where I have been in my life, or where Will was in his, I have always been able to depend on him.  I have always known, and still do, that if I need help, my brother will be there regardless of what he is doing.  There are countless examples of this, but one stands out in my mind.   I got married almost a year ago now, and Will was my best man.   The whole week before the wedding, he was by my side doing anything that was needed.   It was the biggest day of my life, and it was perfect, and Will was with me the whole way through.   It was not all the errands he did, or small things he took care of that made it so important that he was there.   It was the sense of reassurance and stability that he gave me that made it so important to have him by my side.   Will has this way of making you feel confident and strong when he is around.   The whole night before my wedding I was up memorizing my vows.   I was so nervous that I would stand in front of my wife and guests the next day and forget what to say.   Will stayed up with me that night and listened to those vows over and over again. He never once told me to stop, or

that he was going to go to bed.  He waited till I was sure I had them, and told me that he would be right there behind me the next day when I spoke them to my wife.  The next day during my wedding, as I was giving my vows to my wife, I could feel Will's presence behind me.  I knew that he was saying those vows with me as I spoke them.  It was if he was right there next to me whispering them in my ear so I got them perfect.  That is how Will makes you feel.  He makes you feel sure of yourself regardless of the task in front of you, and if you do stumble he is right there to catch you before you fall.

No matter what Will accomplishes, he will never be the one to tell you.  You always find out about his awards, honors, and victories from someone else.  He is incredibly humble, and I think he measures his accomplishments on how they help others.  He might be the best at something, but if it hasn't helped someone else in the process then I don't think he counts it as a victory.  He has always succeeded at what he does through his determination and hard work.  He has received countless honors, awards, and trophies throughout High School and College.  However, you never found out about those awards until he was recognized for them.  All throughout high school he was involved in many activities.  He ran varsity cross country almost every year, and was a member of various clubs in which he held office.  He was also deeply involved in student government, and was elected student body president his senior year.  Being elected as student body president is a very respectable accomplishment in its own right, but I bring it up because Will won the office his junior year while he was in Washington, DC working as a Page for Congress.  Everyone at our school knew Will, and respected him so much, that they elected him to the highest position a student can hold in high school even though he was not there.  I was a freshman the year Will was elected, and though I would never have admitted it at the time, I was amazed and awed that my Will was my brother.  I secretly held him in my mind as a role model, as the top rung of the ladder to strive for, and I still do to this day.

Will was also never the typical older brother throughout our high school years.  He didn't avoid me in the hallway, make fun of me with his friends, or pull pranks on me to embarrass me.  Will was exactly the opposite.  He always introduced me to his friends, and I became known as "little Heaton" in the hallways of our school.  For a freshman and sophomore in high school to be friends with all of the seniors is a pretty big thing.  I know that in the grand scheme of things it might not have a great effect on the world, but it did change my life.  Having Will's support in High School got me through those early years when I was struggling to make friends.  He could have easily ignored me and left me to fend for myself.  Instead he embraced me, and probably without even knowing it helped me to become more confident and secure.

I know that this example might seem menial, but it is important to me, and I tell it because it shows what kind of person my brother is.  Will is the type of person who measures his success on a difference scale than most of us do.  Often, a person's success is measured by how far ahead of others they get.  Success is weighed on how much better they are than their peers.  Will's whole life he has tried to use the gifts, skills, and talents that he has to help others achieve more.  He might be the best at something, but the whole

time he is at the top of the list he is helping everyone under him to be better also.   Will looks at success as the ability to help others succeed.

When Will first graduated from College, he started working in Washington DC right away.   He advanced rapidly through positions until he was listed as the youngest chief of staff to work for a member of Congress.   I know he worked hard.   I remember talking to him, and Will telling me how many hours he had to work, and all of the things he had to balance.   Was he complaining? Absolutely not.   Will worked incredibly hard in everything he did, and that dedication and intensity is what granted him the quick promotions that he received.   He loved what he did, and it was evident when I talked to him.   Though tired, he spoke with excitement, with passion, and with a vigor for life that he has always had.

During the last few years that Will was Chief of Staff for Bob Ney, all of those wonderful qualities that I just mentioned began to fade.   Judge Huvelle, I am not sure if you have an older brother or sister.   If not, please think of someone that you love, admire, and who has been a role model in your life like Will has been in mine.   When you know somebody this well, you see changes in their personality and being even though they might not.   Even though Will always said that he was fine, everything was going well, and he loved work like he always had, I knew that something was different.   I could hear it in his voice.   I could see it in how he acted.   It was a very visible and evident change in him both physically and emotionally.   I remember when Bob Ney asked Will to be his Chief of Staff.   I know that Will worked hard, but he still expressed doubts to me about taking the position.   He was worried because he was one of the newest members of the staff, and was about to outrank people that had worked with Ney much longer than him.   I remember talking to him on the phone, and Will telling me that he had expressed his doubts to Ney, but Ney continued to want him as his Chief of Staff.   I remember that Will finally did accept the job, and over the course of his career as Chief the changes I mentioned above began to become noticeable.

In hindsight, I now know what brought about this change in Will.   He knew that he had carried out orders and actions that were wrong and unethical.   I know and love my brother.   I know how honest he is, how much he cares for others, and how much he values his morals and ethics in everything that he does.   I can not even begin to imagine the pain and burden that he carries.   Despite his pain, Will has still managed to amaze me with his composure, honor, integrity, and respect for others.   Will knows what he has done, and it would be incredibly easy to fall into a pattern of self pity and guilt.   Despite everything that he is going through; all the pain, guilt, sorrow, embarrassment, and responsibility, Will still manages to put everyone around him first.   In the privacy of his heart and mind I know that he worries about his own future, including whether he will be sent to prison for his crime.   But Will still puts everyone around him first.   He worries about his wife, family, and friends more than himself.   I know that his greatest source of pain is that he feels he let all those around him down – his family, friends, and country.

I wish I could explain to you how deeply rooted my brother's sense of responsibility to uphold his values and ethics is.   His whole life he has striven to succeed in order to help

others.   He has a deeply inset sense of duty and respect, and in this case that code of honor hurt him.  Will and I have been brothers for twenty seven years, and throughout that time, Will has guided me towards a life of love, respect for others, and responsibility to help those around me.  There has never been a moment when I could not count on Will to support me, and even now, he would forego all his own worries to help me if I needed it.  Will is my older brother, my friend, my role model, and my guide and compass. Please take his many good qualities into account when deciding his sentence.

Respectfully,

Brian Heaton

# EXHIBIT 22

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 29, 2007

The Honorable Ellen Segal Huvelle
United States District Court
    for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:  <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle,

I write to you on behalf of my son, Will Heaton.  In writing this letter, I am reminded of when Will first told us about working in Mr. Ney's office. He was so excited – a recent college graduate who had gone to Washington to pursue his dream of working in government and he was soon to become the youngest Chief of Staff on Capitol Hill!  But Will was also openly apprehensive. He felt he was too inexperienced and was worried that he might not successfully execute the duties expected of him. However, he greatly admired Mr. Ney and felt confident that Mr. Ney, as well as others in his office, would guide him along the way and help him to understand his duties. Will had a great amount of respect for Mr. Ney because of his public service record, his enthusiasm for his office, his friendly ways, and of course, for the confidence he had in Will.

Over the years that Will worked for Mr. Ney, life became busier and busier. When Will visited us at home, he was always on the phone. In management myself, I know that there are many responsibilities and concerns which take up a great amount of time. However, a long week-end in North Carolina should not have been consumed with phone calls and e-mail messages.  Will appeared to be caught in an ever-growing network of challenges, with no one to report back to except Mr. Ney.  Although he worked hard, he realized much too late that Mr. Ney had surrounded himself with hard-working, young, inexperienced staffers for all the wrong reasons.  If only foresight was as good as hindsight.

Soon, Will became "edgy" at times in our conversations. (Later, we discovered this was about the same time that Will was co-operating with the government in the Abramoff scandal). Where he used to be proud of Mr. Ney's accomplishments and speak enthusiastically about business travel and opportunities provided, he was evasive a little bit and wanted to end conversations quickly. He did not readily provide information about his previous work week. He was soon to be married, so he spent time in our conversations talking about his up-coming wedding rather than about work.  However, even in this part of our conversations, Will seemed to be on edge and overly sensitive about things. Will has always been an honest person so I know that because he couldn't tell me many things at the time, he was uncomfortable. He made a valiant attempt at concealing his frustrations and his predicament, but as a parent, I knew something was not as it should be.

Then came what I think is one of the most difficult conversations that Will has ever had to have. He was not able to come home, so he had to break the news to his mother and I over the phone.  With reluctance and sadness in his voice, he told us about his involvement in the Washington scandal. His regret and remorse were so heavy that it was difficult for us to listen to him and not be able to share a hug. Next came the disbelief. Will had rarely gotten himself into any kind of trouble while growing up. When I was a teenager, I gave my parents a "run for their money".  Will was never any problem. He usually always followed the rules and kept himself busy and out of harm's way. I remember one time when he was late for curfew. Being home on time was very important in our household. He was fifteen minutes late so he owed us fifteen hours. A lot of wood got chopped the next day, but Will was never late again! Now he was facing a huge challenge in his life. It was hard for me to understand how he found himself in this kind of trouble.  I was stunned because it was all so out of character for him. I know my son well enough to know he somehow must have gotten confused in a maze of service, loyalty, responsibility, and allegiance to a man and to a job. As hard as it was, I know it was a relief for Will to finally be able to talk about everything. He went slowly and explained things for us in sequence so we could better understand. He did not make excuses for his behavior. But when I heard the quiver in his voice, I also knew how much he was hurting. Will holds himself to high expectations. It hurt him deeply to not only have let himself down, but to have also let others down.  When I think about how he had to keep everything quiet for the longest time, dealing with his emotions privately without the comfort or support of others, it breaks my heart. It also gives me a real sense of pride in my son to know that he handled all of the embarrassment and regret and dishonor with strength and dignity. He told us that he had been meeting with a priest who was helping him through his feelings. Will knew it was important for him to be able to forgive himself and to see himself worthy in the eyes of God. It has been a struggle and a real journey for him.

When Will and his siblings were younger, my job caused me to travel quite a bit.  It also caused us to relocate three different times. Will was born in my home town in South Carolina. When he had just turned six and was in first grade, we were transferred to Ogden, Utah. It meant leaving our families far behind.  Will had always been a little shy, but the new environment caused him to feel insecure. He had some trouble at school making friends as he didn't know how to "break in" to a group. He attended a Catholic school and soon he began to feel better as he became familiar with friends at church who were also in his class at school. Carpools, music lessons, and church activities kept him busy and connected. Four years later, when Will had just completed fourth grade, we were transferred again. This time we moved to Neenah, Wisconsin. We bought a one hundred year old home in an "old" neighborhood. While in Wisconsin, I traveled extensively, so Will's mom had to assume all of the household responsibilities. She became ill immediately after settling in and Will found himself "in charge" of his siblings. He did a great job and was extremely helpful to his mom. Life was very busy in Wisconsin due to my frequent absences, but Will handled responsibility well. We lived in a small town and the children could walk to school. Will thought it was pretty "neat" when he started middle school and was able to take a different route than his siblings, who were still walking to the elementary school. (But if the truth be known, Will still walked part of the way with his brother and sister before veering off to the junior high.). Three and a half years later, as Will was getting ready to enter eighth grade, we were transferred for the third time to North Carolina. This was perhaps the most difficult of all our moves for Will as he was in that awkward part of his life called puberty. Eighth grade was a little tough for him, but I feel like he emerged with few battle scars. Tough times can help us grow and mature as

well as teaching us lessons. I feel like Will left eighth grade and journeyed into manhood as a stronger person. He entered high school in North Carolina and then went on to college in Virginia. After graduation, he made his own choice to move this time. From college, he moved to Washington, DC.

Will has always been a responsible person.  Although he was shy when he was younger, and things sometimes seemed difficult for him, Will was able to find ways to establish himself within a new group in a new location. He was more comfortable in the classroom than on the athletic field. Having to prove himself in large groups such as athletic teams was hard for him. He preferred instead, extra-curricular activities such as music and scouting. Will took piano lessons for about six years and in my opinion, became fairly accomplished. However, since I do not play the piano and since I am a proud father, my opinion might be a little biased!

Will was the kind of boy and young man who always did his best at school, at work, and in daily life. He did his best because that was what he expected from himself. He is still like this today.

He is also humble. He does not like to make a big deal about his successes or accomplishments. After Will graduated from The College of William and Mary, and had just begun a career on Capitol Hill, I remember Katie, his then girlfriend, and now wife, e-mailed us and was very excited. She had discovered that Will had been written up in the newspaper and had been identified as one of the brightest up-and-coming individuals on Capitol Hill. Will knew all about it but had chosen not to say anything. He said he did not want to gloat or brag about it. There is a Scripture verse that says, "Walk humbly with thy God." That verse is what Will is all about.

In these hard times that are now facing Will, the above Scripture verse continues to guide him. His faith in God has only grown stronger. He has always held the respect of so many people and he continues to seek the respect of all those he meets. I know that he stands humbly before God and continually seeks His forgiveness, guidance, and wisdom.

My son teaches me how to be a better man. From his humility he seeks forgiveness; from his responsibility he challenges himself with new goals; from his accountability he holds himself up to new expectations and self-improvement. He knows he cannot go backwards. He only wants to go forward and to make his life as "right" as he can by reaching out to help and to serve others.  He wants to be able to build a good life for his new family.

Your Honor, Will Heaton is a good man. He is a decent, responsible, and faithful man. He is my son whom I love.


Respectfully,

Daniel Heaton
Daniel Heaton

# EXHIBIT 23

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 30, 2007

The Honorable Ellen Segal Huvelle
United States District Court
    for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:  <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle:

What a glorious day it was on July 17, 1978 – the day my son, Will, was born! Will is my fourth child, having lost three children before him while still in the womb. He is also the first male born into the Donovan (my maiden name) family. My father had two sisters and then three daughters of his own. Will is named for my dad and I can assure you that his birth was the cause for much celebration!

Fifteen months after Will was born, his brother Brian arrived and another fifteen months later, their sister, Mary Addie, joined the family. Those early years were filled with schedules, routines, sharing, laughter, hugs, helping, and an indescribable sense of joy and gratitude for love and family.

Although one salary sometimes made things difficult, I was fortunate enough to be able to stay at home with my children. Will took his responsibilities seriously, liked to follow routines, and viewed order as a necessary ingredient in completing tasks. He shared a room with his brother and expected their books to be lined up in just the right order, their toys to be put away properly, and their prayers and "God blesses" to be recited in the same sequence every night. Will felt secure surrounded by his parents and siblings, his role within the family, and he thrived within the home environment. Will was comfortable with familiarity. Superman was his favorite super-hero. Crème-of-wheat was Will's favorite breakfast. He felt a simple kind of allegiance to his own and to his family's habits.

When it was time for Will to attend kindergarten, a whole new world reached out to grab him and an incredible shyness showed itself from within. It was terribly difficult for Will to reach out and make friends and when others reached out to him, lots of new and strange feelings overtook him and insecurity settled itself into his little body. In the classroom, he was fine while doing his work and meeting goals. He was well-behaved and

sought to do his best and excel. His accountability and orderliness served him well academically. It was on the playground that he fumbled. No matter how much he wanted to get into the middle of that game of tag or bounce that basketball, his insecurities took over and he stood on the outside looking in at all the fun. He came by his shyness honestly as I was shy when I was young. Will and I spent many an evening talking, with Will trying to believe that it was OK to be shy. It was a constant struggle for him in his early years.

When Will was thirteen and entering eighth grade, we moved from Wisconsin to North Carolina. He was determined to "beat" his shyness while he had a new environment with new classmates who did not yet know who he was. As his mom, I was aware of all the turmoil going on inside him. How would he handle himself? Would he be true to all of his great qualities like determination, accountability, responsibility, loyalty?

His determination allowed him to succeed within his new classroom. His sense of responsibility created a respect among his teachers and peers. His loyalty won him friendship from his peers, despite his shyness, which he did conquer to a degree. One evening, when he was "fooling around" with his new friends on the playground, between scenes in the school Christmas Pageant, the boys thought it would be fun to balance a pole across the bumper of a teacher's car. Will agreed to carry out the task and when the teacher later moved her car, the pole shifted and dented the bumper. (the boys had already gone home for the night). The situation was discovered and the next day Will was confronted by the principal. Will had a decision to make. Did he tell the truth or did he try to protect himself and his friends? His accountability kicked in and with much regret, he admitted his role in the drama. He and his friends were reprimanded; his friends still liked him; and eventually, when the sting of the consequence wore away, they came to respect him even more for his honesty.

Your Honor, that incident is the worst trouble Will has ever been in before this prosecution. He just never got into trouble. It's tough to draw parallels, of course, but as his mother, I just don't believe that Will ever meant to harm or to deceive anyone while in Mr. Ney's employment. Just as he did not foresee that a car would be dented while playing along with his friends, I don't think Will looked far enough past his loyalty to Mr. Ney to see that he might be hurting himself, or more importantly, others.

As Will grew older, he began to realize that others saw him as a leader. He never thought to search for this quality within himself, but as he entered high school, others saw that quality within him. Will became very involved in a program called Harvard Model Congress. Will's History teacher during his freshman year was moderator of the program. Will admired the teacher very much. With his encouragement, Will became involved in a "research" capacity; Will did a lot of the behind-the-scenes work for those students who were modeling actual United States senators. His job was to help the "senator" support

and defend certain legislation that he was trying to pass. The following year, Will decided to assume the role himself of a senator or congressman. Because of his keen interest in the subject matter, his shyness began to take a back seat to public speaking. The program allowed Will a platform on which to try out his voice and persuasive skills. It also increased his interest in history and government.

At the beginning of his junior year in high school, Will wanted to serve as a United States page.  His face said it all when he approached me about it and I knew I had to let him do this. Will was mature for his age, his grades were excellent, and his desire to be involved in government and public service was burning a hole in his heart.  He absolutely loved the page program! He made many life-long friends among his peers and again gained the respect of those he worked with because of his sincerity, dedication, and loyalty. I took great pride in looking at C-SPAN every day just to see his head cross the screen when he was delivering messages to various members on the House floor!

While Will was finishing his second semester of Page School, his friends back home were thinking about their senior year. They needed a leader for not only their senior class, but also for the entire student body. Without Will even knowing about it at first, his friends organized a campaign committee for Will to run as Student Body president. When everything was in place, they approached Will with the idea via telephone. He was flattered by what they had done and with the confidence that they had in him. That spring, his friends ran an enthusiastic campaign for Will. Will sent letters and speeches that were delivered for him by his friends. At the beginning of his senior year, Will was back home from DC and elections were held. Despite his absence for much of the previous semester, Will was elected and installed as Student Body president. He utilized many of the skills he had learned in Washington. He worked hard to create an environment within the school where administration listened to the needs of students while still maintaining their authority. He wanted factions to work together instead of working separately as opposing forces. He remained loyal to his friends, the students, and to the confidence they had in him. He was dedicated to the improvement of the school. He felt a responsibility to the faculty and administration to enhance communication and to hold them up as role models. And he always held himself accountable to his job and to the position which he held. As he applied to colleges, he knew he wanted to work within the government and to be a part of public service where he could make a difference for others.

Will, along with his siblings, had grown up with a strong work ethic and knew that when you worked hard for something, you appreciated it more.  As parents, we expected him to play a role in funding his college education. He applied for multiple scholarships. He was granted several, one for twenty thousand dollars, for which we were all very proud. He also worked during college to pay for books, travel, and his social life. He volunteered for

a literacy for adults program and felt honored to be a part of the lives of people trying to overcome obstacles and read for the very first time.  It is a program he is still involved in today.

One of Will's first jobs on Capitol Hill as a new graduate was in the office of the Speaker of the House. Not long after he had been there, he was approached by Congressman Bob Ney's office to see if he would be interested in working for Mr. Ney. Mr. Ney wanted Will to serve as his executive assistant on the House Administration Committee. What an opportunity! Will was so excited to begin this new job. Not long afterwards, Will told us that Mr. Ney offered him a promotion and wanted him to become his new Chief of Staff. Although flattered, Will explained that he did not yet think he had the experience necessary to fulfill the job description and turned down the offer. Will was asked a second, then a third, time. I remember him calling home and discussing this promotion. He was still hesitant but had been assured by Mr. Ney that he was an excellent candidate for the position and Mr. Ney had explained to him that he was confident that Will would "learn the ropes" and do just fine. Will told us that this was a great opportunity for him and if others saw his potential then he needed to have the same amount of confidence in himself and move forward. With some hesitation, but trying to believe in himself as much as others did, he finally accepted the position. Will's determined and responsible nature was key to his good performance. He spoke highly of Mr. Ney. Because of the confidence Mr. Ney had in him, Will, in turn, sought to do his very best for his boss. He devoted himself to his job and to this congressman whom he admired.  When I talked to Will on the phone or when I saw him on visits, Will was *always* busy. He was either talking to Mr. Ney or to someone else associated with Mr. Ney. As time went on, it seemed that he went beyond "busy" and became consumed by his job.  His admiration for Mr. Ney only grew and he seemed to feel an extreme loyalty to this man. Will explained that Mr. Ney was exposing him to so much and that he was able to see and experience so many new places and people. Will felt a deep gratitude to Mr. Ney for all that he was offering him and so in return, Will felt he owed this man his complete loyalty and service.

The longer he lived in DC and the harder he worked, Will connected with us, his family, less and less. I realized he was a respected, hard-working young man living in a big city and serious about his long time girlfriend, but it was unlike Will to never have enough time for those he loved. He was serious, dedicated, and loyal but he was not the kind of man driven by ruthless ambition, forsaking all else for a career. Besides being dedicated to a job or to a cause, Will had also always been devoted
commitment to others, and to his commitment to his own spiritual and physical well being. I began to worry for his health but Will insisted that his congressman needed him and that it was just the nature of his job which kept him so busy.

Eventually though, Will began to talk about being ready to leave his position with Mr. Ney. Mr. Ney had become irritable and oppositional. It was difficult to work with him. But, ever true and loyal, Will was worried about how he was going to disentangle himself from his job and cut loose from Mr. Ney. Will worked with a lot of people in many arenas and he felt a responsibility to them also. The rest of the story has unfolded itself within the pages of the felony charge, to which my son has pled guilty. Your Honor, I know that you are more than familiar with all these facts.

My son has made some mistakes. He erred greatly in using good judgment. He certainly allowed his gratitude, allegiance, and loyalty to his job and to his boss, whom he also considered his friend, to distort his perception of ethical behavior as he had always known it. I don't believe Will did anything for personal gain, politically or financially. He is simply not the kind of person who deliberately sets out to "make a million". His other career considerations besides government service were to join the Peace Corps or to move out west and serve as a forest fire fighter - not high paying jobs!

But Capitol Hill won out because of Will's love of history and tradition. He lives fairly humbly, no matter his financial state. While employed by Mr. Ney, Will made a very nice salary. When he received raises, he would call home and was proud of himself as he considered the raise indicative of doing a good job. He was not a big spender for his own gain, but he was generous with others. On one occasion, I mentioned to Will that one of the St. Joseph sisters with whom I teach and who is my friend, wanted to go home to Philadelphia because her father was having emergency surgery. Her mother needed her help and support. Because it was such short notice, my friend could not afford the price of the ticket. Will did some research on his own, found a round-trip ticket that would work, purchased the ticket, and had me notify my friend when she could leave. The only stipulation was that I could not tell my friend who had purchased the ticket for her. I never asked Will to buy a ticket; it was just something he chose to do because he knew he was in a position to help others because of his own financial blessings.

Now, the situation is reversed and Will finds himself in financial debt, but I have never heard him complain once. Knowing my son, he will give up whatever he needs to, and slowly and methodically pay back to others, in gratitude, the services they have offered him. It will take a long time, but he is willing to do what he needs to do.

Will has lost his right to vote.  That is a huge loss for Will. He is a proud American who considers the vote one of the greatest privileges we have as American citizens. Not having that privilege will weigh heavily upon Will forever and will always be a reminder to him of this dark time.

He has also lost a career in politics. In the beginning, he never really had his sights set on public office; he only wanted to work in a research and management capacity on Capitol Hill (the shyer part of Will).  However, the more he worked with people and saw the potential for many ways to help through the right legislation, I think he had begun to think about the idea of possibly, somewhere down the road, considering a career in a lesser public office, yet one that would still affect the lives of others for the better. Now, that won't happen, but I believe he will find some way to cause a change for the better in others. Will has grown and learned a lot from this whole awful experience: his faith in God has grown even stronger; he has found a new inner strength; he has discovered a greater kind of forgiveness; and he has been humbled before himself, before others, and before God. I am proud of him and the way he has held himself accountable for his involvement without making excuses. As a family, we have discussed the reasons why he got drawn into this whole ugly mess; but in the end, they are reasons, not excuses. Will has never thought otherwise.

Will has suffered a great deal out of love for his new bride.  I appreciate and admire her for standing by my son and supporting him. As they began their lives together, Will brought along some unexpected surprises for her. But they have talked, smiled, cried, and talked some more. I am thankful that they stand together in their commitment to one another and have faced this storm together. I know Will's heart is so sad when he sees his young wife sad and afraid for him. What a heartache to bear! Will cannot ever fix or forget the past, but it is my prayer that he will allow himself, as well as others allowing him, to laugh again and to be glad for who he really is deep down within his own heart.

Your Honor, I hope I have allowed you to come to know my son just a little bit. The conduct for which he is guilty is so terribly out of character for him. The "Will" you have met in the pages of the felony case is not the "Will" whom I know.  It is not the "Will" who so many others know, love, and respect.  I hope that as you read my letter, and the letters of others, that you come to a more real and true understanding of Will. He most definitely is not perfect, but he is a very good man. The beautiful qualities with which Will was born, the same ones that he has developed over the years, have now been part of his failure as a public servant. I know that he is so very sorry for that failure.

Your Honor, thank you for your time and for your willingness to get to know my son in my letter. I'm sure you recognize that I love Will very, very much.  He is a son of whom this mother is extremely proud.

Respectfully,

Deborah Heaton

Deborah Heaton
Clemmons, North Carolina

# EXHIBIT 24

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

27 June 2007

The Honorable Ellen Segal Huvelle
United States District Court
    for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re:    United States v. William Heaton, Case No. 07-042

Dear Judge Huvelle,

I have known Will Heaton for four years, and one year ago I became his sister-in-law. When Will's brother and my husband, Brian, initially described Will to me, I knew that he was an extraordinary person. Brian spoke of him with so much love and respect that I could not wait to meet him. When I met Will for the first time, my initial impressions were confirmed; he was an extremely warm, caring, and intelligent person.

Over the years, I have been lucky to spend more and more time with Will. I have been consistently impressed with his quality of character. He is amazingly devoted to his family. His grandmother, with whom he was very close, passed away about a year ago. He had spent some time living with her in her later years, before she had to move into a place where she could receive full time care. At a reception following the funeral, Will asked the crowded room for their attention while he honored "Mimi" on behalf of all her grandchildren. He spoke emotionally of her impact on all of their lives, especially his own. I was so impressed with his honest display of affection.

Will comes home to North Carolina from D.C. to visit family and friends whenever he gets a chance. He always does such a great job of connecting with everyone who is there, and making everyone feel special. This past May, Will's sister Mary graduated from college. Following the ceremony, family and friends gathered at the Heaton's house. Will divided his time between helping his mother get the food prepared, welcoming guests, and indulging the children in a jump roping contest in the grass outside.

I feel so lucky that my husband has a brother with whom he is so close. I respect Will, and admire the way he puts his family first in his life. I understand that Will has plead guilty to a criminal charge in conjunction with his work in Bob Ney's office. This behavior is extremely contradictory to the person that I have come to admire so much in the past few years.

Respectfully,

Elizabeth Heaton

Elizabeth Heaton
Raleigh, North Carolina

# EXHIBIT 25

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 30, 2007

The Honorable Ellen Segal Huvelle
United States District Court
   for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:   <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle,

Most people call him Will; I call him Wilbur. Will Heaton is my big brother and he is, and always has been, an inspiration to me. Will is fun-loving, compassionate, supportive, and loyal. I just can't imagine our family without him. Ever since we were little, Will has made me laugh with his funny remarks and his playful gestures. He has always been gentle and tender and not afraid to acknowledge me as his sister … even in high school, when sibling ownership can sometimes be tough. I was always able to tell Will something in confidence and know that he would respect my privacy. I could count on him for good advice, even if it was advice that I didn't want to hear. I can still count on him in these same ways today.

When I started high school, I sometimes felt afraid. I was a little bit shy and I was unsure of myself and how to meet friends. Will was always very encouraging and because he was emerging from behind a veil of shyness himself, he was very supportive. He would always check on me in the hallways between classes and make sure I wasn't too lonely. He was willing to talk to me and bring along a friend or two with him. Some of my classmates thought I was pretty special to actually have upper-classmen talk to me! One day, I told Will about a boy in my freshman science class who was bothering me. His harassment had been going on for sometime. The boy sat in front of me and during class he would push his chair back and forth so that it continually bumped my legs. I had asked the boy to stop several times but he just laughed at me. Will was upset that someone was being unkind to me and he said that he would help me handle the situation. I was a little bit nervous because he didn't tell me *how* he was going to help me handle the situation. The next day, on my way to science class, I noticed Will and his friends speaking to the boy in the hallway. When class began and the boy sat down, I was prepared for the worst. Instead, I was pleasantly surprised when not once did this boy bump my legs! What had Will done to cause such a reversal of behavior from this boy? True to character, Will had spoken to the boy about family allegiance. He had also told the student that he needed to stop harassing me, that it wasn't funny, and that he would take the problem to administration if he needed to. There was no threat, no fist fight, no yelling or arguing. Will had handled the situation in a mature and civil way that brought results. I felt very proud. When word got around, Will gained the admiration of the students. They not only respected him for the way he stood up for his sister and was loyal to family, but also for the way he had defended me in a quiet, unassuming way.

When Will left for college in Virginia, I was a sophomore in high school and I really missed him. My other brother, Brian, was still at home with me and we are also very close, but Wilbur was

gone and it was hard to get used to that. However, we went to visit him a lot and I knew I could always call him with my troubles or joys. Will always knew just what to say to me and would call later to check and see if things were better for me. When we went to visit and I watched him walk around the college campus, I remember thinking he was so "old" and grown-up and wise. Now, he is still my wise, grown-up, big brother.

Will tends to think of others before himself and he has really stepped out of himself for me as of late. Right now, he is going through a lot of stress and tension because of the poor choices he made and the way he got mixed up in Mr. Ney's problems. He is also just starting out in a new marriage and trying to make things run smoothly for Katie, his wife. But, true to his character, Will still thinks about others first. On June sixteenth, I was supposed to be married. I had known my former fiancé for two and a half years and had been engaged for well over a year. Scot was treated like a member of our family and both Will and Brian considered him a brother. One month before the wedding, Scot came to our house and cancelled everything. I was devastated. My parents were very supportive and rallied around me. They called to tell both my brothers what had happened. This was one of the few times I knew Will to get outwardly upset. He knew how much I was hurting. He called me often and I called him whenever I needed to be soothed and comforted. He has a way of relaxing me. He told me to think about the future and not to dwell on the past. Despite everything that was going on emotionally in his own life, he still thought about me. He knew the week-end of June sixteenth would be difficult for me, so Will and his wife Katie planned a whole week-end in Washington, DC for me with my best friend Charli, my brother Brian and his wife, Betsy, and for all my cousins who live in the area. Will planned lots of places for us to visit and lots of things for us to do. He tried to keep me busy and my mind off of painful things. One night while there and walking near his home, I broke down in tears. Will took me away from the group and he and I sat in a little park nearby and he just held me and let me cry for the longest time. Then we talked and he gave me some of his big brother advice. Despite all of his own problems and stress, Will was more concerned for me. That's the way he is. He's my Wilbur.

Will has always been committed to serving others around him. After he graduated from college, he wanted to serve in the Peace Corps. My parents were very supportive of this idea, although my mom was a little apprehensive. My two brothers and I have a genetic bleeding disorder which we inherited from my mom. It can be very unpredictable and very serious. Will and I do not have the disorder to as great a degree as my other brother, but in cases of internal bleeding, trauma, or severe lacerations, we have to be careful and make sure we get platelet transfusions. Will filled out all the applications and went through all the medical testing that the Peace Corps required. He did his best to convince the Peace Corps that he would still be able to serve in a full capacity despite the bleeding problem. He was in the last stage of the process when they told him that he had been turned down. The Peace Corps was afraid that something might happen to him and he would be too far away to get sufficient medical treatment. He tried to find some way he could serve, but they kept turning him down. Will was so disappointed. However, because he was Wilbur, he dealt with the disappointment and moved on. He considered being a fire fighter out west, but decided to pursue a career in Washington, DC. After being with him all summer, he left for Capitol Hill.

For his first year in Washington, Will lived with our grandmother. She lived alone with some minimal nursing care. Will was great company for her and she called him her "Buddy". Later, our grandmother came to live with us in North Carolina and Will found his own place to live. His job with Mr. Ney kept him really busy. It was harder to have long phone conversations with him. He was distracted a lot. I didn't like how he never seemed to have enough time to spend with anyone. I was worried, and my worry proved to be real. As Will tried to serve and to help Mr. Ney, he got all mixed up in things that were not right. I know that he must have felt trapped and that he didn't want to let his boss down. Loyalty is important to Will. It was important in our younger days and it is still important to him now. He was trying to serve, to be obedient, and to support and show his loyalty to his boss. It is a rare thing, … but Will made some bad choices. Now it is my turn to be there for my brother. He knows that. He knows he is always my Wilbur.

Will is a courageous and noble person. Honor means a lot to him. I know that this whole sad time for him is so hard and embarrassing because he feels like he has not acted in honorable ways. Will didn't mean to hurt anyone; he would never do that. I feel like he was worn down and led into situations where he felt he needed to help and protect his boss. He has prayed a lot and told us many times that he is sorry for hurting us and for letting us down. I tell him not to worry. He has not let me down. He made some big mistakes, but he was trying to help, defend, and be loyal in the midst of inexperience and confusion. He will grow stronger from all of this. He'll always be my hero. He'll always be my Wilbur.

Sincerely,

*Mary A Heaton*

Mary Heaton
Clemmons, North Carolina

# EXHIBIT 26

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

27 June 2007

The Honorable Ellen Segal Huvelle
United States District Court
     for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001


Re:    <u>United States v. William Heaton</u>, Case No. 07-042


Dear Judge Huvelle:

Thank you for taking the time to listen to the thoughts I have regarding my good friend,
Will Heaton. I am aware that Will is to be sentenced in August for the charges he pled
guilty to in connection with his work in Congressman Ney's office. I have to admit that it
has been tough for me to read all the articles that speak about the actions Will took. I
hope that my words offer insight as to why he is one of the greatest people I will ever
know.

I met Will more than 15 years ago when his family moved to North Carolina and he
joined me at Our Lady of Mercy (OLM) Catholic School. Will and I bonded very quickly
for several reasons: we shared many of the same interests, our parents were (and still are)
very active in our church, and our siblings were very close in age and also became good
friends. After our years together at OLM, we transitioned to the same high school, and
during those four years, our friendship deepened. Although we have not lived in close
proximity since our high school graduation, Will and I have remained in touch. He is one
of those friends who I can go without seeing or talking to for months, and yet when we
do catch up, we pick up right where we left off as though we have been in contact daily.

There are endless stories I could tell about Will that would demonstrate why he is one of
the most genuine, loving, and positive people I know, and that's why I think he will
always be a tremendous leader regardless of his situation in life.

The first thing that comes to mind when I think of Will is the nickname he garnered from
a member of our church growing up. Don Renegar, who was also our basketball coach at
OLM, lived near my parents when I was growing up, so he often spoke to me and Will as
we were playing in the neighborhood. Don, ever the jokester, loved coming up with
clever nicknames for the neighborhood and church kids. While mine was rather
cheesy—Don teasingly called me by my 8th grade girlfriend's name—Will's spoke
volumes of the type of person he was even in his youth: his nickname was "Happy."

While the word seemed only silly to us at the time, I quickly realized as we got older that
Don was on to something. The name "Happy" perfectly describes one of Will's most
incredible gifts: his innate ability to be upbeat and positive, regardless of the

circumstances.   There is no doubt in my mind that this becomes obvious to every person that Will comes in contact with.  He lives his life in such a way that his optimistic outlook is contagious.

Another admirable quality that Will has always possessed is his strong relationship with his family and his belief that family is the most important thing in life.  To this day, Will and I frequently talk about the values our families have instilled in us and how we hope to demonstrate the same type of love and commitment our families have always shown us when we have families of our own some day.  I can still recall one of the first times I met Will's wife Katie.  Rather than discussing trivial things like people we knew in common or college experiences, we found ourselves talking about Will's family.  Katie and I have often reflected on this conversation because it seems to be fitting of what Will is all about:  we talked for what seemed like hours about how everything the Heatons do in life seems to be with the family in mind. I know that Will's commitment to his family will always remain strong.

The last thing I'd like to mention is Will's commitment to work hard no matter what task he is assigned in life. I always thought he would be very successful in his career because he was always willing to do what was asked of him and go above and beyond to get things done. He often talked about joining Americore or another organization that would allow him to give back to the community. I know that he is going to have an incredible impact in any community in which he is involved in the future.

I know that Will has tried to remain very strong throughout this process and is willing to accept that he has made mistakes, but I can definitely tell that he is deeply saddened by what transpired over the previous years at his job. Will always wanted to do the right thing and bring good to the community Ney supported. I feel very strongly that the decisions Will made were far from his normal character.

I will continue to hope and pray that Will's sentence will not only be based upon the actions he took under former Congressman Ney, but rather that they will be based upon the character that he has consistently displayed his whole life.

Sincerely,

Tim Hellinger
Cary, North Carolina

# EXHIBIT 27

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**



## WASHINGTON THEOLOGICAL UNION

18 June 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

**Re:  United States v. William Heaton, Case No. 07-042**

Dear Judge Huvelle:

I am writing on behalf of William Heaton, who recently pled guilty to one charge of conspiracy to commit honest services fraud in connection with his work in Congressman Ney's Office, and is currently awaiting sentencing.  It is my understanding that Will has been cooperating fully with the government since long before he pled guilty to the charge.

Will and I were colleagues this past year at Washington Theological Union.  I met him when he began consulting here in September, and worked closely with him as he assessed and evaluated the development office needs of the Union.  Having worked in the development office for three plus years before assuming my present responsibilities as Executive Assistant to the President, I was the employee with the greatest knowledge of the development processes at the Union and therefore someone with whom Will had frequent conversations.  I worked closely with him while he was consultant through April and have maintained informal but frequent contact with him since then.

It is my opinion and experience that Will is an extraordinary and highly principled young man.  He is very skilled in working with people and in organizing projects.  He is able to involve all the players in the process and to avoid the pitfall of imposing plans that people have had no part in developing.  For example, when he came to the Union, the Development Office was in grave disarray.  He sat down with every one, including faculty, administration staff and students to understand how each saw development fitting into the life of the Union and how each saw his or her role in the development function of the Union.  This one-on-one time was greatly appreciated by all and resulted in many, who had previously had no use for development, willingly becoming involved in the development effort of the Union.

Will worked very well with the President and assisted him in developing his skills in the area of development.  He made contacts, set up meetings, prepared thorough briefing papers, did research and made every encounter as smooth as possible for all parties.

The word 'short-cut' is not in Will's vocabulary.  He takes pride in everything he does; he is committed not to simply getting a task done, but getting it done correctly; he is thorough, precise, and

generous, all with a great good humor. The Union continues to reap the benefits of his presence on a daily basis.

Will married shortly before coming to the Union. He is devoted to his wife Katie and to his own family of origin. He tells the story of going with friends to run a half marathon in North Carolina where he stayed at the summer home of friends. When almost home from NC after the race, he realized that he did not have his wedding ring on. The next day he set out once again for NC in search of the ring – this time by himself. He got there, found the ring on the dresser where he suspected he had left it, picked it up and headed once again north to home – traveling virtually non-stop for more than eleven hours.

While I do not know a great deal about the details of the case pending against Will, I have kept abreast of the situation as it has been presented in the press and, as is my wont, did so with a liberal amount of cautiousness. What I do know is that Will is an honest young man who would never deliberately hurt another or act dishonestly for his own gain. While Will has been admirable in the way he has conducted himself over the past months, I am sure that as a young married man, his current situation weighs heavily on him in relation to his future and that of his wife. I have never heard him make excuses for himself nor have I heard him cast aspersions at others. Having noted this, it is extraordinarily difficult for me to connect Will to the conduct for which he has pled guilty. It is so out of character for him that it challenges ones' ability to comprehend it.

I have read and tried to understand the Honest Services Fraud Legislation and believe I now have a better grasp of its intent, although I note that it has been challenged as vague on several occasions. What I do believe is that his plea of guilty to one charge of conspiracy to commit honest services fraud is totally out of character for Will Heaton, as I know him. He is a fiercely honest and transparent man who is without guile. He is conscientious, dedicated, smart, intuitive, analytical, professional, always respectful, unpretentious, unselfish, friendly, funny, reliable, supportive, generous, kind and quite simply just a grand human being. I would trust him with my life.

I am sure that rendering judgment in any case is not easy, nor a task taken lightly. While I know the weight of such decisions are yours and yours alone, I do presume to ask that you look favorably on the full cooperation that Will has given the government over the past months. I would also put before you once again the dedicated and honest young man that I know and have worked with. He made a mistake, as have we all, albeit one more in the public domain and more damaging to the public trust. However, that is not the person he is. It is my hope that you will know and see the young man that all of us at Washington Theological Union have come to know and respect so deeply.

Thank you for allowing me to express my belief in and affection for Will Heaton, and to share with you the young man who shared our work, our life and our hearts here at Washington Theological Union.

Respectfully,

Rita A. Hofbauer
Assistant to the President

# EXHIBIT 28

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

# David L. Horne
## 4308 Brandywine Street, NW
## Washington, DC 20016

June 28, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the
 District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:            <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle:

On behalf of Will Heaton, I am encouraging you to be as lenient as possible in sentencing Will
to the crimes to which he has plead guilty.

I have known Will for about five years.  I first met him at the Tune Inn for a diner-type breakfast
very early one morning.  This is a glimpse of the Will Heaton I know.  He is a low-key, hard-
working, and casual individual.  That breakfast was also the start of a friendship beyond Capitol
Hill.

We met frequently and socially to keep up and share in each other's lives.  His impending
marriage, my impending marriage, my health, children, families, vacations, baseball, basketball
(mostly college) – job issues and career advice – we discussed the entire gamut of issues.  I
got to know Will well when he worked in Congress, when he left Capitol Hill, and before his
guilty plea.  We have kept up our relationship since then.  Recently we went to a National's
game together -- he is a Brave's fan, but thankfully did not broadcast his allegiances too loudly.

I also dealt with Will when he worked for Congress.  He was always responsive, professional,
straightforward, and honest with me.  I never felt or suspected Will would conduct himself in
any other manner.  My colleagues who are lobbyists had the same impression of Will.

I saw first hand the angst that Will has gone through relating to his bad conduct.  I was
shocked and disappointed to learn of his activities – which he personally told me the week in
which he plead guilty.  I thought to myself and shared with others that it was unfortunate, and
totally unlike Will, to have participated in such activities.  All along, however, I have had faith
that such a young man could learn from his poor judgment and excel even more as a husband,
an individual who is dedicated to giving back to society, and as a productive leader.  Thus far, I
have not been disappointed.  He adores his wife, worked in public service for a non-profit after
he left Capitol Hill, and eventually, I am sure, will have a leadership role in whatever career
path he chooses.

Will is a good person.  He knows that he has "done wrong."  He also has done much that is
right – when he worked for Congress and throughout his life.  Please, again, be as lenient as
possible.  I am confident his future actions will not only affirm any decision by you to be lenient,
but will make you proud of your judgment and decision in ensuring that his life is as productive
as possible.

Sincerely,

David Horne

# EXHIBIT 29

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**



# WASHINGTON THEOLOGICAL UNION

18 June 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

**Re:  United States v. William Heaton, Case No. 07-042**

Dear Judge Huvelle:

Your Honor:

By way of introduction I am the Very Reverend Louis V. Iasiello, OFM, Ph.D. Upon my retirement as the Chief of Chaplains for the United States Navy, Marine Corps and Coast Guard (23 June 07) I assumed the presidency of the Washington Theological Union (WTU).

Upon arrival I discovered that the position of Development Director was vacant. While at a dinner with a fellow clergyperson, it was mentioned that a brilliant young man was seeking temporary employment. I asked if he would vouch for the young man and he responded, "Unconditionally, Lou!" and so I requested Will Heaton's contact information. At our initial meeting Will was very honest about his status and his potential prosecution. He also expressed his willingness to resign if, at any time, his employment at the Union might become negative to the institution. We agreed that Will would be hired as a 'Consultant for Development,' a post he held from September through April, 2007. He resigned his consulting position before entering his plea before the Court, and did so, true to his character, to protect the well being of our institution. I would like to comment on the personal behavior, professional acumen, and strength of character I witnessed on an almost daily basis while he was a consultant to the WTU.

First off, Will is an incredibly gifted thinker who things strategically yet plans to cover both the tactical and operational needs of an institution or program.  Second, Will is a true 'people person' and he related extremely effectively with staff, faculty and administrators, often healing wounds and division left by the last Development Officer. Extremely personable and highly likeable, all at the graduate school immediately warmed to Will and many for the first time in years offered to assist in the development activities of the school. Put simply, in the short period of a month, Will reestablished the

prominence of the development office and shortly thereafter, had others thoroughly involved in development activities. By the time of his departure, he had established himself as an indispensable part of our WTU family and all begged me to allow him to continue, despite his legal situation. I offered just such an option to Mr. Heaton, but, putting the needs and the welfare of the institution ahead of his own, he declined. Such was, and I'm sure still is the depth of character exhibited by this remarkable young man. Rarely did I encounter a person of his intellect, gifts, and character in more than two decades in the military service.

Your Honor, I cannot speak to the actions that lead to the accusations against Will Heaton but I can speak about the remarkable young man who came to work at the Washington Theological Union and transformed a dysfunctional office, built long lasting trust-filled relationships, and displayed nothing but a maturity, knowledge, faith and skill set that is rarely found in someone his age. To put it simply, hundreds of WTU family miss their 'development consultant' and regularly ask that he be reinstated at the earliest opportunity.

I would be most open to further discuss this issue or amplify any information or opinions expressed in this letter. Thank you, your honor, for taking the time to read this letter and take its contents under consideration.

Sincerely,

Very Reverend Louis V. Iasiello, OFM, Ph.D.
RADM, CHC, USN (Ret)

# EXHIBIT 30

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 21, 2007

The Honorable Ellen Segal Huvelle
United States District Court
    for the District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

Re:  <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle:

I write concerning Will Heaton. I am a retired Catholic priest, though still active. I am presently Chaplain at Bishop McGuinness Catholic High School. I was also Chaplain at the high school years ago when Will was a student there, so I knew him through his high school years.

I have known and experienced Will to be a thoroughly Christian gentleman, very high in integrity, dedication, and truthfulness. Consequently, what has occurred is one of my greatest surprises in my seventy-nine years of living. I think that what happened, which is so totally out-of-sync with Will's character and personality, occurred because Will must have been drawn into the situation by the circumstances and surroundings of his work.  I, personally, do not find it easy to forgive those responsible for this desecration of a person I have always admired. Knowing Will, I am sure he is completely repentant and must be undergoing extreme emotional and spiritual pain.

If there is anything else I can do to help in this case, I will be very willing to do so.

Sincerely,

Reverend Joseph Kelleher
Winston-Salem, North Carolina

# EXHIBIT 31

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

July 23, 2007

The Honorable Ellen Segal Huvelle
United States District Court
        for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re:    <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle:

As a friend and former colleague of Will Heaton, I am writing to express my support for him and to request leniency in his upcoming sentencing. I am aware that Will pled guilty to a criminal charge and is awaiting sentencing. I believe that Will regrets his actions and understands that he made mistakes. I also believe strongly that he has significant contributions to make to the community as a citizen.

Will and I worked together in the Office of the Speaker of the House in 2000. In that time, I found him to be conscientious, trustworthy, and eager to learn. He had a very personable and friendly demeanor. He worked very easily with Members of Congress and other congressional staff. I continued to see Will professionally and socially after he left the office to work for Representative Ney.

I have spoken to Will since he pled guilty, and I believe that he is profoundly sorry for his actions. We spoke about the challenges for young people who are promoted quickly to leadership positions on Capitol Hill. Will expressed interest in finding new and innovative ways to teach young staffers on the Hill about the critical importance of ethics in government. It speaks to the nature of his character that as he is facing sentencing for a criminal charge, his thoughts are focused on others and making some good out of what happened.

I firmly believe that Will Heaton came to Washington to advance the ideals he believes in, and I believe that he can make a true contribution to the community. I respectfully request that you take this into consideration in your sentencing decision.

Sincerely,

Daniel J. Kendry
Washington, DC

# EXHIBIT 32

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

# James H. Knapp

June 26, 2007

<u>**VIA REGULAR MAIL**</u>

Honorable Ellen Segal Huvelle
United States District Judge
District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:    United States v. William Heaton
       Case No. 07-042 (ESH)

Dear Judge Huvelle:

This letter is respectfully submitted in support of my brother-in-law Will Heaton, who is scheduled to be sentenced by your Honor in the above action on August 15, 2007. I am aware that Will has entered a guilty plea to one count of conspiracy to commit honest services fraud in connection with his former work as chief of staff to ex-Congressman Robert Ney. As a Federal employee myself who took the oath to uphold the laws of the United States and the Constitution, I recognize the seriousness of Will's conduct. However, I believe it to have been a one-time lapse in judgment from which Will continues to learn.

I first met Will in 1996 when he and my younger sister, Kate, began dating during their first year at the College of William and Mary. But it was during the Summer of 1997 when Will and I first became acquainted. Will joined Kate at our family vacation home on the Outer Banks of North Carolina. Some of my oldest friends came along as well, several of whom had known Kate since she was a toddler. As a would-be suitor to my baby sister, Will withstood all the abuse and harassment that a protective older brother and his life-long friends could muster with humility and a sense of humor. I gained tremendous respect for Will on that trip.

In addition, my five year old son adores Will. Will is loving, attentive, and always giving of his time with my son. Will reads to him and plays sports and games with him when he and Kate visit. My son especially enjoys his visits to Washington when Uncle Will plays tour guide to the National Zoo and the monuments.

Based on my eleven years of interaction with Will, news of his involvement in the so-called Abramoff affair was shocking. This sad chapter has created a considerable emotional and financial strain on Will. It has also created undeserved stress and anxiety on Kate. I know Will Heaton to be a caring, loyal, smart, engaging, and forthright individual. He has acted honorably and honestly in all of our dealings. I acknowledge that the conduct that brings Will before your

Honor for judgment was a mistake, but add that it was completely out of character.

Finally, I know that your Honor will be just in imposing sentence on Will and I respectfully request that your Honor be lenient.

Respectfully submitted,

James H. Knapp
Levittown, New York

# EXHIBIT 33

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

July 24, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Huvelle:

I submit this letter to you after recently celebrating my first wedding anniversary with Will Heaton. I can only share with you that this last year has been the most challenging and emotionally demanding year of our eleven-year relationship. A little more than a week after our wedding, Will began cooperating with the Justice Department and I began to fully understand his interaction and relationship with his boss, Congressman Robert W. Ney and the ongoing Abramoff scandal.

The purpose of my letter is to share with you insights into Will's character. I am confident that in the letters you will receive from Will's family and friends, you will hear about a man who is kind, generous and loyal. It is Will's loyalty that I would like to elaborate upon – as it is my strong belief that his unyielding loyalty to his mentor became his Achilles heel.

Will and I met during our first few weeks of college. He was and still is a kind, considerate person that earns and values the respect of his friends. Will goes out of his way to comfort me or other peers in tough times and lends a helping hand when someone could use an extra boost. I am sure many of the other letters you will read will reflect these same sentiments that I see in Will.

Upon graduation, Will made a bee-line for Washington. He had gotten an early taste of Washington politics while in high school when he served as a Congressional Page. He went to Washington to make a difference – to make the country a better place. Will landed his first job in Speaker Hastert's office. It was at this point in time, while working in the Speaker's Floor Office, that Will was befriended by Congressman Ney, and agreed to go to work for him as his personal assistant.

As Ney's personal assistant, Will developed a close relationship with the Congressman, and viewed him as his mentor. He worked constantly, often putting in 16+ hour days as he shadowed the Congressman. He handled Ney's schedule, coordinated issues with the staff and handled many of the Congressman's private affairs. In fact, Will became such an "insider" to the Congressman that when the Chief of Staff position in the office became vacant, Ney asked Will to take it. Will, only 23 at the time, turned it down on two separate occasions over the course of a week as Ney persisted that Will take the job. Will insisted he was not qualified for the position and could not serve the Congressman well in such an important leadership capacity at such a young age. Despite Will's

reservations, Ney asked a third time. Will finally acquiesced, becoming the youngest Chief of Staff on Capitol Hill at that point in time.

I believe Will viewed his promotion as Ney's way of showing his faith in Will. And though Will felt intimidated every time he held a meeting — he was always the youngest in the room, sometimes by ten or fifteen years — he was not going to let the Congressman down.

While Chief of Staff, I did not see much of Will's interaction with the Congressman or his staff since the Congressman had advised Will to keep his work and personal lives separate. Will remarked to me once that the Congressman didn't trust women. With an admittedly sarcastic inquiry back, I asked if it struck him odd that his boss didn't trust over half of all Americans. With no response back, Will did as his boss instructed. It was so rare that I appeared at office social events, the office staff joked with Will of his "imaginary girlfriend" and I was affectionately dubbed the "Snuffeleupagus" of Ney's office. Will did not share much of his professional life with me and kept much of his career, which occupied the majority of his time, apart from our relationship. Will easily spent more of his time with Congressman Ney than me, even during our year of engagement because Ney demanded so much of his time. This is a very simple example of Will taking the Congressman's advice to heart.

I believe that Congressman Ney chose young men and elevated them into such high level positions quickly so that he could operate carte blanche. My father once asked me if there were any "gray hairs" on staff. Curiously, there were none. A friend of mine, who is familiar with the inner workings of Hill staffs, remarked once about seeing "Ney and the boys" out one night drinking. Will shared with me that he believed Ney manipulated his staff – often pitting one staffer against another. Will explained Ney would often use tickets to concerts or events as means of rewarding or reprimanding staff members. He would give tickets out to one staffer at the expense of another staffer to whom they were previously promised.

Congressman Ney was also verbally abusive to his staff. I remember on two separate occasions Will came over to my apartment very late having been "fired" by the Congressman. These instances would begin because of an argument between the two of them and Will would refuse to back down. Ney would grow angry because of this resistance and the argument would escalate into a screaming match. The evening would result in Ney firing Will. Alcohol was an attributing factor in these evening shouting matches and the next day, once Ney was sobered up, Will would have his job back. Each time this happened, Will was very distraught and believed he would not be able to find another job. At one point, tired of the emotional roller coaster he experienced working in the office, Will shared with me he wanted to leave the Hill. I encouraged him to do so, but Will couldn't bring himself to start a job search, fearful that Ney would "blackball" him in DC. Almost every morning Will would wake up and start coughing fits to the point of gagging. Looking back, I can only attribute those episodes to the immense stress he was under at the office.

These examples of life in Ney's office are by no means meant to excuse Will from the situation he finds himself in – facing sentencing after pleading guilty to conspiracy. Will was brought up knowing what is right and wrong. But I truly believe Will was swayed by his boss - his mentor, a man he believed saw great potential in him and didn't think would steer him wrong. Will's mother and I, on several occasions, questioned his lifestyle and asked if he was forgoing sound decisions in favor of Ney's arrogant manner. Will could not imagine his mentor misleading him, often defending Ney's style as the accepted way of doing politics on Capitol Hill. So when those closest to him were raising alarms, he just didn't see it. Despite a nagging feeling he experienced while working for the Congressman, as he has since shared with me, he listened to Ney, not me, and not his mother.

Looking back at all of this, Will has acknowledged he was listening to the wrong person. He really believed in Ney as he felt Ney believed in him. The entire experience has put a terrible strain on our relationship. I was under the impression we were dealing with one trip to Scotland – I had no idea of the additional details that were to unfold.

I continue to be incredibly angry that Will would jeopardize our relationship in such a way. But it does give me some peace to know that Will accepted his culpability and plead guilty. I see him every day wrestling with what he has done, knowing he has disappointed his family and friends. And despite dealing with the Justice Department, the court system, and knowing that "felony" will be attached to him forever, he no longer has coughing fits. I truly believe he has come to terms with and accepted the fact that his involvement with Congressman Ney was unethical.

Today, I see more of the true Will that I knew when we first met in college. He has worked hard to get his priorities in line again and has shown humility in accepting responsibility for his actions. He has apologized for putting me in this situation, and he knows that his fear to speak up does not excuse his actions. I ask that you show him the leniency that will allow us, as a couple, to move on.

I thank you for your time and consideration.

Sincerely,

*Kathryn Krepp*

# EXHIBIT 34

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 27, 2007

The Honorable Ellen Segal Huvelle
United States District Court for
The District of Colubmia
333 Constitution Ave., NW
Washington, DC 20001

Re: United States vs. William Heaton, Case No. 07-042


Dear Judge Huvelle,

As the sister of Kathryn Knapp, I am writing as a character witness on behalf of William Heaton. I am aware that Will has plead guilty to a criminal charge and is awaiting sentencing.

I met Will more than 10 years ago, when he and Katie starting dating as first year students at William and Mary. Over the years, Will has become an integral part of the family and a devoted husband to my sister Katie.

I have always appreciated and admired Will's good nature and positive approach towards life. He has always been the one at family gatherings to lend a helping hand, no matter how large or small the request.

I remember one example in particular last year. Thanksgiving has become a very festive and fun holiday for our family. Katie and myself are the head chefs for the day, allowing my mother some well-deserved down time. Will was such a help during the entire holiday weekend. He must have run out to the grocery store 5 times for things we needed last minute and went above and beyond to help Katie with chopping, dicing and basting. He was a calming and patient presence amid the cooking chaos.

While on the surface it doesn't appear to be an extraordinary anecdote, I believe it's the little things that one does in everyday situations which demonstrates one's character.

Moreover, Will is a genuinely good person. He is eager to build a life and family with my sister.

This has been a very stressful and sad ordeal for Katie and Will. As newlyweds back from their honeymoon, they were confronted with the reality of Will's situation. Life for them and the family has not been the same since.

I request that leniency be shown to Will. Without getting into the technicalities of the case, I know him to be good person with a kind heart and good intentions.

Respectfully,

Kristin Elizabeth Knapp
New York, New York

# EXHIBIT 35

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 26, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C 20001

Re:    United States v. William Heaton, Case No. 07-042

Dear Judge Huvelle,

I am writing to Your Honor to plead for leniency for Will Heaton when he appears before you for sentencing in the Ney/Abramoff case.

I first met Will on the campus of The College of William & Mary where my daughter and Will attended. Their friendship and relationship developed into courtship and marriage. During the ten plus years that I have known Will, I came to believe in him as an outstanding young man with a bright future. The fact that I and other members of my family are writing to Your Honor is an amazing turn of events.

When Will and Katie graduated, they appeared to go their separate ways. Katie returned to New York and started her career and Will entered government, landing a position with the Speaker of The House on Capitol Hill. He wanted nothing more than to be of service to his country and have a career in government service. Katie soon decided that her future was with Will and moved to Washington, where she grew up. She also chose government service and elective politics. The future seemed bright for two young people starting to make a life together.

When Will went to work for Congressman Robert Ney, it seemed to be an outstanding opportunity. In fact within two years, Will became the youngest Chief of Staff on the Hill, a fact noted in an alumni publication of The College of William & Mary. As the spread of corruption in the Abramoff case began to ensnare Congressman Ney, my antenna as a lawyer and retired FBI agent went up. I learned that Congressman Ney had surrounded himself with a staff full of young men like Will, who had not yet learned from experience, the inner workings of government. My daughter told me stories of abuse that the Congressman heaped on his staff and my question was, Why not resign? I recently asked Will that question and his response was fear of retribution; fear that the Congressman would ruin his career. My contempt and anger at the Congressman for what he has done led me to write a letter to Your Honor seeking an upward departure in his sentence. Although I did not send it, I believe your Honor's action in the Congressman's case was justified.

The role of mentor in the development of a young person's career is a time-honored practice. I was fortunate to work as a young special agent for a true legend in the FBI. He promoted young agents into management positions early in their career to bring in new thinking on how to do things. When the mentor is like him, it benefits an agency or organization. However, when the mentor is corrupt, it corrupts the entire system. The corruption that is being attacked by the Department of Justice and the FBI in Congress is in the finest tradition of federal law enforcement.

Will's lapse in judgment as documented in the pleadings accompanying his guilty plea is disappointing to my wife and I. However, I do not believe that he sought to personally profit by engaging in these activities. I believe he got himself trapped into a corrupt office headed by a scoundrel who's actions have had devastating consequences for a number of young people. Will is worth giving a second chance to while still taking into account his actions that have been found to be illegal. Will's cooperation with the FBI and federal prosecutors, as well as his true remorse and embarrassment, will I hope allow Your Honor to be lenient.

Very Truly Yours,

Robert W. Knapp

# EXHIBIT 36

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

August 1, 2007

The Honorable Ellen Segal Huvelle
United States District Court
for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:    <u>United States vs. William Heaton,</u> Case No. 07-042

Dear Judge Huvelle:

The purpose of this letter is to express my knowledge and familiarity with William Heaton's good character as both a colleague and friend.

It is my understanding that Will pled guilty to a criminal charge and awaits sentencing. Will pled guilty to one charge of conspiracy to commit honest services fraud in connection with his work in former Congressman Bob Ney's Washington office. It is also my understanding that Will cooperated fully with the government long before and subsequent to the time he pled guilty to the charge.

I have known Will since I began working for Will and Congressmen Ney as the Congressman's executive assistant at the Committee on House Administration in September 2002. This was the position that Will was initially hired for the previous year and as such, Will was a tremendous help and source of counsel.

The job of executive assistant was created to manage the constant stream of requests the Committee received from Members of Congress, frequently during House votes. Keeping track of these requests and tracking them to a successful completion was a cornerstone of the job description.

I worked with Will and Congressman Ney until December 2005. I became good friends with Will during this time. Will was a constant source of sound advice and confidence. Will was a great friend who dropped an important meeting to talk with me when I told him that my parents were seeking a divorce in the spring of 2004. This display of kindness and sensitivity was not unique to my circumstances. Will's door was always open to any member of the staff. He was readily accessible and always welcoming to staff members from unpaid interns to senior staff.

Regarding professional experience, on numerous occasions I never found Will to be anything less than considerate and helpful. He is an even-tempered and sound person whose voice I have never heard raised in anger.

Will is a very descent and religious person – I do not believe that he ever would have intentionally broken a law. Will – like so many of us in the office – was quite young and relatively inexperienced in government service. This is not an excuse, but perhaps an explanation that can help bring the context into light. I firmly believe the charge to which Will has pleaded guilty is out of character for him.

As you consider his sentence, I ask that you take into account Will's reputation amongst his friends and professional colleagues.

Thank you for your time and consideration.

Sincerely,

Christopher Krueger

# EXHIBIT 37

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

**Office of the President**                                                      *Los Angeles City College*

*855 North Vermont Avenue*
*Los Angeles, CA 90029*
*Tel (323) 953-4010*
*Fax (323) 953-4009*
*maradis@lacitycollege.edu*

16 May 2007



The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, District of Columbia 20001

Dear Judge Huvelle

RE:     William Heaton

I am writing on behalf of William Heaton who recently pleaded guilty to conspiracy charges stemming from the Abramoff and Ney investigation. It is my understanding that William Heaton will reappear in your courtroom soon with respect to sentencing. Hopefully, the information in this letter will provide greater insights into William Heaton as a person.

I have known Will Heaton since he was appointed a Congressional Page in 1994 as I worked in Washington and my son was a fellow Page. Since that time, we have developed a unique friendship based on mutual respect and trust: I know him as few other professionals do. In addition, my work brings me into contact with a variety of individuals who seek to follow career paths comparable to those who seek public service. This allows me to judge others within a broader context and I would never jeopardize my reputation and professionalism in a situation like this if I believed for a moment that my statements were less than truthful.

As a young Page, impressed with the responsibilities of individual members of the Congress, William Heaton always displayed a unique understanding of the need to be loyal to the institution and with those for whom he worked. After that experience, Will and I spoke frequently about university options; I offered assistance as I do with all promising students. Throughout his time at the College of William and Mary, we communicated and met when time permitted. Upon graduation, I offered to help in any way I could in recommending Will for a position on the Hill. William Heaton neither abused nor took advantage of our friendship and my contacts within the Congress.

Soon after graduation, I provided the recommendation to Congressman Bob Ney – who is a personal friend – with respect to Will Heaton, his character, and capacity to do an outstanding job in the position for which he was eventually hired. In this regard, I feel somewhat responsible for bringing Will and Bob Ney into contact with each other. Shortly thereafter, I continued to advocate for Will Heaton and he was promoted to chief of staff. It was a pleasure to see Will Heaton advance professionally and assist his boss in providing constituent service.

The Honorable Ellen Segal Huvelle
page -2-
16 May 2007

Throughout the entire period when I first met Will Heaton I was impressed by his values of loyalty and responsibility. I met his grandparents and stood with Will and his family when his grandfather passed away. I say this because my friendship with Will is unique and goes beyond the casual: I know his aunts, father, mother, brother, and sister and the closeness and warmth of that family.

It is unfortunate and out of Will's moral fiber to have been caught-up in the episode for which he has plead guilty. I am convinced that his behavior stemmed from his loyalty to Congressman Ney as well as being advised that what was occurring was appropriate. These neither minimize the severity of the behavior nor absolve him from responsibility. Rather, it puts into context how these things might happen.

You have before you a young man with promise and capacity. He has learned from this mistake and I am convinced he will make amends. Will Heaton has married recently. He is working to assist a college in its advancement efforts. He has lost much but has time and the good sense to start over. No good will be accomplished if he were to serve time and I plead with the court to impose upon Will Heaton the judgment that will uphold justice while helping him regain his footing so he can move forward.

In summary, there is no question that William Heaton knows what he did was wrong: he has pleaded guilty to conspiracy. He knows that his future is clouded and he has to overcome many obstacles. He is a young man of immense talent who – I am convinced – will make amends and make us all proud. I ask that you consider his future as he stands before you. I have offered to attend the scheduled court date if you believe it will help. Thank you very much for your consideration.

Sincerely,

Dr. Steve Maradian

**Office of the President**

**Los Angeles City College**

*855 North Vermont Avenue*
*Los Angeles, CA 90029*
*Tel (323) 953-4010*
*Fax (323) 953-4009*
*maradis@lacitycollege.edu*

29 May 2007



**LACC**

**LOS ANGELES
CITY COLLEGE**

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, District of Columbia 20001

RE:      United States v. William Heaton, Case NO. 07-042

Dear Judge Huvelle:

          I am writing on behalf of William Heaton who recently pleaded guilty to conspiracy charges stemming from the Abramoff and Ney investigation. It is my understanding that William Heaton will reappear in your courtroom soon with respect to sentencing. Hopefully, the information in this letter will provide greater insights into William Heaton as a person.

          I have known Will Heaton since he was appointed a Congressional Page in 1994 as I worked in Washington and my son was a fellow Page. Since that time, we have developed a unique friendship based on mutual respect and trust: I know him as few other professionals do. In addition, my work brings me into contact with a variety of individuals who seek to follow career paths comparable to those who seek public service. This allows me to evaluate others within a broader context and I would never jeopardize my reputation and professionalism in a situation like this if I believed -- for a moment -- that my statements were less than truthful.

          As a young Page, impressed with the responsibilities of individual members of the Congress, William Heaton always displayed a unique understanding of the need to be loyal to the institution and with those for whom he worked. After that experience, Will and I spoke frequently about university options; I offered assistance as I do with all promising students. Throughout his time at the College of William and Mary, we communicated and met when time permitted. Upon graduation, I offered to help in any way I could in recommending Will for a position on the Hill. William Heaton neither abused nor took advantage of our friendship and my contacts within the Congress.

          Soon after graduation, I provided the recommendation to Congressman Bob Ney – who is a personal friend – with respect to Will Heaton, his character, and capacity to do an outstanding job in the position for which he was eventually hired. In this regard, I feel somewhat responsible for bringing Will and Bob Ney into contact with each other. Shortly thereafter, I continued to advocate for Will Heaton and he was promoted to chief of staff. It was a pleasure to see Will Heaton advance professionally and assist his boss and office provide constituent service.

The Honorable Ellen Segal Huvelle
page -2-
29 May 2007

Throughout the entire period when I first met Will Heaton I was impressed by his values of loyalty and responsibility. I met his grandparents and stood with Will and his family when his grandfather passed away. I say this because my friendship with Will is unique and goes beyond the casual: I know his aunts, father, mother, brother, and sister and the closeness and warmth of that family.

It is unfortunate and out of Will's moral fiber to have been caught-up in the episode for which he has plead guilty. I am convinced that his behavior stemmed from his loyalty to Congressman Ney as well as being advised that what was occurring was appropriate. These neither minimize the severity of the behavior nor absolve him from responsibility. Rather, it puts into context how these things might happen.

You have before you a young man with promise and capacity. He has learned from this mistake and I am convinced he will make amends. Will Heaton has married recently. He is working to assist a college in its advancement efforts. He has lost much but has time and the good sense to start over. No good will be accomplished if he were to serve time and I plead with the court to impose upon Will Heaton the judgment that will uphold justice while helping him regain his footing so he can move forward.

In summary, there is no question that William Heaton knows what he did was wrong: he has pleaded guilty to conspiracy. He knows that his future is clouded and he has to overcome many obstacles. He is a young man of immense talent who – I am convinced – will make amends and make us all proud. I ask that you consider his future as he stands before you. I have offered to attend the scheduled court date if you believe it will help. Thank you very much for your consideration.

Sincerely,

Dr. Steve Maradian

# EXHIBIT 38

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 30, 2007

The Honorable Ellen Segal Huvelle
United States District Court
     for the District of Columbia
333 Constitution Avenue, NW
Washington, DC   20001

Re:  United States v. William Heaton, Case No. 07-042.

Dear Judge Huvelle:

     I am writing on behalf of my former colleague and friend, William Heaton, who pled guilty to a criminal charge and is awaiting sentencing in your court.

     I have been on the Hill for 31 years; most of those years were spent in the Office of the Parliamentarian, non-partisan advisors to the House.  The Office is located in the Speaker's floor office, which is set up like a bull pin.  Half of the office is populated with the Speaker's staff and the other half with Parliamentarians.  At that time, we numbered 10 staff in total, of which Will was one from August, 2000, to August, 2001.  Because our desks were nearly on top of each other, all of us were quite close.  When he left our office to join Mr. Ney, we stayed in touch; having lunch together often.

     In my 31 years on the Hill, I have seen more staff and Members come and go than I could possibly count.  I have worked with many I respect and many I don't.  It is no longer hard to recognize those who are smart; who are more interested in getting it right that in being right; and who are good, decent, and hardworking individuals.  Will is not the first person I have worked with who has gotten into trouble.  Usually, when they do, one can find me muttering commentary at the predictability of indictment or ethical citation and relieved to see our system works at ferreting out the snakes.

     That was not my response when I learned of the troubles of my friend Will.  Instead, I openly wept -- mostly from shock; and I was not alone in my dismay.  Not Will.  Surely, I have not misjudged his character over the years.  Surely this is a mistake of youth, inexperience, and a misguided choice of mentors.  Your honor, Will does not have the heart of a snake.  Will has a good, kind, and generous heart who is held in high regard by all of those in the office who worked with him. That is the regard with which he is still held, his mistakes notwithstanding.

     Thank you for taking the time to read my assessment of Will's good character.

     Sincerely,

     Muftiah McCartin
     Washington, DC

# EXHIBIT 39

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 20, 2007


The Honorable Ellen Segal Huvelle
United States District Court
      for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re:  United States v. William Heaton, Case No. 07-042


Dear Judge Huvelle:


I am writing to you on behalf of Will Heaton.  I understand that he has pled guilty to one
charge of conspiracy to commit honest services fraud in connection with his work in
Congressman Ney's office.  Although Will is facing a criminal charge, I understand that
he has been cooperating fully with the government since long before be pled guilty to
this charge.

I have known Will Heaton since I came to serve as parish priest at Our Lady of Mercy
Catholic Church in December of 1991.  At that time Will and his family were
parishioners.  Will, his brother, and his sister were also students at Our Lady of Mercy
Catholic School.   Will was in the eighth grade when I first met him.  He was a good
student, played basketball on the school team, and served as an altar boy in the parish.
Even at that young age, Will was well-respected by both his peers and his teachers.

After graduating from Our Lady of Mercy School, Will went on to attend Bishop
McGuinness Memorial Catholic High School.  He continued to do well academically and
athletically.  Again he earned the respect of his classmates and teachers.

Will graduated high school with honors and went on to earn his bachelor's degree from
the College of William and Mary.   After graduation, Will accepted a job in Washington,
D.C.

As Will has grown into an adult, I have kept up with him through his parents who
continue to be faithful parishioners.  On the occasions when he would return to Winston-
Salem to visit, Will would attend Mass with his family, and I would have the opportunity
to speak with him in person.

I know Will grew up in a loving, faith-filled home.  Will's mother, Deborah Heaton,
teaches kindergarten at Our Lady of Mercy School.  I work with her and visit the children
in the school.   I spent time in the Heaton home on a regular basis for a period of three
years when I would bring Holy Communion to Will's grandmother, who lived in the

Heaton home and was bedridden.   Though I could not attend, I was invited to officiate at Will's marriage in New York.   I know Will to be a good man and a good Catholic.

This criminal case facing Will has deeply affected him and those who know and love him.  I believe he was naïve.  He took the job in Washington, D.C.  working for Congressman Ney believing that he was working for a good and honest man.  I believe he got in over his head.  However, Will has not made excuses for the wrongful part he played.  He has taken full responsibility for his actions.  Now Will is awaiting sentencing. He has suffered physically, emotionally, and financially.

Emotionally Will is dealing with disappointment in himself, regret for his actions, and remorse for the pain his actions have caused others.

Marriage is difficult in the best of circumstances.   Will has to deal with the effect this case is having on his wife and on their relationship as they strive to serve God through the sacrament of marriage.  Will's wife's loyalty to him during this difficult time shows that he is a good guy.  Will has been struggling financially to provide for his family and pay for the great cost of legal representation.

As far as his standing in the community, I would say that here in this parish and in this town, people will not change their opinion of Will.  The fact that he did not make excuses for himself and that he has cooperated fully with the government shows that he is a man of honor.  People admire him for that.

As a Franciscan Friar, I know that wisdom comes often by suffering.   I believe that Will has suffered much and has learned much from this experience.   This ordeal has made him a wiser man.   I respectfully request that Your Honor consider leniency when sentencing this young man who has so much of his life yet to live.   If I can help in any way, please contact me.

Yours in Christ,

Fr. Conall McHugh O.F.M. Conv.
Winston-Salem, NC

# EXHIBIT 40

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 23, 2007

The Honorable Ellen Segal Huvelle
United States District Court
    For the District of Columbia
333 Constitution Ave., NW
Washington, D.C. 20001

Re: <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle:

I write to you today on behalf of Will Heaton. I understand that Will pleaded guilty to one charge of conspiracy to commit honest services fraud in connection with his work in Congressman Ney's office.

I have known Will since late August 2004. At the time, I interviewed with and was hired to serve in the office of Ohio's 18th Congressional District. During the time I worked with Will, he was a very supportive co-worker and supervisor. More importantly though, the compassion and care he showed was something I valued being hundreds of miles from home. The best illustration of this that I can share occurred on a "normal" Capitol Hill day. Things were busy, as they usually were, but I was not feeling like myself--totally overwhelmed during office position transitioning. I think most co-workers, let alone a supervisor, would not be bothered with the emotions of a colleague. However, Will asked how I was doing. While this may not seem like some grand gesture, it was.

That is just how Will is. Always concerned and always willing to lend a listening ear or helping hand. There are countless other times that I could share when Will would help me. Maybe it was with the most trivial of tasks, like stuffing constituent letters into envelopes,  or  simply asking how my latest trip home went.  I believe Will was, and continues to be, someone with a good heart. I am happy that I can call him my friend.

I believe Will's actions were completely out of character--a lapse in the better judgment I know he has. I understand and appreciate the task you are faced with, and I ask, with the greatest respect, that you are lenient when determining Will's sentence. Thank you for your time and consideration.

Sincerely,

Jamie McMillen
Alexandria, VA

# EXHIBIT 41

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

*Edward A. Pease*
*5125 East Old Maple Avenue*
*Terre Haute, Indiana 47803*


July 25, 2007


The Honorable Ellen Segal Huvelle
U. S. District Court of the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

    Re: United States v. William Heaton, Case No. 07-042

Dear Judge Huvelle:

I write to share my observations and opinions about Will Heaton as you prepare to sentence him on August 15. I know that Will has pleaded guilty to a charge of conspiracy to commit honest services fraud in connection with his work in the office of former United States Congressman Robert Ney of Ohio, and I know that he has cooperated fully with the government, even before entering his plea.

I have known Will for close to ten years. We met, and worked together, when he was a member of the staff of former Speaker of the House Dennis Hastert and I did extensive duty as Speaker Pro Tempore. I served as a Member of the House of Representatives from Indiana at that time, and have since retired. My work as Speaker Pro Tempore required coordination with the Speaker's floor staff, managed by Karen Haas. Will worked for her. As a consequence, we spent a great deal of time together, often late at night when only a few Members would be present (usually making a record on the floor), and the atmosphere was a bit more relaxed. The opportunity for interaction between staff and Members was greatest then, and I got to know many of the staff and their families during that time. Will was one of them.

My perception of Will was this: a bright, eager and idealistic young man, with a strong work ethic, a winning personality, and desire to please those with whom he worked and those he worked for. He smiled a lot and his smile was infectious. He was always asking how he could help. He was humble and seemed constantly amazed at his good fortune to be working where he was. No

Page Two
July 25, 2007

job was beneath him. Even after he had worked in the Speaker's office for some time, he had resisted the affectations that too often come with work on "The Hill".

After I left the House, we stayed in touch, occasionally getting together for coffee or lunch. We talked some of work, more of mutual acquaintances, occasionally about his future plans, at times discussing possible religious vocations. He continued to be the energetic and idealistic young person I knew, though it was clear after he began work for Congressman Ney that his stress level increased and his personal time availability decreased.

I was stunned when I heard that he had been implicated in the illegal activities in the Congressman's office, for such behavior was absolutely contrary to the character of the young man I knew. In retrospect, I guess I can understand how someone as idealistic and in many ways naïve as he was, and one who was so eager to please, could have been taken advantage of before he realized it. I am not at all surprised to learn that, once he figured out what was happening and what he had himself done, he disentangled himself and cooperated with authorities.

I have seen Will a few times since all of this became public. It has been, understandably, a difficult time for him – in finding work commensurate with his education and experience, in the stress it has placed on his recent marriage, in his relationships with others. Virtually all of the people he knows in Washington are people with whom he worked in government, and many of them now either can't or won't associate with him. Still, he remains optimistic about the future, strong in his faith, and confident that he can make things right once more.

In light of all of the above, I respectfully request the court's leniency when it considers punishment appropriate in this case.

Sincerely yours,

Edward A. Pease

# EXHIBIT 42

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 29, 2007

The Honorable Ellen Segal Huvelle
United States District Court
    for the District of Columbia
333 Constitution Ave NW
Washington, DC 20001

Re: <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle:

I write with regard to the sentencing of William Heaton.

Before I start, I would like to disclose that I am friends with one of your law clerks, Emily Thacher-Renshaw. She does not know that I am friends with Will, I have never discussed the case with her, and I do not know whether she is involved in the matter. I bring this to the Court's attention only to avoid any appearance of impropriety.

I have known Will since September of 1994. We became friends when we served our junior year of high school as pages in the United States House of Representatives. For an entire academic year, Will and I went to school, worked, ate, and lived together. In such close social quarters, you get to know people very well. Will and I became fast friends, and have remained in touch ever since. After I graduated from college, I moved to Washington for a year before attending law school. Will had just begun working on the Hill, and we again socialized regularly. Since moving back to Washington in July 2004, I have again been able to enjoy Will's company.

I am aware that Will pled guilty to one count of conspiracy to commit honest services fraud, that he is awaiting sentencing, and that he has been cooperating with the federal authorities. I am also certain that this recent episode in Will's life does not give the full picture of who he is. People who know Will know that he is honest, kind, generous, hard-working, a loyal friend, and a loving and devoted husband, son, and brother.

For example, when we were in page school, the dorm proctor on our hallway was a college student at Catholic University. After "lights out," the proctor would let the boys on our hallway drop by his room. We would watch David Letterman, play videogames, talk about the day's events, or even cook spaghetti while our proctor fiddled with his old acoustic guitar. At first we regarded the after-hours visits as a privilege, but in time most of us took it for granted. But not Will. At the end of the year, he quietly took up a collection from the guys on the hall, hopped on the metro, and rode to the end of the Red Line, where he bought a new guitar as a thank-you present for the proctor. And, in classic Will Heaton style, he sought and took no credit when the hallway presented our proctor with this going-away gift.

Will remains generous and thoughtful, ungrudgingly sharing his time even when doing so is not easy. I remember an afternoon I spent with Will a few summers ago. At the time, Will was a frenetically busy Hill staffer with a Blackberry glued to his hands and around-the-clock work demands. Yet a friend of his had volunteered to run a children's bike safety course in the parking lot of a local school. The friend was short on help and, despite the strain of his schedule, Will gladly pitched in. Watching the joyful enthusiasm with which Will help set up the obstacle course, instruct and joke with the children, and clean up at the end, one would never guess was giving up the few hours he had to himself all week for children he had never met.

What has impressed me most about Will in recent times is his reaction to the events of the past year or so. There are many ways a person could respond to being indicted and pleading guilty to a crime in a highly publicized case—one could be despondent, make excuses, blame others, grow bitter, or live in denial. Despite the pain his actions have caused him—the fear and anxiety, substantial legal bills, diminished career prospects, and the basic embarrassment of having one's misdeeds published in the morning paper—Will has taken none of those paths. He is candid about his experience and the lessons it taught him. Talking with him, you get the sense of a man who has had a great weight lifted from his shoulders. He realizes that, in his time on the Hill, he was constantly asked to be the kind of person he never wanted to be, a person who he truly is not. Despite the current cost, he is grateful to escape that chapter of his life. Will has completely accepted responsibility for his actions, however, and intends to make amends. For starters, he plans to give talks to other staffers about his experiences and the importance of fighting that slow drift across the line of the law. I do not know exactly what the future has in store for Will, but I am sure that he will be an honest and productive member of society, and that he has learned a lesson he will always carry with him.

Although I know Will made some very bad choices, I am still proud to call him my friend. When the news came out about Will's guilty plea, calls flooded his cell phone and messages piled up in his email account from people letting him know they were there for him. One thing that has bolstered Will over the past months is the fact that not a friend or acquaintance has given him a cold shoulder. But this says more about Will than about us. Supporting and rooting for someone with Will's character and basic goodness comes quite naturally indeed. I am not alone in hoping that the sentence Your Honor selects accounts for the full picture of Will's story and his character, and not just the crime he deeply regrets and for which he accepts complete responsibility. Thank you for consideration.

Respectfully,

Jeffrey A. Pojanowski
Bethesda, Maryland

# EXHIBIT 43

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 30, 2007

The Honorable Ellen Segal Huvelle
United States District Court
for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re: <u>United States v. William Heaton,</u> Case No. 07-042

Dear Judge Huvelle:

I met Will Heaton on my first day at William & Mary.  We were both freshmen and happened to sit next to each other during the opening convocation.  After knowing him for five minutes I could tell he was a genuine and decent person.  He was the first friend I made that day, and I still remember the relief I felt at making a friend in a strange new place.

Throughout college, Will was involved in numerous clubs and organizations.  One of these was an adult literacy program, and he spent a few hours each week year teaching a man to read during our senior year.  At the end of the school year, to thank him, Will's pupil took Will out to eat at the restaurant of his choice.  Will chose a restaurant he had heard about but had never been to that turned out to be much more expensive than he had realized.  Despite Will's objections, the man insisted on paying the whole check, and I still remember how Will felt guilty for a whole week after the incident.

Will was one of the most popular students in our class (I cannot think of anyone who disliked him), but not because he was especially charismatic or charming, or because had a larger-than-life personality.  I think so many people know and like Will because of those same qualities that I noticed on our first day at college:  His good nature and the unadorned interest he takes in other people.

I understand that Will has pled guilty to the charge of conspiracy to commit fraud.  Since our senior year in college, I see Will only about once a year, and so I know very little of the circumstances or the reasons behind his crime.  I can, however, say with confidence that he is essentially the same person now that he was in college.  I hope this letter provides you with some idea of who Will is as you make your sentencing determination.

Respectfully,

Robert Porter
Richmond, Virginia

# EXHIBIT 44

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 24, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re: <u>United States v. William Heaton</u>, Case No. 07-042

Dear Judge Huvelle:

I am writing on behalf of my friend Will Heaton, who I have known since 1996, when we were students at the College of William and Mary. I know that Will recently pled guilty to a conspiracy charge in connection with his work for Congressman Bob Ney. This news came as an absolute shock to me, as I have always known Will to be an honorable member of the community and to be a person with deeply held ethical values.

In college, Will was very involved with the Ultimate Frisbee Club and the Catholic Students Association. We also shared a concentration in Government, which led us to become engaged in many political conversations. Drawing upon his work as a page in the House of Representatives, Will exhibited a real passion for public service. From our student days, I know that he has always wanted to help people through his work.

Aside from his excellent sense of humor, what has always most impressed me about Will is his love for his family and caring for his friends and the community at large. For several years when he first moved to Washington, Will lived with his aging grandmother, both to help her around the house and because it was where he wanted to be. Every time I talked to Will, the concern, pride, and love he felt for his siblings, parents, spouse, and other family was readily apparent.

I have always known Will to be an exceptionally generous and thoughtful person. For example, the summer after I graduated from college, I participated in a bike ride to raise money for the National Multiple Sclerosis Society. Most of my friends were not able contribute, but Will sent me a $50 check. Given that none of us were working yet, it was a very generous donation.

Another example of Will's thoughtfulness occurred when he and another friend visited me at my parents' house in Massachusetts. They were on their way to Cape Cod and my mother gave them a guidebook from AAA to take on their trip. She wasn't even expecting it back, but Will mailed back the book along with a kind note saying how much it helped them.

I believe that the conduct for which Will has pled guilty was very out of character for him. For as long as I've known Will, he has endeavored to be an honorable public servant. The only explanation that makes sense to me is that Will is an exceptionally loyal person. It is unfortunate that an unethical boss took advantage of Will's extraordinary talents and character.

I respectfully ask you to be lenient in sentencing Will. He is an honest person who realizes that the practices of his former office were wrong. I believe that Will has the potential to help many more people in his life and ask you to take every aspect of his character into consideration.

Sincerely,

Aaron Rashba
San Francisco, CA

# EXHIBIT 45

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

BISHOP
McGUINNESS

Office of the Principal
July 1, 2007

The Honorable Ellen Segal Huvelle
United States District Court
  for the District of Columbia
333 Constitution Avenue
Washington, D.C.  20001


Re:  United States v. William Heaton, Case No. 07-042


Dear Judge Huvelle:

I am writing on behalf of the above-named individual who is a distinguished graduate of this high school.  I was Will's high school principal and have known him since 1992.  It is a genuine privilege to provide insights which may be helpful to the Court in its deliberations regarding sentencing.

Will is an extraordinary and extraordinarily accomplished man.  He showed early in his high school career that he possessed the grounded personality and personal character which drew others to him as a leader.  His intellectual gifts, his selfless regard for the well-being of all those he comes in contact, and his personal drive and dedication to excellence are characteristics which all who know him have come to recognize very shortly after meeting him.

I knew Will as an accomplished scholar and as a young man who had a passionate interest in the worlds of political science and public service.  I have known him as a grown man not to have lost his passionate interest or idealism.  Will became involved in student leadership activity early in high school and rose through the ranks of one of our finest and most competitive co-curricular organizations, the Harvard Model Congress program, to the position of president.  In this position, he was responsible for directing others toward the attainment of goals reflecting a commitment to excellence.  He was extraordinarily successful in that effort, and it, as well as the exceptional instruction he received here in history and politics prepared him well for a distinguished record at William and Mary College.

Will is known in this school community and in the community-at-large for a sterling record of achievement and peerless character.  He has been and remains still an individual to whom others look for example and guidance.   He is considered one of this high school's truly extraordinary graduates, and we have followed his career closely.

The unfortunate circumstances in which he has found himself before the Court are, I believe, a small portion of the picture of his accomplishments.  I have known and continue to know him as

Re: William Heaton
July 1, 2007
Page 2

a man of honor and integrity, and I believe his record of cooperation with the law in the current affair is a natural complement to the integrity he has always shown.  I know that he has suffered greatly but with great dignity the difficulties of the situation in which he finds himself – not only its impact on his personal well-being but also on that of his family.  And I know that he is willing to accept the consequences deemed appropriate.

I should be happy to provide additional insights if so requested.

Respectfully,

George L. Repass
Principal


Bishop McGuinness Catholic High School
Kernersville, North Carolina

# EXHIBIT 46

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 26, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re: United States v. William Heaton, Case No. 07-042

Dear Judge Huvelle:

I am writing to you on behalf of Will Heaton. Unfortunately I am writing under less than perfect circumstances to tell you about Will: I know Will has pled guilty to a criminal charge and is awaiting sentencing. Further, I specifically know that Will has pled guilty to one charge of conspiracy to commit honest services fraud in connection with his work in Congressman Ney's office. I also know, and entirely support, the fact that Will has been cooperating fully with the government since long before he pled guilty to this charge.

I have known Will since we were Congressional Pages together in Washington, DC during our junior year of high school (the 1994-1995 school year). Will was a yearlong Page, and I was a spring semester Page. He was one of the first people I met upon arriving in Washington, DC to begin my tenure serving Congress. Ours was a privileged and unparalleled experience, which Will (and I) fully appreciated even at the age of 17. Will and I shared, and still share, different political, social, and personal views on many topics, and maybe because of this, we engaged in several interesting and often heated discussions, which were important growing opportunities. Though we often didn't, and still do not, share the same points of view on many topics, he has always been respectful and supportive of my viewpoints and interests. This is one of the things I most respect about Will.

Even though our college and career paths evolved in different directions, I always felt I could count on Will to be compassionate and supportive. His good nature - and his steadfast support of friends · is some of what I most admire about him. I'll never forget a friend's wedding a couple of years ago when Will, myself, and other Pages sat together catching up on the previous year of our lives. The enthusiasm and earnestness he displayed for his work was heartfelt and sincere, as was his interest in our work and our lives.

Whenever I saw Will during my visits to Washington, DC, he always seemed to be hard at work (either in the office or en route to something work-related). He was passionate about what he was doing and enamored of the work of Congress.

Therefore, I was completely shocked when I read about Will's guilty plea and involvement in this case. None of my interactions with Will over the 12 years I have

known him would have ever led me to believe he was capable of being part of a crime of this nature. It seems completely out of character.

I spoke with Will shortly after learning of his guilty plea and this allowed me to understand: 1) he takes full responsibility for his actions; 2) he is distraught over his actions; and 3) he is repentant for the actions of which he was a part. We talked for a long time that day, and what I also came to understand was how much he desires to help others learn from his mistakes. I think this outreach is extremely important, and I hope he is able to continue on with this work as I believe there is a serious need for it.

Please do not hesitate to call on me for any further information.


Respectfully submitted,

*Lindsay Rosenfeld*

Lindsay Rosenfeld
Boston, MA

# EXHIBIT 47

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 5, 2007

The Honorable Ellen Segal Huvelle
United States District Court
 for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re:    United States v. William Heaton, Case No. 07-042

Dear Judge Huvelle:

I write to you on behalf of William Heaton, a fine young man whom I have known for twelve years. I am aware that Will has pled guilty to a criminal charge and that he awaits sentencing. I am not surprised that Will has been cooperating fully with the government in regards to allowing this case to progress as smoothly as possible, for Will has always been extremely cooperative, which in this circumstance is both a blessing and a curse.

I have been the Republican Page Supervisor of the Congressional Page Program for the past twenty years. I have been in charge of over 5,000 high school juniors, and can honestly say that of these many, Will was one of my finest. As a page, Will exemplified all of the moral characteristics and positive qualities that one hopes to find embodied in the federal government, but certainly does not expect to find in one so young. He was at sixteen, and has remained throughout the years, a mature, compassionate, responsible young man who has worked hard to meet and indeed surpass the expectations of myself and all of his supervisors. Will fulfilled his job as a page efficiently and impressively, taking actions to ensure that he did not disappoint those whose opinions he held in high regard. It is my belief that Will became caught up in the situation at hand, and that any misdeed he committed was a result of his hesitancy to be uncooperative with one whose authority he respected. I call to mind the fact that Will became the youngest Chief of Staff on the Hill only after first turning down the position, then reconsidering and accepting the job at the persistent bidding of his Member, former Congressman Bob Ney.

I would like to provide the following anecdote as merely one example of Will's good character. On an occasion when I was out to dinner with my colleagues, Will

among them, there was a discrepancy in the distribution of the split check to our Debit cards, resulting in the entire total being charged to my card. Although I told Will not to worry about it, he took it upon himself to return to the restaurant and deal with the problem himself. As a result, I saved a vast amount of money due to Will's honesty and kindness.

Will always worked hard in order to please, which has been for him both a virtue and a vice. I have spoken to Will and he feels much remorse. He knows now that when he is in a situation of questionable moral value that he should state his position, firmly in the negative, or remove himself from the situation. Will Heaton is a good kid with a good heart. He is young and was recently married a few years ago. His life is just beginning. I would ask that you would please be lenient in Will's sentencing, for any involvement he may have had as this chaos was spurious and contrary to his nature and character, which are of the highest caliber. Having talked with Will, I am very sure that he considers this a very hard lesson learned.

Respectfully,

Peggy C. Sampson

McLean, VA

# EXHIBIT 48

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 21, 2007

The Honorable Ellen Segal Huvelle
United States District Court
    For the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001


Re:    <u>United States v. William Heaton</u>, Case No. 07-042


Dear Judge Huvelle:

I am writing on behalf of Will Heaton with regards to his sentencing. I know that Will pled guilty to one charge of conspiracy to commit honest services fraud. I hope that this letter will help you better know Will outside of this guilty plea.

I have known Will for almost 8 years. First, we were coworkers in the Office of Speaker Hastert. Will had a job in the floor office, and I was the secretary for the director of that office, so we worked together frequently. We quickly developed a strong friendship because we had many things in common.

Will and I share a love of the outdoors. I taught him to fly-fish, we went hiking together, and we kept each other sane in this city life. But on a deeper level, Will and I are very much the same person: we value the same things in life – family, true friendships, loyalty, faith, and trust. Having those core values in common made our friendship easy and carefree.

Will was always the person I talked to about "the big things." Of course, I had my girlfriends to talk about dating and gossip, but when the rubber hit the road, I always wanted Will's opinion. When I wanted to quit my safe job in Washington, move to rural Wyoming, and learn construction from the lone carpenter finishing a log cabin, Will was encouraging, supportive, and realistic, all at the same time. In the end, moving to Wyoming was the right decision for me, and Will was the only person who believed in me and stood by me when all others thought I was crazy.

Will visited me twice in Wyoming, both times when my parents were also there. When I told my parents about Will's guilty plea, they were shocked into silence. Then my mom said "please send me his address, I want to write him a letter." They had the same reaction as I did. It is unbelievable to all of us that Will did these things. My parents only knew him for a cumulative 3 weeks, but to them, he was the kind young man who stayed behind on hikes with my mom while my dad and I forged ahead; he was the patient passenger in the rowboat when I was fishing; and he was the guest who fit like a glove into our tight-knit family.

When Will went to work for Mr. Ney, my old boss called me in Wyoming and offered me Will's job in the Speaker's floor office. I jumped at the chance to work on the House Floor, and I returned to Washington. Will and I were both busy with work, but we continued our close friendship for awhile. I feel it is important for me to spell out the

progression of our friendship during the past 4 years, because I think it shows how his employment with Mr. Ney distorted his whole life.

As I'm sure you know, shortly after joining Ney's staff, Will was promoted to Chief of Staff. It was around this time that my friendship with Will started to trail off. He was always either busy with work or busy going out with Ney and others. Similarly, Will was absent from many of our usual group activities, like birthday lunches with the House Parliamentarian's office. I was saddened that he seemed to be losing touch with many of the people who were our mentors, but it is only in hindsight that I see this as an example of Will losing contact with the people who were grounded in his life. He had quickly become immersed in Ney's office and culture, and once he was surrounded by people making poor decisions, he lost his moorings.

When the Abramoff scandal broke, I didn't even think of Will. It was unfathomable to me that he would be even remotely involved in something like this. But as the newspapers uncovered more and more of Ney's involvement, I started to worry about Will. At that same time, he was almost completely incommunicado with our previous group of friends. None of us knew what was happening.

Shortly after Will's plea, I reached out to him and we had lunch. It was then that I learned of his long cooperation with the investigation and that he had been avoiding contact with me and others due to the situation. I hadn't physically seen my friend Will in months, and it looked as if he had aged years. I kept thinking of his mother, the woman who has "GD4MENU" ("God for me and you") as her license plate. I could tell that this ordeal has weighed heavily on him and his family.

Surprisingly, the best part about my recent lunch with Will was the talk of his future. He admitted that he doesn't know what this sentencing will bring, but he knows he must accept it, and he and his wife Katie are at peace with that. But he asked me to help him brainstorm what he can do to prevent this from happening to other young staffers in the future. I thought that this was an extraordinary thing for a young man in his position to want to do. Most people I know would try to find a town – definitely not Washington, DC – where nobody has heard of Jack Abramoff or Bob Ney, where someone could go live in anonymity and start over. Not Will Heaton. Will wants to speak to groups of young staff on Capitol Hill about what he did – both right and wrong – and what he wishes he had known. For instance, Will said that there were many times when he was uncomfortable, but he was scared to ask anyone outside of the Ney office for guidance. He wishes he had known about the House's employee services office, where he could have gone for help, and he wants to begin an educational program for others.

Your Honor, I hope that this letter has helped you to see my friend Will from a different angle. His actions as Chief of Staff for Mr. Ney were completely out of character. I respectfully request that you take this into consideration during your sentencing deliberations.

Sincerely,

Emily R. Seidel
Springfield, Virginia

# EXHIBIT 49

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

June 11, 2007


The Honorable Ellen Segal Huvelle
United States District Court
for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001


      Re:   *United States v. William Heaton*, Case No. 07-042

Dear Judge Huvelle:

      I write this letter as a friend of Will Heaton, whose above-cited case will enter the sentencing phase in August of this year. I am aware that Will has pled guilty to one count of conspiracy to commit honest services fraud, and would like to take this opportunity, before Will is sentenced, to lend my knowledge and opinion of Will to you.

      I met will during our freshman year of college, in the fall of 1996. Since that time, Will and I have been close friends, and during some of the past 11 years we were roommates and teammates. In all of these circumstances Will proved first-rate. As a friend, Will never let me down and was always ready to help in difficult situations. As a teammate, Will always worked the hardest to bring victory to everyone, but was modest of his own abilities and never blamed defeats on those less gifted. As a roommate, Will was the kind of person with whom one could live without any complaints, as rare praise as I can conceive. He even voluntarily slept on the couch so that our dorm room would be more spacious and comfortable. I now live across the country from Will, but, largely through his efforts, we stay in touch and I continue to consider him one of my closest friends.

      I cannot enumerate here all of the ways that Will inconvenienced himself to help, or simply to bring a smile to the face of, a friend. One Saturday morning, for no particular reason, Will woke up early and baked beignets for us, his roommates and friends. Beignet baking is not an easy process, and there was no clear reward for Will in doing it other than to please us; in fact, I'm not sure he ate any himself. Will was also there to help in more serious times, as when a friend we had in common was suffering from depression and he did more than anyone to help her through her darkest days, or when a teammate of his broke a leg in practice and needed not only quick thinking to get an ambulance on the field as soon as possible but also someone to reassure him that he would heal and play again. But it was not only his college friends who benefited from Will's generosity of spirit; he also volunteered as a tutor for the local adult literacy program, not only helping his students, but inspiring and befriending them as well. And only complications surrounding a medical condition kept Will from entering the Peace Corps after college.

Indeed, it is somewhat hard to believe that this selfless person would involve himself in a scheme to defraud anyone, but there are explanations for this as well. While he is certainly intelligent enough to be responsible for his own actions, and I believe he agrees that he should be held responsible, hence his decision to enter into a plea agreement, Will certainly suffered from the leadership, or lack thereof, of Congressman Ney. I believe that a culture of loyalty, which overemphasizes that virtue to the detriment of more fundamental ethics, currently pervades the highest levels of public office and that Will was a victim of this culture.

As a high school student, Will served as a page at the Capitol and from that early age nurtured an undeserved reverence for the country's leaders. In college, Will's appreciation of and focus on the federal government and national politics was clear not only from the courses he took but also from the books he read at leisure. After college, Will quickly returned to D.C. to work on the Hill and his responsibilities quickly grew until he became the youngest congressional Chief of Staff in years. But while his intellect and work ethic brought Will success quickly, they denied him the chance to mature in his role as a servant to our country. He served as a top aide to a very powerful politician, but he reached that post without ever losing his naïve faith in the authority of such leaders. So while on a purely intellectual level he knew his actions were wrong, I believe that on some deeper level he thought that failing to follow where Mr. Ney led would be an even graver sin. And while this does not exculpate Will, it may explain how a truly good person could make the wrong choices, and such explanation argues, in this case, for clemency.

In his current circumstances, Will is frustrated and anxious about his future, but most of all, he is disappointed in himself. He knows he has failed in his attempt to improve our government and our country, and I believe he wants nothing more than an opportunity to redeem himself through the hard work that has characterized his adult life. While he understandably has no desire to return to Capitol Hill, Will still wants to make a difference in the world, and I know he can do so, if given the opportunity. Thus we would all benefit from Will's being allowed to move on with his life and pursue his noble goals as soon as possible.

Sincerely yours,

Peter B. Sinclair
San Diego, California

# EXHIBIT 50

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

Michael Streich
105 A Westgate Circle
Winston Salem, NC 27106

March 17, 2007

The Honorable Ellen Segal Huvelle
District Court Judge
United States District Court
Washington, DC 20001

Madam:

I write you in regard to William Heaton, who appeared in your court to enter a guilty plea concerning the on-going lobbyist scandal. I have not been asked to write this letter by any party and do so of my own accord, having read newspaper stories of this case. I obtained your name and address from internet sources.

My letter seeks to paint a picture of Will Heaton that may be different from the court documents. Although I have not spoken to Will since December of 2002, I believe I can offer a picture of a very zealous young man who, in my opinion, was utterly seduced by his supervisor, Bob Ney.

I was Will's high school teacher, his confirmation sponsor, and his friend. I knew Will was highly motivated from the first time I met him. As a sophomore, he was part of our high school delegation to Harvard University's "Model Congress." At the conclusion of that four-day event, Will was honored with a coveted award of excellence. His junior year was spent in D.C. as a Congressional page. We wrote to each other throughout that time. When he returned as a senior, his peers elected him Student Council President. He was a member of our National Honor Society.

Will was one of the most moral young men I have known. Although it might sound trite, while his friends order meat pizza during Lent, Will refused. They called him "Mr. Jesus." Will was a leader who truly led by personal example. Will's family was very strict but very loving. They attended church together every Sunday. I always saw the Heaton's as a "model" family. They exemplified what a living Christian lifestyle is really

all about.

Will went off to the College of William and Mary and we kept up our contact. On his visits home, he would stop by and we would talk late into the night on all kinds of topics from history to theology and politics. I always loaded him up with books; Will was a voracious reader. One on- line blog refers to Will as a "straight arrow" and that comment is correct. The Will I know was always this way. During his senior year, I invited him to join me on a Thanksgiving trip to Scotland, sponsored by EF Educational Tours. I was attending an educator's conference and I felt the experience would help round out Will's education.

When he began working in Washington I was thrilled. We wrote and emailed. Will was always helpful. I recall that when I was asked to coach our school cross country team (after much arm twisting since I knew absolutely nothing about running and my own obesity wasn't much of an incentive to the team) Will brought by his old "Runner" magazines and gave me pointers on what to do. On two occasions, during his college years, Will flew to Boston in February to help me moderate and advise our student team attending the Harvard Model Congress.

Will was a genuine kid. He never put on a different persona to throw me - or any other adult - off the track.

In January 2002 I arranged with Will to bring my then Harvard Model Congress team to D.C. so that they could meet with some of the members of Congress that they would be portraying at the competition. A week before we were to depart, I suffered a heart attack. Will came to visit me that Easter to see how I was doing. By then he had been about six months on the job as Chief of Staff for Bob Ney. He related the details of a recent trip he had taken with the congressman to Japan. They were treated as first class and the entire experience had made a deep impression on Will. His eyes were aglow as he shared the details of the trip. But I also noticed a certain allure to the power that Will perceived.

I last spoke to him December of 2002 when he very kindly helped me to place one of our seniors in Ney's office for a one week internship in January 2003. Our school facilitates a shadow program for seniors called "Winterim." That senior, Brian Sopp, came back from the experience

completely excited. And he was completely taken by Will, the "youngest chief of staff" who was in the thick of government. Brian's impression of Bob Ney was equally positive. This was just after Ney asked the Capital cafeteria to change the name of "French Fries" to "Freedom Fries." For young conservatives, that kind of thing was dynamite.

I am convinced of two things. Firstly, Will Heaton went to Washington to make a positive difference. He had passion and he had a vision. He was religious in that he lived out his faith. That was always a part of his vision and his make up. Secondly, he was slowly, perhaps even subtly, seduced by Bob Ney and the corridors of power. Was there a point in which he began to question? I don't know. From everything I have read, Mr. Ney was a corrupting and autocratic boss who fully knew how to coerce his staff. He was a master of exploitation and manipulation. Does this mean that Will should walk away without any punishment? Probably not. But these facts should be taken into consideration.

Perhaps, rather than jail time, Will should be ordered to devote several years of his life to the common good: teaching in an inner city school or working with the poor. Before he went to D.C., Will wanted to work with the Peace Corps but his blood disorder prohibited him from doing this.

I am not asking that Will be absolved from his responsibilities. As a teacher, I loathe the trend of students - and parents, failing to take responsibility for their actions and instead assessing blame. I start my classes every day with prayer or a reading of Scripture. In coaching my Harvard Model Congress kids I highlight integrity. If any of my students should seek public service, I want them to be as honest as the day is long.

So many young men and women travel to Washington full of promise and vision. They want to change the world for the better. Several years ago an NPR radio story highlighted these young idealists stating that they loved their work so much that they practically lived on Capital Hill and had to be told to go home and get some rest. Too often they work for men and women in powerful positions who themselves have forgotten how it all started. And they corrupt these young people, either deliberately or by example. I firmly believe that is what happened to Will Heaton.

For over ten years I taught a law class. One of the lessons I imparted to

my students was that our legal system must act in justice as well as mercy. While there are those who seek to place the Ten Commandments in every court room, there is, perhaps, a better list to post: the Beatitudes.

Thank you very much for taking the time to read my letter.

Sincerely yours,

Michael Streich
Chairman, History Department
Bishop McGuinness Catholic High School

# EXHIBIT 51

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

The Honorable Ellen Segal Huvelle
United States District Court
 For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

RE: United States v. William Heaton, Case No. 07-042

Dear Judge Huvelle:

It is my understanding that Will Heaton has agreed to plead guilty in relation to the
government's prosecution of Will in relation to his work with Congressman Bob Ney. I
wanted to express my thoughts relative to Will's character and the terrible judgment he
showed in relation to this entire situation.

First, it is important for you to know that I worked for 23 years on Capitol Hill until my
retirement in the Fall of 2005. During my last seven years, I was the Clerk of the House
and was the highest constitutional official after the Speaker and witnessed many things –
both good and bad – throughout my service. Unfortunately, I never realized how
Congressman Ney was influencing others or the crimes he was committing.

I have known Will since he came to Capitol Hill as a page. He's an outstanding, honest
and very thoughtful person. He showed terrible judgment in allowing others
(Congressman Ney) to influence his values and decisions. I know that he regrets what
has happened and takes full responsibility for his role and the decisions he made.

I am asking you to be aware of the terrible impact this situation has had on many people,
including Will and his family. He is a young man with many productive years ahead.
And, I know that he needs to fulfill whatever punishment is rendered and then move
forward.

I am asking that you be thoughtful in judging him. I can only imagine how difficult it is
to judge others you don't know and that you get many requests to be lenient. I just want
you to know the person I know.

Thank you for your service and all the time you have given this case.

Sincerely,

Jeff Trandahl
Washington, D.C.

# EXHIBIT 52

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

July 2, 2007

The Honorable Ellen Segal Huvelle
United States District Court for
 the District of Columbia
333 Constitution Avenue, NW
Washington, D.C.  20001

Re: United States v. Will Heaton, Case No. 07-042

Dear Judge Huvelle:

I would have never thought I would see the above caption.

I have known Will Heaton for 8 years.  I was responsible for overseeing the floor operations of the U.S. House of Representatives on behalf of Speaker Hastert.  Will was a member of our floor staff in the early years of the Hastert Speakership.

Will was a former House page.  He had a keen interest in the House and a deep respect for the institution.  That is why the Speaker's office hired him.  He didn't disappoint me while he worked for us.

He left our office when Congressman Bob Ney hired him.  Will quickly moved up the ranks of that office and became the youngest chief of staff on the Hill.  Will unfortunately worked for a man who became publicly known as manipulative and a corrupt individual.  Although I did not have much contact with Will during those years, as the scandal around Congressman Ney grew, I became worried about Will and whatever involvement he may have had.

He did disappoint me and far more importantly, he disappointed himself, his wife and his family.  I have had long talks with Will since he left the Hill and began cooperating with investigators.  Will acknowledges his mistakes, understands how he got there, and has shown true remorse.  He blames no one but himself.

Will was a young staff person, on a fast track, and working for the new chairman of the Committee on House Administration.  Will realizes he lacked the experience to confront the Congressman about his behavior and allowed himself to become enmeshed in something he knew to be wrong.  At some point it seems Will lost his moral compass, probably in part because of loyalty and in part because he became consumed in the moment and with his boss.  I think the painful lessons of this experience has taught him the need to stand for one's convictions no matter the circumstances.

I was the former chief counsel and staff director for the House Committee on Standards of Official Conduct (Ethics Committee).  Will has expressed his desire to me to be part of the ethics training for House staff.

The message he would like to convey is that everything one does matters.  One cannot be ethical part of the time and think no one is watching or cares at other times.  If one gets corrupted seemingly just a little bit, one is corrupted and the rest becomes easy.  If anyone ever should ever feel like cheating, even just a little, they should think of him and the how it has cost him.  Nothing is worth the risk of  losing your reputation.

I think that would be a very valuable life lesson for every staff person to hear -- from the most seasoned veteran to the newly arrived staff assistant.  I have passed along Will's willingness to be part of the new mandatory staff training that the House instituted this year.

Will at his core is an honest and decent person.  He is surrounded by a loving wife and family and very supportive friends.  I have seen a much more mature and stronger individual emerge from this experience.  I have heard him acknowledge his mistakes and am convinced it should not happen again.  I've also seen a relieved Will -- one free from the agony of living with himself knowing he did wrong.

You have before you a fine young man who knows and acknowledges that he has done wrong.   The truth has set him free and that is a lesson for all citizens.

Sincerely,

Theodore J. Van Der Meid

# EXHIBIT 53

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

July 7, 2007

The Honorable Ellen Segal Huvelle
United States District Court
  for the District of Columbia
333 Constitution ave., NW
Washington, DC 20001

Re: <u>United States v. William Heaton, Case No. 07-042</u>

Dear Judge Huvelle:

I am aware that Mr. William Heaton has plead guilty to one charge of conspiracy to commit honest services fraud in connection with his work in Congressman Ney's office, and is currently awaiting sentencing.

I have known Will since 1997 when we met during our sophomore year of college at William and Mary. I firmly believe that the state of conduct for which Will has plead guilty is fundamentally out of character, for Will is a person of integrity and morals who has made significant contributions and sacrifices for his friends, family, and community.

Throughout college, I spent many afternoons and late nights studying and talking with Will. As we discussed the issues of friendship, relationships, family, passionate adventures, and our futures, Will's thoughts and comments were always enshrouded in goodness. Will's actions are with the best of intentions for the people in his life as his friends, family, and community have always been a top priority.

I recall one occasion, during our junior year of college, when some mutual friends decided to throw a dorm party. It was understood that underage drinking was likely to occur and therefore the party hosts decided not to "register" the party as was required for dorm parties at William and Mary. Out of respect for the student honor code, Will decided not to attend the party with his friends because he believed it presented opportunities that were in violation of the student code the college is built on.

I've always believed that a good judge of someone's character is through the friendships they keep. I'm sure that over the course of the past year, you have seen that Will has numerous friendships of genuine quality in his life. I believe one of the reasons why Will has so many people in his life is because he is a loyal friend and he gives all he can to maintain and give to the people he cares about. Perhaps Will's greatest weakness is that he is loyal to a fault.

Will has an adventurous, spirited, thoughtful, and positive outlook on life.  Our society needs more people like Will making active contributions toward the betterment of society.  It is with great sincerity that I ask you to be lenient in Will's sentencing as it will be a detriment to the community to lose someone of Will's stature and goodness.

Respectfully,

Dana Waesche
San Francisco, CA

# EXHIBIT 54

*United States v. William J. Heaton*
**Case No. 07-CR-42 (ESH)**

# Privately Funded Trips Add Up on Capitol Hill

## Report: $50 Million Spent in 2000-2005

By JEFFREY H. BIRNBAUM
Washington Post Staff Writer

Over 5½ years, Republican and Democratic lawmakers accepted nearly $50 million in trips, often to resorts and exclusive locales, from corporations and groups seeking legislative favors, according to the most comprehensive study to date on the subject of congressional travel.

From January 2000 through June 2005, House and Senate members and their aides were away from Washington for more than 81,000 days — a combined 222 years — on at least 23,000 trips, according to the report, issued yesterday by the nonpartisan Center for Public Integrity. About 2,300 of the trips cost $5,000 or more, at least 500 cost $10,000 or more, and 16 cost $25,000 or more.

"While some of these trips might qualify as legitimate fact-finding missions," the study said, "the purpose of others is less clear." In addition, the lawmakers' financial reports that disclose the details of the trips are routinely riddled with mistakes and omissions.

Lawmakers and their staffers were treated to $25,000 corporate-jet rides and $500-a-night hotel rooms, the study showed. Lawmak-

## Frequent Fliers

House offices (legislator and staff) that took **more than $350,000 in privately funded travel** between January 2000 and June 2005.

- Joe Barton (R-Tex.)
- Roy Blunt (R-Mo.)
- John A. Boehner (R-Ohio)
- Tom DeLay (R-Tex.)
- J. Dennis Hastert (R-Ill.)
- Gregory Meeks (D-N.Y.)
- Michael G. Oxley (R-Ohio)
- W.J. "Billy" Tauzin (R-La.)*
- Bill Thomas (R-Calif.)
- Robert Wexler (D-Fla.)
- Don Young (R-Alaska)

* No longer in office.

SOURCE: Center for Public Integrity

ers accepted thousands of costly jaunts — one worth more than $30,000 — to some of the world's choicest destinations: at least 200 trips to Paris, 150 to Hawaii and 140 to Italy.

"Congressional travelers gave speeches in Scotland, attended

See TRIPS, A4, Col. 1

# Study Details Congressional Travel

TRIPS, *From A1*

meetings in Australia and toured nuclear facilities in Spain," the study reported. "They pondered welfare reform in Scottsdale, Ariz., and the future of Social Security at a Colorado ski resort."

Many congressional offices have voluntarily curtailed their privately funded travel since disgraced lobbyist Jack Abramoff pleaded guilty in January to conspiring to bribe public officials, in part with lavish overseas trips. But lawmakers and their aides still may accept travel for official purposes from private interests without limit.

House Speaker J. Dennis Hastert (R-Ill.) proposed banning such travel soon after Abramoff's plea. But lawmakers of both parties and in both chambers of Congress quickly resisted imposing significant new restrictions on the trips, which are a much-prized perk of office. Rep. John A. Boehner (R-Ohio) won election to the post of House majority leader this year by running on a platform that included opposing the travel ban.

Boehner and members of his office were among the top beneficiaries of privately funded travel, according to the study, taking more than 200 trips during the 5½-year period reviewed. Others included the offices of Rep. Joe Barton (R-Tex.), Majority Whip Roy Blunt (R-Mo.), Rep. Michael G. Oxley (R-Ohio), Rep. Gregory Meeks (D-N.Y.) and Rep. Robert Wexler (D-Fla.).

Kevin Madden, a spokesman for Boehner, said yesterday that privately funded travel by members of Congress is fully disclosed and "leads to greater understanding of the issues" at no cost to taxpayers.

One of the largest corporate sponsors of lawmakers' travel was General Atomics, a relatively small San Diego-based defense contractor that makes the Predator, an unmanned spy plane now in wide use by the United States and other countries. The study reported that the company "largely targeted congressional staff members, spending roughly $660,000 on 86 trips for legislators, aides and their spouses from 2000 to mid-2005." Some of the trips were valued at more than $25,000.

**washingtonpost.com**

For today's House and Senate schedules, go to www.washingtonpost .com/congress

General Atomics' spending on congressional travel was more than that of many larger companies and was considerably higher than what other defense contractors spent. Microsoft, for instance, funded nearly $395,000 in trips during the period; SBC Communications Inc. spent about $205,000. Among General Atomics' defense competitors, Northrop Grumman spent about $12,000 on congressional junkets and Boeing spent about $13,000.

On trips paid for by General Atomics to Turkey and Australia, congressional staffers attended meetings with foreign government officials that the company was soliciting to buy the Predator.

"[It's] useful and very helpful, in fact, when you go down and talk to the government officials, to have congressional people go along and discuss the capabilities of [the plane] with them," Tom Cassidy, chief executive of General Atomics Aeronautical Systems, the company's aircraft-manufacturing subsidiary, told the center.

The center's study illustrates how widespread the practice has become, for both Democrats and Republicans. Of the 25 individual lawmakers who accepted more than $120,000 worth of travel during the period, 17 were Democrats. Of the two dozen congressional offices on which private trip sponsors spent the most money, 15 were Republican, the study said.

At least 150 of the disclosure forms scrutinized by the center did not list a sponsor. After the center contacted her, Rep. Katherine Harris (R-Fla.), a candidate for Senate, amended her 2003 form to fill in the name of the group that paid for her two-day visit in November to the Breakers in Palm Beach, Fla. — the Center for the Study of Popular Culture. A spokesman for Harris called the omission "a staff error."

After he was contacted by the Center for Public Integrity, Rep.

Charles B. Rangel (D-N.Y.) reimbursed the Cuban government and John A. Catsimatidis, a grocery store owner, $1,922 for expenses incurred by his son, Steven, during a trip that Rangel, his wife and his son took to Cuba to study the ecology there in 2002. House rules permit sponsors of lawmakers' trips to cover the cost of only one accompanying relative. A Rangel spokesman said the office had not been aware of the rule.

The House had more frequent fliers than did the Senate during the period. The 10 congressional offices that accepted more than 200 privately sponsored trips each were all in the House, as were the 11 offices that had travel expenses exceeding $350,000 each. The 10 most expensive trips were taken by members of the House or, in one instance, a House aide.

The study, which took nine months to complete, found many instances in which, the center said, "trip sponsors appeared to be buying access to elected officials or their advisers." Several of the sponsoring organizations defended their trips, saying they provide lawmakers with an opportunity to discuss issues in a relaxed setting.

"If you try to talk to a member for any great length of time about your issues while they're in Washington, they're simply too busy," Tom White, a spokesman for the Association of American Railroads, told the center.

The center's study was co-sponsored by American Public Media and Northwestern University's Medill News Service.



Summer Sl

**S A**

Cl

S

—

DRA

# Costliest Itineraries

*Lawmakers and their staffs can accept free travel from corporations and interest groups for official purposes but are required to disclose the sponsor and cost of the trip.*

**Most expensive privately sponsored trips, 2000-2005**

| Traveler | Destination | Sponsor | Reported cost |
|---|---|---|---|
| *Rep. Thomas J. Bliley Jr. (R-Va.) | London | Brown & Williamson Tobacco | $31,171 |
| Rep. Robert Wexler (D-Fla.) | Kazakhstan | Jewish Congress of Kazakhstan | $29,951 |
| Rep. A.B. "Ben" Chandler (D-Ky.) | Australia | Australian government, American Australian Assn. | $29,177 |
| Robert Cochran** | Australia | General Atomics | $28,446 |
| Rep. Mike Ross (D-Ark.) | Australia | Australian government, American Australian Assn. | $28,236 |
| Rep. Tom DeLay (R-Tex.) | Great Britain | National Center for Public Policy Research | $28,106 |
| Rep. Mark E. Souder (R-Ind.) | Germany | International Management and Development Inst. | $28,100 |
| Rep. Tom DeLay (R-Tex.) | South Korea | Korea-U.S. Exchange Council | $28,000 |
| Rep. Bill Thomas (R-Calif.) | Beaver Creek, Colo. | American Enterprise Institute, Vail Valley Foundation | $27,962 |
| Rep. Ileana Ros-Lehtinen (R-Fla.) | Israel, South Korea | Korea-U.S. Exchange Council | $27,960 |

DIST!
HOME ED!

Prices may in areas outs
Washington.

# The Washington Post

TUESDAY, JUNE 6, 2006